Jim Walden (pro hac vice to be filed), jwalden@wmhlaw.com
Avni P. Patel (pro hac vice to be filed), apatel@wmhlaw.com
Deanna Paul (pro hac vice to be filed), dpaul@wmhlaw.com
Peter A. Devlin (pro hac vice to be filed), pdevlin@wmhlaw.com
Catherine Weiss (pro hac vice to be filed), cweiss@wmhlaw.com
Walden Macht & Haran LLP
250 Vesey Street
New York, NY 10281
(212) 225-2030

Marc Van Der Hout (SBN 80778), mv@vblaw.com
Johnny Sinodis (SBN 290402), jsin@vblaw.com
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco, CA 94108
(415) 821-8820

Andrea J. Prasow (pro hac vice to be filed), andrea@thefreedomi.org
The Freedom Initiative
1101 New York Avenue, NW, Suite 1000
Washington, DC 20005
(917) 842-5109

Attorneys for Plaintiff Areej Al-Sadhan

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AREEJ AL-SADHAN, and ABDULRAHMAN AL-SADHAN, an Incompetent, by his Sister and Next Friend AREEJ AL-SADHAN,<br><br>        Plaintiffs,<br><br>-against-<br><br>TWITTER, INC., KINGDOM OF SAUDI ARABIA, SAUD AL-QAHTANI, AHMAD ABOUAMMO, ALI ALZABARAH, AHMED ALMUTAIRI a/k/a AHMED ALJBREEN, BADER AL-ASAKER, SAUDI ARABIAN CULTURAL MISSION, and JOHN DOES 1-10.<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF UNDER THE CIVIL RACKETEERING INFLUENCED ACT AND ALIEN TORT STATUTE**<br><br>**DEMAND FOR JURY TRIAL** |

**"[Transnational repression] is most often portrayed as a feature of America's enemies, even as authoritarian allies of the United States have become increasingly emboldened in their efforts to curtail rights and freedoms abroad."**

- The Freedom Initiative, In the Shadows of Authoritarianism, Egyptian and Saudi Transnational Repression in the U.S. (2023).

**"Twitter gave my brother's identifying information to the government of Saudi Arabia, which blatantly violates its terms and conditions.  This puts every Twitter user at risk.  As a result, Saudi Arabia kidnapped, tortured, imprisoned, and—through a sham trial—sentenced my brother to 20 years in prison, simply for criticizing Saudi repression on his Twitter account.  The Saudi government has since denied him contact with his family or access to his attorney.  I am not sure if he is alive.  After I began to speak out against Saudi repression, my life became a living hell."**

- Plaintiff Areej Al-Sadhan Affidavit, Exhibit 1.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 3

THE PARTIES .................................................................................................................... 6

  A.  Plaintiffs ................................................................................................................... 6

  B.  Members of the Saudi Criminal Enterprise ............................................................. 8

JURISDICTION AND VENUE ......................................................................................... 13

DIVISIONAL ASSIGNMENT .......................................................................................... 13

FACTUAL ALLEGATIONS .............................................................................................. 13

  A.  Background:  Defendant Twitter and the Arab Spring ........................................... 13

  B.  The Pattern of Racketeering Activity .................................................................... 15

    1.  Racketeering Acts 1 to 30,892:  The Saudi Criminal Enterprise Accessed Confidential Identifying Data from Defendant Twitter. ................................ 17

    2.  Racketeering Acts 30,893 to 30,895: The Saudi Criminal Enterprise Kidnapped, Tortured, and Conspired to Kill Plaintiff Abdulrahman. ............................... 23

    3.  Racketeering Acts 30,896 to 30,898: Conspiracy to Kidnap, Torture, and Kill Omar Abdulaziz and Other Exposed Twitter Users. ............................................... 26

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____          1
COMPLAINT – DEMAND FOR JURY TRIAL

4.  Racketeering Acts 30,899 to 30,905 and Continuing: The Saudi Criminal Enterprise Stamped Out Other Dissenting Voices in the United States and Abroad Through Criminal Activity. ............................................................................... 27

    a.  Racketeering Acts 30,899 to 30,901: Kidnapping, Torturing, and Killing Jamal Khashoggi. ........................................................................... 28

    b.  Racketeering Acts 30,902 to 30,904: Conspiracy to Kidnap, Torture, and Kill Saad Aljabri. ................................................................................ 28

    c.  Racketeering Act 30,905: Kidnapping Saad Almadi. ............................... 29

C.  Racketeering Acts 30,906 to 30,908: The Saudi Criminal Enterprise Stalks, Threatens, Terrorizes, and Conspires to Kidnap, Torture, and Kill Plaintiff Areej. ......... 30

    1.  The Saudi Criminal Enterprise Stalks and Threatens to "Throw Away" Plaintiff Areej Like Her Brother After She Speaks Out. ................................. 30

    2.  The Saudi Criminal Enterprise Holds Plaintiff Abdulrahman Hostage to Terrorize Plaintiff Areej in Retaliation for Her Speech. .................................. 35

    3.  The Saudi Criminal Enterprise Again Stalks Plaintiff Areej and Threatens to Kill Plaintiff Areej in Graphic and Violent Messages. ................................ 38

D.  The Saudi Criminal Enterprise's Unlawful Activities Have Caused Plaintiff Areej to Severely Suffer, Including By Losing Substantial Business Opportunities. ................ 40

E.  The Saudi Criminal Enterprise's Actions Are Continuous and Related. ......................... 41

FIRST CAUSE OF ACTION ..................................................................................... 43

SECOND CAUSE OF ACTION ................................................................................. 45

THIRD CAUSE OF ACTION ..................................................................................... 47

PRAYER FOR RELIEF ............................................................................................. 49

JURY DEMAND ...................................................................................................... 49

Plaintiffs Areej Al-Sadhan, by and through her undersigned counsel, and Abdulrahman Al-Sadhan, an incompetent, by and through his sister and next friend, Areej Al-Sadhan, for their Complaint, allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff Areej Al-Sadhan, a U.S. citizen, is an activist speaking out about the disappearance and torture of her brother, Plaintiff Abdulrahman Al-Sadhan, who resided and studied in the United States for several years, in Saudi Arabia.  Plaintiff Abdulrahman was kidnapped, tortured, and imprisoned for operating an anonymous Twitter account critical of the government of the Kingdom of Saudi Arabia ("Defendant KSA").  Plaintiff Abdulrahman's family has not heard from him since 2021.  Because of Plaintiff Areej's advocacy, Plaintiff Areej has been targeted by Defendant KSA and its agents, including non-party Prime Minister and Crown Prince Mohammed bin Salman ("MBS"), as well as Defendants John Does 1-10.

2.      The racketeering enterprise in this suit is a group of individuals and entities with the shared goal of transnational repression (the "Saudi Criminal Enterprise").  The Saudi Criminal Enterprise seeks to extend Defendant KSA's authoritarian control beyond Saudi Arabia's borders, including by reaching into U.S.-based businesses and commerce, and stifling discourse critical of Defendant KSA and the Saudi royal family around the world.  The members of the Saudi Criminal Enterprise unlawfully surveilled, killed, tortured, disappeared, kidnapped, extorted, and threatened perceived dissidents to suppress speech globally and to export terror and repression into the world's democracies, including within the United States.

3.      Most infamously, several members of the Saudi Criminal Enterprise lured Jamal Khashoggi, a U.S. Person within the meaning of Section 105A(c) of the National Security Act of 1947 and a former Washington Post columnist critical of Defendant KSA, to the Saudi Consulate

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____          3
COMPLAINT – DEMAND FOR JURY TRIAL

in Istanbul, under the guise of issuing papers necessary for his then-impending marriage. Once Khashoggi entered the consulate, members of the Saudi Criminal Enterprise tortured, executed, and dismembered him on the orders of non-party MBS, disposing of his body in a way to ensure that many of its parts would never be found.

4.     The Saudi Criminal Enterprise has since targeted numerous supposed dissidents, including Plaintiffs Areej and Abdulrahman, by infiltrating the United States market, accessing Defendant Twitter's confidential data on its users with assistance from two of Defendant Twitter's own employees, and supplying that data to Defendant KSA to target and retaliate against its critics, by kidnapping, torturing, imprisoning, and killing perceived dissidents.

5.     Defendant Twitter—which was once the chosen platform for Arab youth revolutionizing to liberate their countries from despotic leadership during the Arab Spring—enabled its co-conspirators in the Saudi Criminal Enterprise to crush that very dissent, and then even permitted Defendant KSA to enjoy an equity stake in Defendant Twitter through its private investment funds.

6.     The conspiracy and malign activities of the Saudi Criminal Enterprise came to light when the United States Department of Justice indicted three of its members. In November 2019, the United States Attorney's Office for the Northern District of California revealed that Defendants KSA, Ahmed Almutairi, and Bader Al-Asaker recruited two California-based employees of Defendant Twitter to the Saudi Criminal Enterprise.[1]  The employees, Defendants Ahmad Abouammo and Ali Alzabarah, exploited their access to Defendant Twitter's data to advance the Saudi Criminal Enterprise's goal of transnational repression. They transmitted the confidential

---

[1] *See* Exhibits 2, 3.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____
COMPLAINT – DEMAND FOR JURY TRIAL

4

names behind anonymous user accounts, which Defendant Saud Al-Qahtani had identified for them at non-party MBS's direction.  These accounts belonged to voices critical of the Saudi royal family and Defendant KSA's policies.  Plaintiff Abdulrahman's name was among the roughly 6,000 users whose personally identifying information Defendant Twitter provided to Defendants KSA, Alzabarah, and Almutairi and non-party MBS.

7.     In 2018, Plaintiff Abdulrahman, a target of the Saudi Criminal Enterprise, disappeared.  Plaintiff Areej and her family were devastated, helpless, and fearful for her brother's safety.  For two years, Plaintiff Areej did not know where he was or if he was alive.  Plaintiff Areej did what she could—she spoke out loudly against Defendant KSA.  After Plaintiff Areej's activism brought international pressure on Defendant KSA and highlighted how Plaintiff Abdulrahman was arbitrarily detained without charges against him, Defendant KSA brought baseless allegations against him—primarily related to his U.S.-based, protected speech on Twitter—in a sham trial before sentencing him to 20 years in prison, with the principal purpose of silencing Plaintiff Areej and others who challenged Defendant KSA.

8.     Today, Plaintiff Areej is once again in the dark about the fate of her brother, and she is now herself a target the Saudi Criminal Enterprise's conspiracy.  Its members have stalked her openly and with impunity.  They have harassed her online and threatened her and her brother's lives.  They have held her brother hostage, lording their control over him to keep her silent.  She has taken leaves of absence from work, missing promotion opportunities, to ensure that she and her family remain safe and healthy and to advocate for her brother.  She remains constantly vigilant and must craft travel plans to reduce the risk of being kidnapped, incurring heavy financial and psychosocial tolls.  Plaintiff Areej suffers daily as a target of the Saudi Criminal Enterprise, in what she can only describe as a "living nightmare."

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____          5
COMPLAINT – DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9.      The Saudi Criminal Enterprise's pattern of unlawful racketeering to quell political dissent, including by deploying confidential information for unlawful purposes and threatening human life, violates the Racketeering Influenced and Corrupt Organizations Act ("RICO").

10.     The allegations in this Complaint are pled on information and belief throughout, except to the extent certain allegations are verified by Plaintiff Areej's affidavit ("Areej Aff."). *See* Exhibit 1.

## **THE PARTIES**

A.      **Plaintiffs**

11.     **Plaintiff Abdulrahman Al-Sadhan**, an incompetent under Federal Rule of Civil Procedure 17(c), is a humanitarian aid worker and citizen of Saudi Arabia.  Plaintiff Abdulrahman attended middle school in the United States and, after returning to Saudi Arabia for a few years, moved to the United States in or around 2008 to attend college.  Plaintiff Abdulrahman then lived in the United States for approximately six years.   While living in the United States, Plaintiff Abdulrahman created an anonymous Twitter account that he used to call out hypocrisy in Defendant KSA and the royal family.  Plaintiff Abdulrahman returned to Saudi Arabia in or around 2014.  In March 2018, Plaintiff Abdulrahman was kidnapped by KSA secret police for operating the anonymous Twitter account.  Plaintiff Abdulrahman was last seen imprisoned in Saudi Arabia but has not been heard from since 2021, when he was sentenced to 20 years in prison followed by a 20-year travel ban.  Because Plaintiff Abdulrahman is believed to be incarcerated in Saudi Arabia and his family is unable to contact him, Plaintiff Abdulrahman is unable to assist counsel in the

preparation of the case.[2]  Further, due to the circumstances of his disappearance, caused by the very conduct at the heart of this case, Plaintiff Abdulrahman lacks the practical and financial ability to access American courts.

12.  **Plaintiff Areej Al-Sadhan** is a United States citizen and a resident of San Francisco, California where she works in project management for an American multinational technology conglomerate that owns numerous social media platforms.  She was born in Washington State.  Growing up, she lived in both Saudi Arabia and the United States before settling in the United States.  She has not returned to Saudi Arabia since early 2009.  Plaintiff Areej is a human rights activist campaigning against Defendant KSA's oppression and to rescue her brother from unlawful detention, torture, and disappearance in Saudi Arabia.  It is because of her advocacy against the Defendants that she became a direct target of the Saudi Criminal Enterprise. Plaintiffs Areej and Abdulrahman are siblings and always enjoyed a close emotional bond and were in contact regularly until Plaintiff Abdulrahman disappeared.  Up until the time that Plaintiff Abdulrahman was kidnapped, and despite living across the world from each other, Plaintiffs Areej and Abdulrahman spoke to each other a few times per week to check in with each other, tell each other that they missed the other, and discuss work opportunities and share advice.  Plaintiff Areej deeply misses her brother every single day.  Plaintiff Areej is also the next friend of Plaintiff Abdulrahman and is dedicated to pursuing her brother Plaintiff Abdulrahman's best interests in this litigation.[3]

---

[2] *AT&T Mobility, LLC v. Yeager*, 143 F. Supp. 3d 1042, 1050 (E.D. Cal. 2015) ("In California, a party is incompetent if he or she . . . is unable to assist counsel in the preparation of the case.").

[3] *Jurgens v. Dudendorf*, No. 2:14-cv-2780, 2015 WL 4910536, at *2 (E.D. Cal. Aug. 17, 2015) (permitting "next friend standing" where the next friend shows "(1) an adequate explanation . . . why the real party in interest cannot appear on his own behalf to prosecute the action, and

**B.** **Members of the Saudi Criminal Enterprise**

13.     **Defendant Twitter, Inc.** is a Delaware corporation with its principal place of business located in San Francisco, California.  Defendant Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Defendant Twitter is a member of the Saudi Criminal Enterprise whose employees—in their roles at Defendant Twitter—accessed and sent confidential account data to members of the Saudi Criminal Enterprise.  Defendant Twitter has more than 10 million users in KSA, making KSA its most important market in the Middle East.[4]  Moreover, Defendant KSA has been heavily invested in Defendant Twitter throughout the period of the conspiracy.

    a.  In 2011, Saudi Prince Alwaleed Bin Talal's private investment firm Kingdom Holding Company ("KHC") invested $300 million in Defendant Twitter.  On May 22, 2022, Bin Talal sold 16.87% of KHC to the sovereign wealth fund of Defendant KSA, the Saudi Public Investment Fund, for $1.5 billion.

    b.  As of October 28, 2022, KHC owned approximately 35 million shares, valued at $1.89 billion, in Defendant Twitter.  KHC is the second largest shareholder of Defendant Twitter behind Elon Musk.

---

(2) dedication to the best interests of the person on whose behalf he seeks to litigate." (internal quotation marks omitted)).

[4] *See* Exhibit 4 ("This crackdown began, in part, on Twitter, which is used by approximately 10 million people in Saudi Arabia, making it the service's largest Middle Eastern market. . . . . After a brief honeymoon of unfettered speech, pro-regime trolls and surveillance emerged on the site.  Now as popular with members of the Saudi ruling family as the public, Twitter is no longer a place where ordinary Saudis feel comfortable speaking freely.  Much the same could be said of Saudi dissidents and exiles, who talk of constant harassment, death threats, and attempts to hack their accounts.  In their view, Twitter bears some responsibility for how its service has been abused.").

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____      8
COMPLAINT – DEMAND FOR JURY TRIAL

14.     **Defendant KSA** is a nation in the Arabian Peninsula with an embassy located in the United States.  Defendant KSA, through its agents, directed individuals to reside in or enter the United States and recruit employees of Defendant Twitter, then deployed those employees in the U.S. market through Defendant Twitter in aid of transnational repression, including by accessing and transmitting confidential personal information of Twitter users.

15.     **Defendant Saud Al-Qahtani** is a citizen of Saudi Arabia who has served as a trusted adviser to non-party MBS and was considered his enforcer.  He coordinated Defendant KSA's access and transmittal of Twitter users' confidential data and helped develop Defendant KSA's online anti-dissent strategy.  Non-party MBS personally gave Defendant Al-Qahtani the mission and resources to suppress critical or embarrassing social media content with an "electronic army" of media posters.  Defendant Al-Qahtani is a member of the Saudi Criminal Enterprise.  In August 2017, Defendant Al-Qahtani posted an ominous warning against anonymous critics of Defendant KSA using his own verified Twitter account asserting that Defendant KSA could access personal information through various means.[5]

16.     **Defendant Ahmad Abouammo** is a dual citizen of the United States and Lebanon.  While working at Defendant Twitter, he resided in Walnut Creek, California from at least November 4, 2013 until May 22, 2015, and then resided in Seattle, Washington.  Defendant Abouammo is a member of the Saudi Criminal Enterprise and a former employee of Defendant Twitter.  Defendant Abouammo transmitted Twitter users' confidential account data to members of the Saudi Criminal Enterprise.

---

[5] *See* Exhibit 5.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____     9
COMPLAINT – DEMAND FOR JURY TRIAL

17.   **Defendant Ali Alzabarah** is a citizen of Saudi Arabia.  Defendant Alzabarah worked at Defendant Twitter and resided in San Bruno, California from at least August 12, 2013 until December 3, 2015.  Defendant Alzabarah is a member of the Saudi Criminal Enterprise and transmitted Twitter users' confidential account data to members of the Saudi Criminal Enterprise. Defendant Alzabarah, before he began working for Defendant Twitter, was a recipient of a scholarship from Defendant KSA through Defendant Saudi Arabian Cultural Mission ("SACM").

18.   **Defendant Ahmed Almutairi a/k/a Ahmed Aljbreen** is a citizen of Saudi Arabia. He was present in the United States between approximately August 2014 and May 2015. Defendant Almutairi is a member of the Saudi Criminal Enterprise and an agent of Defendant KSA.  Defendant Almutairi helped recruit Defendants Abouammo and Alzabarah and facilitated their transmissions of confidential account data from California.

19.   **Defendant Bader Al-Asaker** is Secretary General of non-party MBS's non-profit organization, the Mohammed bin Salman Foundation ("MISK Foundation").   The MISK Foundation is non-party MBS's personal multi-billion-dollar foundation operating under his control and direction.  The MISK Foundation, as part of its cultural "programming" in Saudi Arabia and abroad, supports Defendant SACM and its scholars in the United States by funding and organizing student events across U.S. school campuses.  The MISK Foundation also has ongoing business with a technology company, Samaat, founded by Defendant Almutairi. Defendant Al-Asaker is a member of the Saudi Criminal Enterprise.  He helped recruit and pay Defendants Abouammo and Alzabarah to transmit Twitter users' confidential account data to the Saudi Criminal Enterprise.

20.   **Defendant SACM** is a U.S.-based entity.  Since at least 2013, Defendant SACM has been headquartered in Fairfax, Virginia.  Defendant SACM's ostensible purpose is to

administer KSA-funded scholarships for Saudi students to study in the United States.[6]  To advance the illegal and malign activities of the Saudi Criminal Enterprise, Defendant KSA leverages Defendant SACM to surveil, stalk, and harass dissidents in the United States.  Defendant SACM's Committee for Support and Oversight monitors and reports on dissident student activities back to other members of the Saudi Criminal Enterprise.  Defendant SACM engages in transnational repression by encouraging scholarship students to target and harass other Saudi students in the United States if they criticize Defendant KSA.[7]

21.     The Saudi Criminal Enterprise has other members, who joined the racketeering enterprise as co-conspirators, including **Defendants John Does 1-10**.

22.     Most notable among the non-party conspirators is non-party MBS, the Prime Minister and Crown Prince of Saudi Arabia.  At his direction, Defendant KSA's secret police and other foreign agents have repressed political dissent by kidnapping, disappearing, torturing, killing, and terrorizing Saudi Arabian and foreign citizens.  Most infamously, as the U.S. Office of the Director of National Intelligence found, "Saudi Arabia's Crown Prince Muhammad bin Salman approved an operation in Istanbul, Turkey to capture or kill Saudi journalist Jamal Khashoggi."[8]

---

[6] *See, e.g.*, Exhibit 6 ("Figures obtained from the Office of International Affairs show that 83 percent of Saudi Arabian students at [Portland State University] received scholarship funding from the Saudi Arabian Cultural Mission in fall 2015.").

[7] *See* Exhibit 7 (". . . [P]rosecutors say Ibrahim Alhussayen, 42, who was studying at a Mississippi university on a scholarship funded by the Saudi Royal Court and Saudi Cultural Mission, used the @samar16490 Instagram account to harass Saudi Arabian citizens in the US and Canada who were known critics of their government.  Most of the alleged victims are women.").

[8] *See* Exhibit 8.

Non-party MBS also directed Defendants Abouammo and Alzabarah to access the confidential account data of Twitter users who were critical of Defendant KSA.[9]

23.     The Saudi Criminal Enterprise conspired to quell speech, activism, and the lawful petitioning of government representatives in the United States.  It conscripted a U.S. corporation, Defendant Twitter, into the conspiracy to obtain access to confidential personal information of the corporation's customers.  The Saudi Criminal Enterprise then used that information to attack political dissidents, including U.S. residents, citizens, and green card holders on U.S. soil and abroad.

24.     The common goal of the Saudi Criminal Enterprise is transnational repression. Transnational repression is the strategy through which an authoritarian regime controls freedoms beyond its own borders to protect its power at home.[10]  Transnational repression can be carried out in many ways, including by wrongfully detaining, physically or digitally surveilling, harassing, threatening, or taking hostage critics of the state.[11]  The goal of transnational repression is to intimidate and chill political and social dissenters from voicing their criticism or otherwise exercising their fundamental civil and human rights.

---

[9] The U.S. District Court for the District of Columbia held that non-party MBS was immune from prosecution for the Khashoggi murder under the Head of State immunity doctrine, a finding that was supported by the Biden Administration.  *See Cengiz v. Salman*, No. 20-3009, 2022 WL 17475400, at *4-7 (D.D.C. Dec. 6, 2022).

[10] *See* Exhibit 9 at 14 ("Transnational repression is not the mere exacting of violence beyond national borders, but a mode of governance:  To the modern authoritarian state, borders extend to the body of the furthest subject they can reach, or presenting even more complex challenges, to the behaviors, speech or criticisms that may form outside of their own sovereign control.").

[11] *See id.* at 6-8 (listing various forms of transnational repression carried out by Defendant KSA in the United States).

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____                    12
COMPLAINT – DEMAND FOR JURY TRIAL

25.     Here, each member of the Saudi Criminal Enterprise participated in a conspiracy to chill anti-authoritarian advocacy by, among other conduct, unlawfully obtaining personally identifying information of political dissidents to identify and target them and kidnapping, torturing, stalking, harassing, threatening, and killing other political dissidents.  The conspiracy repeatedly violated U.S. laws and terrorized political dissidents in the United States and abroad.  Plaintiffs Areej and Abdulrahman are two of many victims of the conspiracy.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO") of 1970, Pub. L. 91–45, 84 Stat. 922 (codified at 18 U.S.C. § 1962 et seq.), and the Alien Tort Statute, 18 U.S.C. § 1350.

27.     Venue is properly laid in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims set forth herein occurred in this District.  Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because there is no district in which this action may otherwise be brought and because Defendants are subject to the Court's personal jurisdiction with regard to this action.

## DIVISIONAL ASSIGNMENT

28.     San Francisco is the appropriate division because a substantial part of the events giving rise to the claims set forth herein occurred in this Division.

## FACTUAL ALLEGATIONS

**A.     Background:  Defendant Twitter and the Arab Spring**

29.     Social media and the Internet have become borderless and ubiquitous tools of political organization and speech.  The rise of the Internet age has strained the power of

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____                    13
COMPLAINT – DEMAND FOR JURY TRIAL

authoritarian regimes to suppress dissent and control speech. Previously, dissenters were largely within arm's reach, inside a state's borders under its oppressive police state. Now, undesirable speech can originate from foreign countries and reach the state with a mere click.

30.     In 2010, the Arab Spring roiled the Arab world, unseating brutal dictators while promising liberal reform. The Arab Spring was a series of anti-government protests, uprisings, and armed rebellions that spread across much of the Arab world beginning in the early 2010s, challenging authoritarian regimes. Young people largely built this grassroots movement on Defendant Twitter's platform, often using aliases to protect themselves and family as they organized and voiced their anger.

31.     Anonymity was a shield to protect protestors against authoritarian repression. During the Arab Spring, Defendant Twitter empowered such persons, allowing them to use "pseudonymous accounts, meaning an account's profile is not required to use the name or image of the account owner."[12] Defendant Twitter described itself as being from the "free speech wing of the free speech party."[13] But, unfortunately, Defendant Twitter became a participant tool of transnational repression to silence voices of dissent beyond Saudi Arabia's borders in the United States and abroad, all in an effort to monetize its commercial relationship with Defendant KSA.

32.     The fair inferences from the evidence and allegations stated below demonstrate that Defendant Twitter's participation in the racketeering activity was either knowing or based on its conscious avoidance and/or deliberate indifference to the criminality occurring within Defendant

---

[12] *See* Exhibit 10.

[13] *See* Exhibit 11.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____                                  14
COMPLAINT – DEMAND FOR JURY TRIAL

Twitter as it abetted acts of murder, kidnapping, and torture.[14]  Indeed, press accounts of Defendant KSA's official, malign activities utilizing Defendant Twitter began to circulate as early as 2018,[15] and, as early as 2015, the FBI visited Defendant Twitter's headquarters to inform them of a "Saudi espionage problem."[16]  Despite being warned of dangerous activity occurring on its platform, Defendant Twitter only finally banned Defendant Al-Qahtani on or about September 20, 2019, well after his malign activities had been revealed and after much of the damage had been done, including to Plaintiff Abdulrahman.[17]

## B.    The Pattern of Racketeering Activity

33.    Defendant Twitter is a commercial enterprise.  According to public filings, during the period of the racketeering activity, on average, Defendant Twitter was worth an estimated $10.2 billion, generated $2.8 billion in advertising revenue, and enjoyed a market cap of $24.3 billion.  Defendant KSA has a commercial relationship with Defendant Twitter, which is used to advance the goals of the Saudi Criminal Enterprise.

34.    Among other aspects of the commercial relationship, Defendant KSA took advantage of Defendants Abouammo's and Alzabarah's status as employees at Defendant Twitter to obtain user data.  Defendant KSA has used Defendant Twitter to advance its tourism.[18]

---

[14] *See United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) ("[D]eliberate ignorance and positive knowledge are equally culpable.").

[15] *See, e.g.*, Exhibit 12.

[16] Exhibit 4.

[17] See Exhibit 13 ("Qahtani, a close confidante of Crown Prince Mohammed bin Salman, ran the royal court's media center as well as an electronic army tasked with protecting the kingdom's image and attacking its perceived enemies online.").

[18] *See* Exhibit 14.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____        15
COMPLAINT – DEMAND FOR JURY TRIAL

Defendant KSA has been a longtime investor in Defendant Twitter and is currently its second-largest shareholder.[19]   That commercial relationship is at the heart of Defendant Twitter's participation in the Saudi Criminal Enterprise.

35.   The Saudi Criminal Enterprise first unlawfully obtained and transferred thousands of Twitter users' personal and confidential data over a seven-month period in 2014 and 2015.  The conspiracy principally targeted anonymous Twitter users who posted critical or embarrassing information about Defendant KSA and the Saudi royal family.  With that anonymity breached due to the malign activities of Defendant Twitter, the Saudi Criminal Enterprise put a target on the backs of those users, betraying the trust the users had placed in Defendant Twitter.  The Saudi Criminal Enterprise has since attacked, harassed, detained, tortured, and abducted persons whose identifying information was exposed.

36.   Plaintiff Abdulrahman was among the conspiracy's victims.  He was kidnapped from Red Crescent Society, his place of work in Saudi Arabia, and for two years was detained without representation or communication with his family, tortured, and kept in solitary confinement; then, a year later, he was put through a sham trial and sentenced to decades of imprisonment.  His fate today is unknown.

37.   When Plaintiff Areej tried to save her brother by speaking out, she became a target of the Saudi Criminal Enterprise.  Because she dared call out Defendant KSA's history of repression, petition her U.S. representatives to help her brother, and condemn the Saudi Criminal Enterprise's kidnapping, torture, forced disappearance, and baseless charges against her brother,

---

[19] *See* Exhibit 15.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____
COMPLAINT – DEMAND FOR JURY TRIAL

16

the Saudi Criminal Enterprise has stalked, harassed, threatened, and intimidated Plaintiff Areej and wielded the familial bond of love for her brother against her.

1.     **Racketeering Acts 1 to 30,892:  The Saudi Criminal Enterprise Accessed Confidential Identifying Data from Defendant Twitter.**

38.     In 2014, Defendants Abouammo and Alzabarah were employees of Defendant Twitter in California.[20]  During their employment, they accessed confidential user data, such as identifying information on thousands of Twitter users, and sent this data to Defendant KSA, including information on Plaintiff Abdulrahman.  Defendants Abouammo and Alzabarah were recruited by Defendant Al-Asaker.  Defendant Almutairi then coordinated Defendants Abouammo and Alzabarah's activities while they used their positions at Defendant Twitter to fraudulently transmit confidential information to Defendant KSA.

39.     Defendant Twitter hired Defendant Abouammo as a Media Partnerships Manager responsible for the Middle East and North Africa region.  He began working at Defendant Twitter on November 4, 2013, while residing in California.

40.     On or around May 16, 2014, a representative of a U.S.-Saudi Arabian trade organization in Washington D.C. asked Defendant Abouammo to help arrange a tour for a delegation of "entrepreneurs" from Saudi Arabia to Defendant Twitter's headquarters in California.  Defendant Abouammo acceded.  The visit occurred on or around June 13, 2014, with Defendant Al-Asaker and other employees of the Saudi royal family.  During that meeting, Defendants Almutairi and Al-Asaker discussed the goals of the Saudi Criminal Enterprise.

---

[20] *See* Exhibit 2 (The criminal indictment in *United States v. Abouammo*, No. 19-cr-621 (N.D. Cal.), includes information related to the racketeering acts alleged in this Section B.1.).

41.     Later that year, on or around November 15, 2014, Defendant Almutairi emailed Defendant Abouammo.  He requested an "urgent meeting" to discuss their "mutual interest."  They met in San Francisco near Defendant Twitter's headquarters.  During that meeting, Defendants Almutairi and Abouammo discussed the goals of the Saudi Criminal Enterprise.

42.     Defendants Almutairi and Abouammo continued to communicate by phone and email in late 2014 to coordinate a meeting with Defendant Al-Asaker.  Defendant Al-Asaker and Defendant Abouammo met on December 5, 2014 in London.  At the meeting, Defendant Al-Asaker gave Defendant Abouammo a watch worth at least $20,000.  During that meeting, Defendants Al-Asaker and Abouammo discussed the goals of the Saudi Criminal Enterprise.

43.     After the meeting on December 5, 2014, Defendant Abouammo began sending confidential data to Defendant KSA officials.  Defendant Abouammo sent Defendant Al-Qahtani a message on Twitter proclaiming, "proactively and reactively we will delete evil, my brother," a reference to the goal of the Saudi Criminal Enterprise to identify and harm perceived dissidents.

44.     Defendant Abouammo resigned from his position at Defendant Twitter in May 2015, but Defendant Al-Asaker continued to ask Defendant Abouammo to refer requests to Defendant Twitter for confidential information on users.

45.     To continue and carry on the conspiracy, on or around February 2015, Defendant Abouammo introduced Defendant Almutairi to Defendant Alzabarah.  Defendant Alzabarah had been working at Defendant Twitter since August 2013 as a Site Reliability Engineer.  He was responsible for maintaining Defendant Twitter's hardware and software.

46.     In May 2015, Defendant Alzabarah met with Defendant Almutairi in Fairfax, Virginia, at a SACM-related property.  Defendant Al-Asaker orchestrated the meeting.  After the

meeting, Defendant Alzabarah returned to San Francisco, where Defendant Alzabarah, like Defendant Abouammo, began accessing and transmitting confidential Twitter user data.

47.     On May 29, 2015, over the course of approximately three hours, Defendants Al-Asaker and Alzabarah exchanged three phone calls and Defendant Alzabarah accessed Twitter user data of two users.  That same day, Defendant KSA submitted emergency disclosure requests to Defendant Twitter for those same two user accounts.

48.     Defendant Alzabarah took personal leave and traveled to Saudi Arabia in July and August 2015.  During that time, Defendant Alzabarah accessed nonpublic account information of hundreds of Twitter users, including on July 29, 2015, when Defendant Alzabarah connected his laptop issued by Defendant Twitter to Defendant Almutairi's company's wireless local area network in Saudi Arabia.  Despite Defendant Alzabarah taking leave and traveling to Saudi Arabia, Defendant Twitter allowed him to access sensitive and private user data for non-work-related purposes and did not disable his access.

49.     From January to at least November 2015, Defendant Abouammo (from January to May) and Defendant Alzabarah (from May to November) accessed and disclosed confidential user data at least 30,892 times.

50.     While these events were ongoing, Defendant KSA was simultaneously negotiating to increase its equity stake in Defendant Twitter.  The efforts culminated an announced increase in Defendant KSA's equity stake to over 5% on October 7, 2015, double its prior stake.[21]

51.     In late 2015, U.S. intelligence agencies informed Defendant Twitter that Defendant Alzabarah had sent data to Defendant KSA that Defendant Alzabarah had been able to access in

---

[21] *See* Exhibit 16.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____                                    19
COMPLAINT – DEMAND FOR JURY TRIAL

the course of his employment.  On December 2, 2015, Defendant Alzabarah tried to contact Defendant Almutairi and then contacted Defendant Al-Asaker, who quickly coordinated Defendant Alzabarah's departure from the United States with the Saudi Arabian consulate in Los Angeles, California.  The next day, Defendant Alzabarah flew to Saudi Arabia and resigned from Defendant Twitter.

52.     Over the course of the conspiracy, Defendant Al-Asaker and other members of the Saudi Criminal Enterprise sent Defendants Abouammo and Alzabarah the names of Twitter users posting criticism of Defendant KSA and the Saudi royal family.  Defendants Abouammo and Alzabarah unlawfully transmitted back the names, birthdates, device identifiers, phone numbers, IP addresses, and session IP histories associated with these accounts.

53.     Each time they accessed this user data, they committed a racketeering act in aid of the Saudi Criminal Enterprise's goal of transnational repression.  Each of the 30,892 accesses occurred close in time to the prior access—either within minutes, hours, or days, and occasionally weeks, and was part of the same conspiracy to uncover anonymous Twitter users.

54.     With this user data, Defendant KSA could identify critics of the government who had anonymous accounts and silence them.  Among many other accounts, the conspirators identified Plaintiff Abdulrahman's @sama7ti account and provided its information, including his name, to Defendant KSA.

55.     From January 2015 to November 2015, Defendants Abouammo and Alzabarah transmitted personally identifying information of nearly 6,000 Twitter user accounts to Defendant KSA, including the names of persons behind at least 33 accounts that Defendant KSA had asked Defendant Twitter to disclose.

56. Six months later, despite Defendant Twitter knowing full well Defendant KSA's malign activities and various crimes, Defendant Twitter's CEO Jack Dorsey met with non-party MBS and reportedly discussed how the two could cooperate to "train and qualify Saudi cadres."[22]

57. Among the exposed account users were (i) Plaintiff Abdulrahman, (ii) Ali Al-Ahmed, who resides on asylum in the United States, (iii) Omar Abdulaziz, who resides on asylum in Canada, (iv) Turki bin Abdulaziz Al-Jasser, who was reportedly arrested and tortured while imprisoned in Saudi Arabia, and (v) an account operated by the well-known whistleblower of Defendant KSA, Mujtahid. Each of these individuals had posted criticism or information critical of members of the Saudi Criminal Enterprise.

58. A fundamental purpose of the conspiracy was to gather intelligence on anonymous Twitter users critical of Defendant KSA and the Saudi royal family so that the Saudi Criminal Enterprise could terrorize and punish people into silence. The campaign to silence dissent was done by threatening, harassing, kidnapping, torturing, and killing political dissenters at home and abroad, and indirectly by creating an example of such persons.

59. Defendants Abouammo and Alzabarah, while they were employees of Defendant Twitter, received cash, gifts, and promises from the head of non-party MBS's affairs and operator of non-party MBS's foundation. Defendant Abouammo received over $300,000, and Defendant Alzabarah, after fleeing the United States, received a lucrative position at the MISK Foundation.

---

[22] *See* Exhibit 17.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____
COMPLAINT – DEMAND FOR JURY TRIAL

60.     Defendants Almutairi, Al-Asaker, and Al-Qahtani were acting at non-party MBS's direction.  Defendant Almutairi told Defendant Abouammo that he was working on behalf of and advising a "very important" member of the Saudi royal family.  Defendant Almutairi, in May 2015, posted a photo with non-party MBS and met with his representatives in Washington, D.C.



61.     Defendant Al-Asaker personally advised non-party MBS.  Defendant Al-Qahtani held a seat on the board of directors of the MISK Foundation and also advised non-party MBS.

62.     On November 19, 2019, the U.S. Attorney's Office of the Northern District of California indicted Defendants Abouammo, Alzabarah, and Almutairi.  The charges were made public on or around November 7, 2019.[23]  The U.S. Attorney's Office filed a superseding indictment on July 28, 2020, charging them with acting as an agent of a foreign government without notice, wire fraud, money laundering, and falsifying records.  Only Defendant Abouammo

_____

[23] *See* Exhibit 3.

was arrested; Defendants Alzabarah and Almutairi are believed to be in Saudi Arabia.[24]  Defendant

Abouammo was convicted on August 9, 2022, and subsequently sentenced.[25]

63.     In total, the Saudi Criminal Enterprise, through the collective efforts of all the

Defendants, unlawfully accessed and transmitted confidential Twitter user data 30,892 times.[26]

Each access and transmittal constituted a separate racketeering act in violation of 18 U.S.C.

§§ 1028(a)(7), 1029(a)(7).

**2.     Racketeering Acts 30,893 to 30,895: The Saudi Criminal Enterprise Kidnapped, Tortured, and Conspired to Kill Plaintiff Abdulrahman.**

64.     In 2011, while living in the United States, Plaintiff Abdulrahman created his

anonymous Twitter account @sama7ti that called out hypocrisy in Defendant KSA and the royal

family.  His account was known for its scorching and entertaining sarcasm.  Over several years,

he built a substantial following.  But he, like many others, kept his account anonymous to avoid

reprisal from Defendant KSA.

65.     The Saudi royal family was a frequent subject of his tweets.  Through his @sama7ti

account, Plaintiff Abdulrahman tweeted, for example, political cartoons and commentary featuring

non-party MBS, issues of gas prices and taxes, and other topical stories and critique.

66.     Plaintiff Abdulrahman also retweeted dissident journalists and activists in Saudi

Arabia, including Turki bin Al-Jasser (@coluche_ar) and Omar Abdulaziz (@say_it_and_walk

---

[24] *See* Exhibit 3.

[25] Defendant Abouammo was convicted based on conduct that forms the basis of Racketeering Acts 1 through 30,892, and thus—with respect to those acts—principles of res judicata apply in relation to this action.

[26] *See* Exhibit 18 (Tr. Ex. No. 352, *United States v. Abouammo*, 19-CR-0621, N.D. Cal. July 26, 2022).

and @i5beearmy). Today, only Abdulaziz, who is in exile in Canada, still tweets. Al-Jasser is missing, reported as being held at the Al Ha'ir prison in Riyadh.

67. Plaintiff Abdulrahman returned to Saudi Arabia in 2014. After returning, Plaintiff Abdulrahman tweeted less, focusing instead on his humanitarian work for the Red Crescent Society, where he was employed, while trying to keep a low profile. But that was all for naught because the Saudi Criminal Enterprise had already targeted Plaintiff Abdulrahman. The Saudi Criminal Enterprise knew that Plaintiff Abdulrahman was behind the anonymous @sama7ti Twitter account as a result of the Saudi Criminal Enterprise's access to Defendant Twitter's confidential files on its users.[27]

68. Plaintiff Abdulrahman was 34 years old when he was kidnapped from his office at the Red Crescent Society. It was March 12, 2018, and Plaintiff Areej and her family could not reach him. Before Plaintiff Abdulrahman disappeared, Plaintiff Areej's family and Plaintiff Abdulrahman spoke daily. The next day, messages, emails, and phone calls stopped going through.

69. Plaintiff Areej began to panic. She checked with her family who was residing in Saudi Arabia, but nobody knew where her brother was.

70. Plaintiff Abdulrahman's coworker at the Red Crescent Society told the family that Plaintiff Abdulrahman was taken by Defendant KSA's secret police, the State Security Presidency.

[27] Defendant Twitter's privacy policy, effective 2015, states in relevant part: "We may share or disclose your non- private, aggregated or otherwise non-personal information, such as your public user profile information, public Tweets, the people you follow or that follow you, or the number of users who clicked on a particular link (even if only one did), or reports to advertisers about unique users who saw or clicked on their ads after we have removed any private personal information (such as your name or contact information)." Another provision of the policy states that Twitter will preserve user information "if we believe that it is reasonably necessary . . . to protect the safety of any person." *See* Exhibit 19.

71.     On March 13, 2018, neighbors observed men in police uniforms break into Plaintiff Abdulrahman's house and leave with a laptop and personal belongings.  Plaintiff Abdulrahman had been taken to an unknown location.  He had not been shown any arrest warrant.

72.     Plaintiff Areej, with her family, hoped that the government had only taken Plaintiff Abdulrahman to ask a few questions and that he would be released.  Her family contacted the secret police, but the police denied holding Plaintiff Abdulrahman or knowing where he was. Plaintiff Abdulrahman's name did not appear in searches of any of the government's online prison databases.

73.     After a month, a government clerk responded to a request from a member of Plaintiff Areej's family—Plaintiff Abdulrahman was in the "system," the clerk said, and under investigation.  The clerk would give no information about where he was held.  Nor was Plaintiff Areej, or anyone, allowed to communicate with Plaintiff Abdulrahman.  The clerk said they could request a phone call or visit, but that a visit would not be permitted, and, even if it were, it could be "after years, not months."

74.     Plaintiff Areej's family submitted three more requests to see or speak with Plaintiff Abdulrahman—in April, August, and October 2018.  On the fourth request, they were told that "there is no point of you calling us and you should just stop and wait until we respond to you."  To this day, Plaintiff Areej and her family's requests have been ignored.

75.     Plaintiff Areej and her family were not entirely in the dark.  They received information from inside sources.  They were told that Plaintiff Abdulrahman was seen by co-detainees in Dhahban prison in Jeddah—a prison known for torturing its inmates.  They called Dhahban but were told to speak with the Presidency of State Security. On November 25, 2018, the

National Society for Human Rights informed Plaintiff Abdulrahman's family that Plaintiff Abdulrahman had been transferred to Al Ha'ir prison in Riyadh.

76.    Plaintiff Areej eventually learned that Defendant KSA's secret police broke Plaintiff Abdulrahman's hand and smashed his fingers, taunting him that "this is the hand you write and tweet with."  The secret police also tortured Plaintiff Abdulrahman with electric shocks, flogged and hung him from his feet, suspended him in contorted positions, deprived him of sleep, threatened to behead him, insulted him, and kept him in solitary confinement for years.

77.    The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of kidnapping Plaintiff Abdulrahman, in violation of Cal. Penal Code § 207(a), and torturing and conspiring to kill Plaintiff Abdulrahman, in violation of Cal. Penal Code §§ 187, 189.

### 3.    Racketeering Acts 30,896 to 30,898: Conspiracy to Kidnap, Torture, and Kill Omar Abdulaziz and Other Exposed Twitter Users.

78.    Omar Abdulaziz is a Twitter user whose account information, like Plaintiff Abdulrahman's, was exposed in the Saudi Criminal Enterprise's conspiracy.  Between April and June 2017, Abdulaziz was approached by an agent of non-party MBS to persuade Abdulaziz to return to Saudi Arabia.  In mid-May 2018, two KSA agents told Abdulaziz that non-party MBS was not pleased with his online criticism but that if Abdulaziz stopped criticizing KSA and returned to Saudi Arabia, he would have a bright future there.

79.    The Saudi Criminal Enterprise targeted him because he posted criticism of Defendant KSA and the Saudi royal family on Twitter, including Defendant KSA's human rights abuses.  Had Abdulaziz returned to Saudi Arabia, as the Saudi Criminal Enterprise's agents urged, Abdulaziz would have been kidnapped, tortured, and killed.  The Saudi Criminal Enterprise's

activities constituted unlawful racketeering acts of conspiring to kidnap, torture, and kill Abdulaziz, in violation of Cal. Penal Code §§ 187, 189, 207(a).

80.     The Saudi Criminal Enterprise has similarly conspired to kidnap, torture, and kill other persons among the nearly 6,000 exposed Twitter users.  Persons were targeted because they posted criticism of Defendant KSA, non-party MBS, or the Saudi royal family.

81.     In addition to Abdulaziz, alleged above, at least five other instances of documented kidnappings—including of Plaintiff Abdulrahman—occurred close in time to the transmittal of Twitter's private user data, according to the executive director of the Arabic Network for Human Rights Information.  The kidnappings in those five instances were a result of the Saudi Criminal Enterprise's access to confidential data illegally disclosed by Defendant Twitter.

82.     The Saudi Criminal Enterprise has conspired to or in fact kidnapped, tortured, and killed numerous others among the 6,000 exposed individual Twitter accounts, in violation of Cal. Penal Code §§ 187, 189, 207(a).  The Saudi Criminal Enterprise's campaign to terrorize perceived political dissidents is continuing and ongoing.  The Saudi Criminal Enterprise continues to use confidential data illegally disclosed by Defendant Twitter.

**4.     Racketeering Acts 30,899 to 30,905 and Continuing: The Saudi Criminal Enterprise Stamped Out Other Dissenting Voices in the United States and Abroad Through Criminal Activity.**

83.     Beginning in 2017—around the time Plaintiff Abdulrahman was abducted—the Saudi Criminal Enterprise's campaign to crush undesirable speech escalated.  Having obtained confidential information illegally disclosed by Defendant Twitter, members of the Saudi Criminal Enterprise began to harass, threaten, kidnap, torture, and kill exposed users.  These users and others whom the Saudi Criminal Enterprise have targeted in its conspiracy continue to face threats from

the Saudi Criminal Enterprise. The Saudi Criminal Enterprise's illegal activity and assault on speech and democracies worldwide shows no signs of abating.

84.   In addition to the exposed Twitter users, the Saudi Criminal Enterprise has targeted numerous other perceived dissidents. These dissidents spoke out publicly against the repressive regime in Saudi Arabia and the Saudi Criminal Enterprise punished them for it.

   a.   **Racketeering Acts 30,899 to 30,901: Kidnapping, Torturing, and Killing Jamal Khashoggi.**

85.   Jamal Khashoggi was a United States-based columnist for the Washington Post. He was well-known for his reporting and advocacy on democratic reform in the Arab world. He challenged the Saudi Criminal Enterprise, which surveilled Khashoggi, waiting to strike.

86.   In October 2017, non-party MBS's senior lieutenant, Defendant Al-Qahtani, called Khashoggi in the United States. Defendant Al-Qahtani made thinly veiled threats on the call. The plan to kill Khashoggi then began at the Saudi Embassy in Washington, D.C., where Defendant KSA lured Khashoggi to travel to Istanbul, Turkey to obtain necessary documents.

87.   The United States-based KSA ambassador falsely told Khashoggi that he would be safe during his travels. Khashoggi was tortured and killed at the Saudi Consulate in Istanbul. Non-party MBS directed and ordered the execution.

88.   The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of kidnapping, torturing, and killing Khashoggi, in violation of Cal. Penal Code §§ 187, 189, 207(a).

   b.   **Racketeering Acts 30,902 to 30,904: Conspiracy to Kidnap, Torture, and Kill Saad Aljabri.**

89.   On or around October 2018, non-party MBS sent members of the Saudi Criminal Enterprise known as the "Tiger Squad"—the same team that assassinated Khashoggi—to Canada

to kidnap, torture, and kill another person critical of his regime, Saad Aljabri. The Tiger Squad entered Canada through the United States.

90.     Aljabri is a former Saudi intelligence official who the Saudi Criminal Enterprise believes defected and betrayed non-party MBS. In or around the spring of 2015—several years before non-party MBS directed members of the Saudi Criminal Enterprise to locate and kill Aljabri—non-party MBS implied to Aljabri that he had a covert agent inside Twitter who took action to silence Twitter users critical of non-party MBS.

91.     Prior to the attempted assassination, Defendant KSA deployed three members of the Saudi Criminal Enterprise in the United States to gather information on Aljabri's whereabouts and habits to facilitate the attempt. The three members were affiliated with Defendant SACM in the United States and participated in MISK-sponsored programming in the United States.

92.     Two of his children were also taken hostage in Saudi Arabia because of Aljabri's dissident activities. On March 16, 2020, they were kidnapped in a raid by over fifty armed men from their residence in Saudi Arabia and held incommunicado.

93.     The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of conspiring to kidnap, torture, and kill Aljabri, in violation of Cal. Penal Code §§ 187, 189, 207(a).

### c.     Racketeering Act 30,905: Kidnapping Saad Almadi.

94.     In 2021, the Saudi Criminal Enterprise kidnapped and detained Saad Almadi when he visited Saudi Arabia. Almadi is a Saudi-American dual citizen who lived in Florida.

95.     The Saudi Criminal Enterprise targeted him because he sent a tweet in 2015 that non-party MBS "has taken over the economy, defense and everything under the king." He received a 16-year sentence—increased to 19 years after he appealed his sentence and his son petitioned

U.S. officials for help. Almadi was released from prison in March 2023 but is banned from leaving Saudi Arabia.

96.     The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of kidnapping Almadi, in violation of Cal. Penal Code § 207(a).

**C.     Racketeering Acts 30,906 to 30,908: The Saudi Criminal Enterprise Stalks, Threatens, Terrorizes, and Conspires to Kidnap, Torture, and Kill Plaintiff Areej.**

97.     When Plaintiff Areej began speaking out against Defendant KSA to share what happened to Plaintiff Abdulrahman, she raised her profile with the Saudi Criminal Enterprise. She became a target of its conspiracy of transnational repression.

**1.     The Saudi Criminal Enterprise Stalks and Threatens to "Throw Away" Plaintiff Areej Like Her Brother After She Speaks Out.**

98.     Plaintiff Abdulrahman was being held in a secret prison with others who had spoken out against non-party MBS and the Saudi regime on Twitter. Saudi officials gloated about obtaining confidential information from Defendant Twitter about Plaintiff Abdulrahman and the other prisoners.

99.     Plaintiff Areej began speaking out publicly against the Saudi Criminal Enterprise and her brother's unlawful disappearance.

100.     Plaintiff Areej filed a complaint with the United Nations and shared details of her concerns with many organizations, including the American Bar Association and human rights groups MENA Rights Group, ALQST, the Freedom Initiative, Amnesty International, Human Rights Watch, and Human Rights Foundation. Plaintiff Areej also petitioned the United States Department of State and her local county and state representatives.

101.     Around April 9, 2019, a woman activist publicly referenced Plaintiff Areej's efforts to shed light on her brother's kidnapping. Plaintiff Areej received an influx of online threats,

frightening messages, and a phone call from Defendants John Doe 1-9, saying Defendant KSA killed her brother and warning her that she and her family would meet the same fate.

102.    In May 2019, Plaintiff Areej visited Oslo to attend the Oslo Freedom Forum hosted by the Human Rights Foundation, where an agent of the Saudi Criminal Enterprise, Defendant John Doe 10, threatened her.  At 5:00 am on May 29, 2019, Plaintiff Areej was walking to the train station in Oslo.  When she left the hotel, she noticed a car parked across from the hotel with its engine running.

       a.   The streets were empty, except for a man, Defendant John Doe 10, in a suit walking parallel to her on the other side keeping the exact same pace as her stride.  Defendant John Doe 10 was speaking into a headset and staring pointedly at her as she walked.  Plaintiff Areej stopped a passerby, who she asked to walk with her.  The man continued to follow Plaintiff Areej.

       b.   When Plaintiff Areej and her companion had to part ways, Plaintiff Areej decided that continuing to the train station was too dangerous.  She turned into the first building with security inside because she was fearful that Defendant John Doe 10 was an agent of the Saudi Criminal Enterprise tasked with following her.  The moment she did, her fears were confirmed— Defendant John Doe 10 yelled at her in Arabic with a Saudi accent, "Where are you going?!"

103.    Plaintiff Areej was rattled by being stalked but decided her only option was to be louder in protest.   Plaintiff Areej began tweeting about her brother on her Twitter account @AreejASadhan.  The account has since been a dedicated tool for her advocacy.



104.    Plaintiff Areej first began tweeting in March 2019, expressing frustration that her continued silence has made the situation with her brother worse.  In April 2019, she tweeted: ". . . I will speak out of necessity, as silence has become more dangerous than speaking in an environment where speech is forbidden.  I will tell you about the case of my brother[.]"  In one early tweet, she asked:  ". . . [A]fter a year of trying all possible methods that did not work . . . I no longer have any other choice.  [W]here is my brother?"

105.    Since then, she has been tweeting and speaking out regularly about the Saudi Criminal Enterprise's transnational repression of her brother.  Immediately, she received threats

to her life in response.  Defendant John Doe 1, using the Twitter handle @9198Turky, replied to

one tweet "God willing, it will be your turn."



106.    Other tweets, published on Twitter by Defendants John Does 2 through 9,

threatened her life and sadistically taunted her: "In the sewer and you will follow him."  "Any

word or trying to amplify opinion, you'll regret it."  "If it was up to me I'd let you see him while

I torture him."   The stream of threats from Defendant Al-Qahtani's "digital army" has been

unrelenting:





107.    From the moment that Plaintiff Areej received the first threat, she knew that she was in danger and that the Saudi Criminal Enterprise would try to silence her.  Because of Plaintiff Areej's public activism, United States officials and international organizations began pressuring Defendant KSA to account for Plaintiff Abdulrahman's whereabouts and allow him to communicate with his family.

108.    Two years after Plaintiff Abdulrahman had vanished, in early 2020, the family received its first call from Plaintiff Abdulrahman.  Plaintiff Abdulrahman was allowed to speak with a family member for one minute.

109.    Plaintiff Abdulrahman told the family member that he was being held in Al Ha'ir prison in Riyadh.  The family member urged him to be strong and patient and said that the family was praying for him.

110.    A year passed before the family heard from Plaintiff Abdulrahman again.  On March 2, 2021, Plaintiff Abdulrahman called the family member.  He shared positive news that the prosecutors had told him he would be released from prison soon.  Plaintiff Abdulrahman said he felt hopeful and that he could not wait to see his family.  Plaintiff Areej's family was excited and happy and believed that his indefinite detention would soon be over—that he would be able to return to his family.

### 2.    The Saudi Criminal Enterprise Holds Plaintiff Abdulrahman Hostage to Terrorize Plaintiff Areej in Retaliation for Her Speech.

111.    Plaintiff Abdulrahman was not released.  Instead, the Saudi Criminal Enterprise put him through a sham trial and shattered his expectation and hope that he would soon be released when they convicted and sentenced him to 20 years in prison followed by a 20-year travel ban. Until Plaintiff Abdulrahman was sentenced, he and his family believed that he might return home.

No longer.  Plaintiff Abdulrahman's baseless conviction and resulting sentence conferred a permanent injustice upon his life—he became a convicted person who would likely never be able to return to work and, even if he could, his conviction would impose restrictions on employment opportunities and have immigration consequences for work visas.

112.    On March 3, 2021, the Saudi Criminal Enterprise reportedly presented the case in secret before the Specialized Criminal Court ("SCC") for a first hearing—approximately three years after he had been detained.  Plaintiff Abdulrahman had no legal representation and his family members were denied access to the hearing.  Plaintiff Areej followed these events from the United States, awaiting updates from her family.

113.    On March 4, 2021, Speaker Nancy Pelosi's office received a call from Defendant KSA's Embassy.  An Embassy official said that Abdulrahman was in "good health," that his "arrest and trial relate to a national security matter of transferring funds to problematic individuals designated as terrorists," and that he had been "appointed a lawyer and will receive due process under Saudi law."  Plaintiff Abdulrahman's "legal rights and health," the Embassy official said, "will always be guaranteed, and if there was a conviction there is a right to appeal."

114.    A week later, there was a second hearing.  Plaintiff Abdulrahman received a court-appointed lawyer, and a family member was finally allowed to see Plaintiff Abdulrahman.  The meeting happened within ear shot of security guards and lasted only five minutes.

115.    Plaintiff Abdulrahman's family member noticed that he had trouble walking and focusing, his toenails were missing, his hand was mutilated, and his body showed other signs of torture.  Plaintiff Abdulrahman had spent five days in an ICU.

116.    Plaintiff Abdulrahman was forced to sign confessions and evidentiary documents blindfolded.  And he had been threatened not to speak of the torture in court or he would receive

more.  Plaintiff Abdulrahman's legal representative was forced to remove details about torture from Plaintiff Abdulrahman's response in court.

117.    The proceedings lasted one month.  The public prosecutor presented as evidence 200 printed tweets from Plaintiff Abdulrahman's account @Sama7ti—the same anonymous account for which Defendant Twitter illegally disclosed confidential, personally identifying data for Plaintiff Abdulrahman.  Plaintiff Abdulrahman's lawyer was allowed to review the Twitter posts for less than an hour before they were introduced as evidence at the proceeding.

118.    Over five hearings, Defendant KSA accused Plaintiff Abdulrahman of funding and supporting terrorism and sending tweets that would prejudice the public order and religious values, including the formal charge of "storing and sending what would prejudice public order and religious values which is declared criminal and punishable under paragraph 1 of article 6 of Anti-Cyber Crime Law issued by Royal Decree no. 17/M dated 08/03/1428 H through publishing tweets on his Twitter accounts[.]"  His tweets violated this law, the charges stated, because they were allegedly "contempt[uous] of religion," "adopting an extremist approach calling for the exclusion of women and depriving them of the rights guaranteed to them by law," and "offending state institutions and officials and spreading false rumors about them."

119.    The Saudi Criminal Enterprise's agenda was in the open:  on April 5, 2021, Plaintiff Abdulrahman was sentenced to 20 years in prison followed by a 20-year travel ban.  Plaintiff Areej had to watch her brother reappear, find hope, and be cruelly shut down.

120.    After Plaintiff Abdulrahman was sentenced, and his sentence affirmed, he disappeared once again.  The family has had no contact with him since.  His family has asked government officials to speak with Plaintiff Abdulrahman many times but were either summarily denied or ignored.

### 3. The Saudi Criminal Enterprise Again Stalks Plaintiff Areej and Threatens to Kill Plaintiff Areej in Graphic and Violent Messages.

121.    Defendant KSA has offered no information about Plaintiff Abdulrahman—where he is held, or if he is alive.  Instead, the Saudi Criminal Enterprise continues to intimidate, taunt, stalk, and threaten to kidnap, torture, and kill Plaintiff Areej and her family.

122.    In October 2022, Ahmed Alobaid followed Plaintiff Areej while she was attending a human rights event with the Freedom Initiative in Washington, D.C.  An agent of the Saudi Criminal Enterprise, Alobaid, who worked for the Saudi Ministry of Foreign Affairs, followed Plaintiff Areej and her three companions, also human rights activists, to a restaurant.  Alobaid menaced Plaintiff Areej and her companions.  Alobaid was sent to the restaurant by members of the Saudi Criminal Enterprise to intimidate or track her whereabouts and activism.

123.    The attacks from Defendant Al-Qahtani's "digital army" have continued and escalated.  For example, Defendant John Doe 2 sent a Tweet on August 18, 2022, threatening to "rape" Plaintiff Areej and "throw [her] head under MBS's foot."  And on October 16, 2022:  "Keep barking in Twitter and you'll get the fate of your brother, God willing."

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. _____          38
COMPLAINT – DEMAND FOR JURY TRIAL













124.    The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of conspiring to kidnap, torture, and kill Plaintiff Areej, in violation of Cal. Penal Code §§ 187, 189, 207(a).

**D.    The Saudi Criminal Enterprise's Unlawful Activities Have Caused Plaintiff Areej to Severely Suffer, Including By Losing Substantial Business Opportunities.**

125.    The Saudi Criminal Enterprise's conduct has caused Plaintiff Areej to take time away from her employment to care for her health and advocate for her and her family's safety and her brother's release.  Plaintiff Areej's efforts to combat the Saudi Criminal Enterprise's threats, stalking, and treatment of her brother have resulted in her losing countless opportunities at work and the right to earn more.

126.    Plaintiff Areej's advocacy work against the human rights abuses by the Saudi Criminal Enterprise is a second job and takes away from her ability to earn more at her primary place of employment due to her inability to put in more work and focus on development projects, which would likely have led to promotions and pay increases, and the need to take a leave of absence, which was partially unpaid.  But for the actions of the Saudi Criminal Enterprise and its targeting of Plaintiff Areej and her brother, she would not have been deprived this right.

127.    Since approximately 2020, Plaintiff Areej has devoted much of her focus and energy toward traveling across the country and abroad to speak out against human rights abuses by the Saudi Criminal Enterprise and for her safety and her brother's release.  The time that she has spent advocating for her brother is time that she would have otherwise spent furthering her career and pursuing employment opportunities.  For example, in or around September 2019 through December 2019, Plaintiff Areej took a three-month leave to care for her health and safety and to advocate for her brother.  While she was on leave, Plaintiff Areej's colleagues replaced her

on teams and projects.  She could not complete projects that ultimately contributed to her peers—who replaced Plaintiff Areej on those initiatives—being promoted within the company over her.  This has been a recurring experience.  In order around late 2019, Plaintiff Areej took sick days and time off to care for her health and to gain strength to advocate against the Saudi Criminal Enterprise and for her brother's release after receiving a message about his torture.  As a result of Plaintiff Areej's leave of absences from work, Plaintiff Areej lost opportunities for professional advancement and was replaced on projects that were integral to securing career progression within her company.

128.    Because of the time she has taken away from opportunities to develop her skills and take leads on new initiatives, Plaintiff Areej has missed opportunities for promotions, networking, and bonuses.

129.    The Saudi Criminal Enterprise's actions have impacted Plaintiff Areej's ability to work in other ways as well.  For example, the incessant and gruesome messages that Plaintiff Areej received from Defendant Al-Qahtani's "digital army" have dissuaded her from leaving her house and going to work.  In one instance, after Plaintiff Areej received a message that her brother had been killed, Plaintiff Areej was so devastated and fearful for her own safety if she left her house that she had to request time off from work.

130.    Plaintiff Areej every day bears the responsibility to protect herself and her family from the Saudi Criminal Enterprise's actions.  They have failed, however, at silencing her.  She will continue to fight for human rights that the Saudi Criminal Enterprise seeks to diminish.

**E.     The Saudi Criminal Enterprise's Actions Are Continuous and Related.**

131.    The fair inferences from the evidence and allegations stated herein demonstrate that the Saudi Criminal Enterprise's racketeering acts and behavior are related and continuous.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

132.    As described above, the racketeering acts have continued from 2015 through the present and all involve the Saudi Criminal Enterprise's efforts to engage in transnational repression.  For example, in 2014 and 2015, members of the Saudi Criminal Enterprise facilitated the access of confidential Twitter user data and fraudulently transmitted it to Defendant KSA to identify and target Defendant KSA's political dissidents.   Members of the Saudi Criminal Enterprise then used Twitter data to conspire to kidnap, torture, and kill other exposed Twitter users.

133.    Members of the Saudi Criminal Enterprise have conspired and attempted to kidnap, or in fact kidnapped, three additional U.S. citizens or residents:

    a.  In 2019, U.S. citizen Carly Morris was lured to Saudi Arabia, charged baselessly, and detained in Saudi Arabia. She now faces a 10-year travel ban.  Morris was detained because she spoke out about Defendant KSA's oppressive male guardianship system.

    b.  In 2021, Anonymous No. 1, a Saudi citizen residing in the United States, reported to the Freedom Initiative that an employee of Defendant KSA's embassy in Washington D.C. grabbed and pulled her towards the embassy until she was able to break free.

    c.  In 2022, Anonymous No. 2, a dual United States-Saudi citizen, reported to police that she had received a phone call from an individual aligned with the Saudi government who threatened that "they," the Saudi Criminal Enterprise, could kidnap her and her child from the United States and forcibly return them to Saudi Arabia "even though they were U.S. citizens."

134.    In addition to these three U.S. residents and/or citizens, the Saudi Criminal Enterprise's transnational repression continues to threaten innocent individuals.  Last year, Prince Abdullah bin Faisal al Saud—a graduate student at Boston's Northeastern University—was arrested on a trip to Saudi Arabia after discussing his cousin's imprisonment at the hands of Defendant KSA.  Prince Abdullah was sentenced to 30 years' imprisonment in August 2022.

## FIRST CAUSE OF ACTION

(RICO Conspiracy, 18 U.S.C. § 1962(d))

*Plaintiffs Abdulrahman and Areej Against All Defendants*

135.    Plaintiffs repeat and reallege the allegations in paragraphs 1-134 as if fully set forth herein.

136.    Each individual Defendant agreed and conspired to conduct and participate in the conduct of the affairs of the Saudi Criminal Enterprise through a pattern of racketeering activity, specifically:

a.  Acts 1 to 30,892:  Conspiracy to access and transfer nearly 6,000 third-party users' confidential personally identifying information 30,892 times from Twitter users, including that of Plaintiff Abdulrahman and Omar Abdulaziz, without the third-party users' permission, to identify and target third-party Twitter users who communicated and published political dissent of Defendant KSA, in violation of 18 U.S.C. § 1028(a)(7).

b.  Acts 1 to 30,892: Conspiracy to use modified telecommunications instruments to obtain unauthorized access and use of nearly 6,000 third-party user accounts with intent to defraud third-party Twitter users 30,892 times, including Plaintiff

Abdulrahman and Omar Abdulaziz, and affecting interstate commerce, in violation of 18 U.S.C. § 1029(a)(7).

c. <u>Acts 30,893 to 30,895:</u>  Conspiracy to kidnap Plaintiff Abdulrahman, in violation of Cal. Penal Code § 207(a), and torturing and conspiring to kill Plaintiff Abdulrahman, in violation of Cal. Penal Code §§ 187, 189.

d. <u>Acts 30,896 to 30,898:</u> Conspiracy to kidnap, torture, and kill Omar Abdulaziz, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

e. <u>Acts 30,899 to 30,901:</u>  Conspiracy to kidnap, torture, and kill Jamal Khashoggi, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

f. <u>Acts 30,902 to 30,904:</u> Conspiracy to kidnap, torture, and kill Saad Aljabri, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

g. <u>Act 30,905:</u> Conspiracy to kidnap Saad Almadi, in violation of Cal. Penal Code § 207(a).

h. <u>Acts 30,906 to 30,908:</u>  Conspiracy to kidnap, torture, and kill Plaintiff Areej, in violation of Cal. Penal Code §§ 187, 189, 207(a).

137.    Each individual Defendant knowingly engaged in and agreed to this pattern of racketeering activity and agreed to the commission of multiple acts of statutory violations to further their conspiracy to identify and target perceived political dissidents of Defendant KSA.

138.    As a direct and proximate result of the Defendants' conspiracy, the racketeering activities of their enterprise, the overt acts taken in furtherance of the conspiracy, and the violations of 18 U.S.C. § 1962(d), Plaintiffs Abdulrahman and Areej have been severely harmed in their

property.   Defendants' activities have directly and proximately caused severe financial and professional harms.

139.   Plaintiffs Abdulrahman and Areej are entitled to damages, costs, and fees as allowed by law.

## SECOND CAUSE OF ACTION

(RICO, 18 U.S.C. § 1962(c))

### *Plaintiff Areej Against Defendants Twitter, KSA, Al-Qahtani, Abouammo, Alzabarah, Almutairi, and Al-Asaker*

140.   Plaintiffs repeat and reallege the allegations in paragraphs 1-139 as if fully set forth herein.

141.   Defendants are members of an enterprise engaged in and whose activities affect interstate commerce.  The purpose of the Saudi Criminal Enterprise is to suppress dissent and criticism of Defendant KSA, non-party MBS, and the Saudi royal family by conscripting social media organizations in the United States and abroad and silencing dissidents through theft, kidnapping, indefinite detention, torture, and killing.

142.   Defendants agreed to and did participate in the conduct of the Saudi Criminal Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of fraudulently accessing and stealing third parties' identifying information to conspire to retaliate against dissenters, including the kidnapping and torture of Plaintiff Abdulrahman and to threaten, harass, and silence Plaintiff Areej.

143.   The following acts of the Saudi Criminal Enterprise constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5):

a. <u>Acts 1 to 30,892</u>:  Accessing and transferring nearly 6,000 third-party users' confidential personally identifying information 30,892 times from Twitter users, including that of Plaintiff Abdulrahman and Omar Abdulaziz, without the third-party users' permission, to identify and target third-party Twitter users who communicated and published political dissent of Defendant KSA, in violation of 18 U.S.C. § 1028(a)(7).

b. <u>Acts 1 to 30,892</u>: Using modified telecommunications instruments to obtain unauthorized access and use of nearly 6,000 third-party user accounts with intent to defraud third-party Twitter users 30,892 times, including Plaintiff Abdulrahman and Omar Abdulaziz, and affecting interstate commerce, in violation of 18 U.S.C. § 1029(a)(7).

c. <u>Acts 30,893 to 30,895</u>:  Kidnapping Plaintiff Abdulrahman, in violation of Cal. Penal Code § 207(a), and torturing and conspiring to kill Plaintiff Abdulrahman, in violation of Cal. Penal Code §§ 187, 189.

d. <u>Acts 30,896 to 30,898</u>:  Conspiracy to kidnap, torture, and kill Omar Abdulaziz, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

e. <u>Acts 30,899 to 30,901</u>:  Kidnapping, torturing, and killing Jamal Khashoggi, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

f. <u>Acts 30,902 to 30,904</u>:  Conspiracy to kidnap, torture, and kill Saad Aljabri, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

g. <u>Act 30,905</u>:  Kidnapping Saad Almadi, in violation of Cal. Penal Code § 207(a).

h. <u>Acts 30,906 to 30,908</u>:  Conspiracy to kidnap, torture, and kill Plaintiff Areej, in violation of Cal. Penal Code §§ 187, 189, 207(a).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

144.    Defendants have directly and indirectly conducted and participated in the conduct of the Saudi Criminal Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

145.    Defendants intended to cause injury to Plaintiff Areej, a public and vocal dissident of Defendant KSA's authoritarian regime.

146.    As a direct and proximate result of Defendants' racketeering activities and in violation of 18 U.S.C. § 1962(c), Plaintiff Areej has been severely harmed.  Defendants' activities have directly and proximately caused severe financial and professional harms.

147.    Plaintiff Areej is entitled to damages, costs, and fees as allowed by law.

### THIRD CAUSE OF ACTION

(Alien Tort Statute, 28 U.S.C. § 1350)

***Plaintiff Abdulrahman Against Defendants Twitter, Abouammo, and Alzabarah***

148.    Plaintiffs repeat and reallege the allegations in paragraphs 1-146 as if fully set forth herein.

149.    Defendants Twitter, Abouammo, and Alzabarah engaged in a joint criminal enterprise with, conspired with, or aided and abetted Defendant KSA in torturing Plaintiff Abdulrahman.  Defendant KSA tortured Plaintiff Abdulrahman with electric shocks, flogged and hung him from his feet, suspended him in contorted positions, deprived him of sleep, threatened to behead him, insulted him, and kept him in solitary confinement for years.

150.    Defendants Twitter, Abouammo, and Alzabarah acted knowingly and with specific intent that Defendant KSA would detain and torture individuals whose confidential Twitter account data Defendants Twitter, Abouammo, and Alzabarah transmitted to Defendant KSA, including Plaintiff Abdulrahman's confidential Twitter account data.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

151.    Defendants Twitter, Abouammo, and Alzabarah acted under apparent authority or color of law of Defendant KSA.

152.    Defendants Twitter, Abouammo, and Alzabarah provided substantial assistance to and agreed to participate in Defendant KSA's torture of Plaintiff Abdulrahman by providing Plaintiff Abdulrahman's identifying information to Defendant KSA.

153.    The torture of Plaintiff Abdulrahman constitutes a "tort . . . committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that it violated customary international law prohibiting torture as reflected, expressed, defined, and codified in customary international law, multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

154.    As a result of being tortured in violation of the law of nations, Plaintiff Abdulrahman has suffered severe physical and mental pain, suffering, and anguish.

155.    As a result of being tortured in violation of the law of nations, Plaintiff Abdulrahman is entitled to damages in an amount to be determined at trial.

156.    Defendants Twitter, Abouammo, and Alzabarah's acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

157.    Additionally, Plaintiff Abdulrahman is entitled to a declaratory judgment stating that Defendants have violated the law of nations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Abdulrahman and Areej pray that the Court enter judgment and relief as follows:

A.      Appointing Plaintiff Areej as Next Friend of Plaintiff Abdulrahman pursuant to Federal Rule of Civil Procedure 17(c)(2);

B.      Awarding Plaintiffs Abdulrahman and Areej a money judgment for damages, in an amount to be determined at trial;

C.      Awarding Plaintiff Abdulrahman punitive and exemplary damages;

D.      Awarding Plaintiff Abdulrahman declaratory relief that Defendants have violated his rights;

E.      Awarding Plaintiffs Abdulrahman and Areej prejudgment interest;

F.      Awarding Plaintiffs Abdulrahman and Areej reasonable attorney's fees and costs incurred in connection with this action; and

G.      Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

158.    Plaintiffs Abdulrahman and Areej demand trial by jury of all claims triable to a jury in this action.

Dated: May 16, 2023, in San Francisco, California

WALDEN MACHT & HARAN LLP

By: _____

     Jim Walden
     Avni P. Patel
     Deanna Paul
     Peter A. Devlin
     Catherine Weiss
     250 Vesey Street, 27th Floor
     New York, NY 10281
     (212) 335-2030

VAN DER HOUT LLP

By: _____

     Marc Van Der Hout
     Johnny Sinodis
     360 Post Street, Suite 800
     San Francisco, CA 94108

     (415) 821-8820

THE FREEDOM INITIATIVE

     Andrea J. Prasow
     1101 New York Avenue, NW
     Suite 1000
     Washington, DC 20005
     (917) 842-5109

     *Attorneys for Plaintiff*