KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
ANJALI SRINIVASAN - # 304413
asrinivasan@keker.com
W. HAMILTON JORDAN - # 295004
wjordan@keker.com
RYAN J. HAYWARD - # 330924
rhayward@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:      415 397 7188

Attorneys for Defendant X Corp.,
as Successor in Interest to Named
Defendant Twitter, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| AREEJ AL-SADHAN, and ABDULRAHMAN AL-SADHAN, an Incompetent, by his Sister and Next Friend AREEJ AL-SADHAN,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC., KINGDOM OF SAUDI ARABIA, SAUD AL-QAHTANI, AHMAD ABOUAMMO, ALI ALZABARAH, AHMED ALMUTAIRI a/k/a AHMED ALJBREEN, BADER AL-ASAKER, SAUDI ARABIAN CULTURAL MISSION, and JOHN DOES 1-10,<br><br>Defendants. | Case No. 4:23-cv-02369-HSG<br><br>**DEFENDANT X CORP.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Date:       September 14, 2023<br>Time:       2:00 p.m.<br>Dept.:       Courtroom 2 – 4th Floor<br>Judge:      Hon. Haywood S. Gilliam, Jr.<br><br>Date Filed: May 16, 2023<br>Trial Date: None Set |

2169615

1

## <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3    I.      INTRODUCTION ....................................................................................................1

4    II.     BACKGROUND ......................................................................................................3

5            A.      Mr. Al-Sadhan joins Twitter and builds a "substantial" following for his
                     public criticism of the KSA and the Saudi royal family............................3

6

7            B.      Ahmad Abouammo and Ali Alzabarah engage in espionage against Twitter
                     and its accountholders on behalf of the KSA..............................................3

8            C.      Twitter promptly notifies individuals whose accounts may have been
                     compromised................................................................................................5

9

10           D.      In March 2018, the KSA kidnaps Mr. Al-Sadhan. ....................................5

11           E.      Ms. Al-Sadhan publicly criticizes the KSA over its treatment of her
                     brother.........................................................................................................5

12           F.      Ms. Al-Sadhan brings this suit on behalf of herself and her brother. ......6

13           G.      Procedural History .....................................................................................6

14   III.    ARGUMENT .........................................................................................................8

15           A.      Plaintiffs fail to establish Article III standing to pursue claims against
                     Twitter related to the alleged 2014–2015 data breach. ..............................8

16

17                  1.      Mr. Al-Sadhan lacks Article III standing to sue Twitter because the
                            KSA, not Twitter, caused his arrest, torture, and detention......................9

18                  2.      Ms. Al-Sadhan lacks Article III standing to sue Twitter because the
                            KSA, not Twitter, is responsible for stalking and harassing her. ..............10

19

20           B.      Plaintiffs' claims also should be dismissed for lack of proximate causation. .......12

21           C.      As the district court held in *Abdulaziz*, Twitter did not authorize or ratify
                     Abouammo's and Alzabarah's rogue actions and is not liable for them. .............12

22           D.      Plaintiffs' RICO claims fail for several additional reasons. ...................14

23                  1.      Plaintiffs' RICO claims against Twitter are untimely. ...........................14

24                  2.      Plaintiffs fail to plead adequate facts to support their RICO claims..........15

25                          a.      The Complaint fails to allege a RICO "enterprise" including
                                    Twitter.......................................................................................16

26

27                          b.      Plaintiffs fail to allege that they suffered a domestic injury
                                    to their business or property.........................................................18

28                          c.      Plaintiffs fail to plausibly allege that Twitter entered into
                                    any agreement with its purported co-conspirators. ........................20

i

d.   Plaintiffs fail to plausibly allege that Twitter had the requisite knowledge of the alleged enterprise and intended to participate............................................................21

e.   Section 230(c)(1) of the Communications Decency Act precludes Plaintiffs' RICO claims to the extent they seek to hold Twitter liable for the KSA's use of Twitter's services. .........22

E.   Mr. Al-Sadhan's ATS claim fails for several additional reasons. .........................23

1.   Mr. Al-Sadhan fails to plead facts sufficient to establish that Twitter conspired to, or aided and abetted, his torture. ...........................................23

2.   Mr. Al-Sadhan fails to establish jurisdiction under the ATS....................24

3.   The Complaint improperly seeks to apply the ATS extraterritorially. .......25

IV.   CONCLUSION...........................................................................................................25

2169615

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abcarian v. Levine*,
   972 F.3d 1019 (9th Cir. 2020) ..........................................................................16, 18

*Abdulaziz v. Twitter, Inc.*,
   2020 WL 6947929 (Aug. 12, 2020) ("*Abdulaziz I*") ....................................... *passim*

*Abdulaziz v. Twitter, Inc.*,
   2021 WL 2986400 (N.D. Cal. July 15, 2021) ("*Abdulaziz III*")..................................8, 10, 12

*Abdulaziz v. Twitter, Inc.*,
   2021 WL 633812 (Feb. 18, 2021) ("*Abdulaziz II*")................................8, 10, 11, 15

*Agency Holding Corp. v. Malley–Duff & Associates, Inc.*,
   483 U.S. 143 (1987)...........................................................................................14

*Al Otro Lado, Inc. v. McAleenan*,
   394 F. Supp. 3d 1168 (S.D. Cal. 2019)...........................................................24

*Al-Ahmed v. Twitter, Inc.*,
   2023 WL 27356 (N.D. Cal. Jan. 3, 2023) ("*Al-Ahmed II*") ...........................8, 15, 23

*Al-Ahmed v. Twitter, Inc.*,
   No. 4:21-cv-08017-EMC, ECF No. 52 (N.D. Cal. Jun. 15, 2022) ("*Al-Ahmed I*")..................8

*Allen v. Wright*,
   468 U.S. 737 (1984)...........................................................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................16

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ..........................................................................22

*Baumer v. Pachl*,
   8 F.3d 1341 (9th Cir. 1993) ..............................................................................21

*Boyle v. U.S.*,
   556 U.S. 938 (2009)...................................................................................16, 18

*Doan v. Sing*h,
   617 F. App'x 684 (9th Cir. 2015) .....................................................................16

*Doe I v. Cisco Sys.*,
   ___ F.4th ___, 2023 WL 4386005 (9th Cir. 2023) ..........................................23

2169615

*Doe I v. Nestle USA, Inc.*,
   766 F.3d 1013 (9th Cir. 2014) ...................................................................................12

*Doe v. Tapang*,
   2019 WL 3576995 (N.D. Cal. Aug. 6, 2019) .........................................................19, 20, 25

*Fin. Corp. Mortg.-Backed Sec. Litig.*,
   2012 WL 10731957 (C.D. Cal. June 29, 2012) ...................................................................17

*Fraser v. Team Health Holdings, Inc.*,
   2022 WL 971579 (N.D. Cal. Mar. 31, 2022)...................................................................16

*Gianelli v. Schoenfeld*,
   2021 WL 4690724 (E.D. Cal. Oct. 7, 2021) ...................................................................21

*Global–Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ...................................................................................................22

*Grimmett v. Brown*,
   75 F.3d 506 (9th Cir. 1996) ...................................................................................14

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
   896 F.2d 1542 (9th Cir. 1989) ...........................................................................4, 13

*Howard v. Am. Online Inc.*,
   208 F.3d 741 (9th Cir. 2000) ...................................................................................21

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018)...................................................................................24

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
   497 F. Supp. 3d 552 (N.D. Cal. 2020) ...................................................................12

*Kanter v. Warner–Lambert Co.*,
   265 F.3d 853 (9th Cir. 2001) ...................................................................................24

*Keel v. Schwarzenegger*,
   2009 WL 1444644 (C.D. Cal. May 19, 2009) ...............................................................19

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) ...................................................................................22

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).........................................................................................8, 12

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ...................................................................................12

*Metaxas v. Lee*,
   503 F. Supp. 3d 923 (N.D. Cal. 2020) ...................................................................20

DEFENDANT X CORP.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT
Case No. 4:23-cv-02369-HSG

2169615

*Mohamed v. Jeppesen Dataplan, Inc.*,
    614 F.3d 1070 (9th Cir. 2010) .......................................................................................23

*Morales v. Brown*,
    2015 WL 6167451 (E.D. Cal. Oct. 20, 2015) ................................................................24

*Nestle USA, Inc. v. Doe*,
    141 S. Ct. 1931 (2021)....................................................................................................25

*Noland v. Chua*,
    816 F. App'x 202 (9th Cir. 2020) ..................................................................................15

*Novak v. United States*,
    795 F.3d 1012 (9th Cir. 2015) ..........................................................................................9

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ...................................................................................16, 18

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*,
    298 F.3d 768 (9th Cir. 2002) ...................................................................................12, 13

*Oscar v. Univ. Students Coop. Assn.*,
    965 F.2d 783 (9th Cir. 1992) (en banc) .........................................................................18

*Pac. Recovery Sols. V. United Behav. Health*,
    508 F. Supp. 3d 606 (N.D. Cal. 2020) ...........................................................................20

*Pincay v. Andrews*,
    238 F.3d 1106 (9th Cir. 2001) .......................................................................................15

*RJR Nabisco, Inc. v. Eur. Cmty.*,
    579 U.S. 325 (2016)..................................................................................................16, 19

*Rotella v. Wood*,
    528 U.S. 549 (2000).......................................................................................................15

*Salinas v. United States*,
    522 U.S. 52 (1997).........................................................................................................21

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) .........................................................................................20

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)........................................................................................................18

*Serra v. Lappin*,
    600 F.3d 1191 (9th Cir. 2010) .......................................................................................24

*Sikhs for Justice v. Nath*,
    893 F. Supp. 2d 598 (S.D.N.Y. 2012)............................................................................24

v

2169615

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)..........................................................................8, 9, 11

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ...............................................................13

*Vess v. Ciba–Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003) .............................................................16

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000)..............................................................................12

*Yegiazaryan v. Smagin*,
    599 U.S. ___, 2023 WL 4110234 (2023) .............................................19

*Zhang v. Twitter Inc.*,
    2023 WL 3919546 (N.D. Cal. June 8, 2023) .......................................23

**State Cases**

*Ventura v. ABM Indus. Inc.*,
    212 Cal. App. 4th 258 (2012) ..............................................................12

**Federal Statutes**

18 U.S.C. § 1962 .............................................................14, 15, 20, 21

18 U.S.C. § 1964 .............................................................................15, 18

Communications Decency Act § 230 ...............................8, 11, 22, 23

2169615

## NOTICE OF MOTION AND MOTION TO DISMISS

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on September 14, 2023, at 2:00 p.m., or as soon thereafter as this matter can be heard, in the courtroom of Judge Haywood S. Gilliam, Jr., located at Oakland Courthouse, Courtroom 2 – 4th Floor, 1301 Clay Street, Oakland, CA 94612, Defendant X Corp., as successor in interest to named defendant Twitter, Inc., ("Twitter") will move this Court for an order dismissing Plaintiffs' Complaint as to Twitter.

This motion is brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the Court lacks subject matter jurisdiction, and that the Complaint fails to state a claim upon which relief may be granted.  This motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the Declaration of Benjamin Berkowitz and accompanying exhibits, Twitter's Request for Judicial Notice, the Declaration of X Corp. Employee ("Twitter Employee Declaration")[1] and accompanying exhibits, all files and records in this action, oral argument, and such additional matters as may be judicially noticed by the Court or may come before the Court prior to or at the hearing on this matter.

The issues presented by Twitter's motion to dismiss are as follows:

1.  Whether Plaintiffs' Complaint alleges facts establishing Article III standing under Rule 12(b)(1); and

2.  Whether Plaintiff Abdulrahman Al-Sadhan alleges facts establishing subject matter jurisdiction as to his Alien Tort Statute claim under Rule 12(b)(1); and

3.  Whether the Complaint states a claim upon which relief can be granted under Rule 12(b)(6).

---

[1] For the reasons set forth in Twitter's accompanying Administrative Motion, Twitter has asked the Court to seal from the public record the name and identity of the Twitter Employee declarant. Accordingly, Twitter refers to the declarant solely as Twitter Employee in this motion.

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.      INTRODUCTION**

3         In 2014 and 2015, Twitter and certain Twitter accountholders were victims of state-

4   sponsored espionage carried out by the Kingdom of Saudi Arabia ("KSA").  The KSA allegedly

5   targeted and recruited two Twitter employees, Ahmad Abouammo and Ali Alzabarah, to access

6   and provide the KSA with information regarding certain Twitter accountholders without Twitter's

7   knowledge or authorization.  Upon learning that these rogue employees may have been

8   compromised by a foreign government, Twitter immediately took steps to protect its

9   accountholders, including by terminating Alzabarah's access to Twitter's computer systems,

10  seizing his laptop, physically escorting him out of the building, and notifying potentially affected

11  accountholders.  Abouammo had already left the company months earlier.  Thereafter, Twitter

12  cooperated with the Federal Bureau of Investigation and the U.S. Department of Justice ("DOJ")

13  investigation into these individuals' activities.  On November 5, 2019, as a result of that

14  investigation, the DOJ filed charges in a criminal complaint against Abouammo, Alzabarah, and

15  another individual.  Following a jury trial, Abouammo—the only defendant who was

16  apprehended, as the others are believed to be in Saudi Arabia—was convicted on numerous

17  charges and sentenced to a term of incarceration.

18        This lawsuit, filed more than seven years after the KSA-directed attack on Twitter and its

19  accountholders, seeks to blame Twitter for numerous harms later carried out by the KSA against

20  Plaintiff siblings Areej Al-Sadhan and Abdulrahman Al-Sadhan, two dissidents who used Twitter

21  to publicly criticize the KSA.  Plaintiffs—who claim to have suffered serious physical and

22  psychological harm at the hands of the KSA, including Mr. Al-Sadhan being kidnapped, tortured,

23  and detained, and Ms. Al-Sadhan being harassed, threatened, and stalked—assert civil RICO and

24  Alien Tort Statute ("ATS") claims against Twitter, the KSA, and several alleged KSA agents.

25        While the Complaint paints a disturbing picture of abuse and torture by the KSA, this

26  lawsuit is, respectfully, directed at the wrong target.  It is plain from Plaintiffs' own Complaint

27  and the exhibits thereto—which include and incorporate the DOJ's superseding indictment

28  against the rogue former Twitter employees—that Twitter was a *victim* of the very conduct

2169615

alleged against the KSA, and that Twitter played no role in the KSA's espionage campaign or its subsequent abuse of Plaintiffs. Two other courts in this district have already dismissed with prejudice similar lawsuits by other Saudi dissidents seeking to hold Twitter liable for alleged harms perpetrated by the KSA following the same 2014–2015 KSA espionage against Twitter and its accountholders. *See Abdulaziz v. Twitter, Inc., et al.*, No. 3:19-cv-06694-LB (N.D. Cal.) (the "*Abdulaziz* action"); *Al-Ahmed v. Twitter, Inc.* No. 4:21-cv-08017-EMC (N.D. Cal.) (the "*Al-Ahmed* action"). This Court should reach the same result here.

The Complaint fails to state a claim and should be dismissed as to Twitter in its entirety for numerous, independent reasons. *First*, it fails to establish a causal connection between the alleged unauthorized access of Mr. Al-Sadhan's account information in 2014 and 2015 and the harm he allegedly suffered several years later in 2018. Similarly, Ms. Al-Sadhan fails to identify a connection between that same 2014–2015 data breach and her own alleged injuries, which she alleges resulted from her own public criticisms of the KSA. As a result, Plaintiffs lack Article III standing to bring this suit. *Second*, and for substantially the same reasons, Plaintiffs fail to allege proximate causation as required to plead their RICO and ATS claims.

*Third,* the Complaint fails in its entirety also because each of the causes of action rests on the argument—already rejected in the *Abdulaziz* action—that Twitter was vicariously liable for its former employees' rogue conduct. This assertion is contrary to the incorporated superseding indictment, which makes clear that the former employees acted against Twitter's policies and "without Twitter's approval" and in fact "defraud[ed] Twitter," which was itself a victim of the espionage. Because those rogue employees acted beyond the scope of their employment and without Twitter's knowledge or approval, Plaintiffs cannot establish *any* of their civil RICO or ATS claims, which depend on holding Twitter responsible for the former employees' undisputedly unauthorized conduct.

*Fourth*, Plaintiffs fail to state a claim under RICO for numerous additional reasons. Plaintiffs' RICO claims are untimely, having been brought more than four years after they knew about their alleged injuries. Further, Plaintiffs do not plausibly allege that Twitter was part of a qualifying RICO "enterprise," or that either Plaintiff suffered a qualifying domestic injury to their

2

2169615

"business or property" because of any alleged RICO violation.  Additionally, the Complaint lacks any well-pleaded facts establishing that Twitter entered into any agreement to commit predicate RICO acts, or that it was aware of the essential nature and scope of the alleged enterprise, as required for Plaintiffs' RICO conspiracy claim.

*Fifth*, Mr. Al-Sadhan's ATS claim likewise fails for additional reasons, including because he fails to allege Twitter engaged in any conduct with the knowledge of aiding his torture. Moreover, the Court lacks subject matter jurisdiction because Mr. Al-Sadhan does not allege he is an alien.  In addition, he impermissibly seeks extraterritorial application of the ATS.

In sum, Plaintiffs cannot maintain this suit against Twitter.  They have sued a victim of the KSA's alleged conduct, not a perpetrator of—or co-conspirator behind—Plaintiffs' injuries. The Complaint should be dismissed against Twitter in its entirety and with prejudice.

## II.    BACKGROUND

### A.    Mr. Al-Sadhan joins Twitter and builds a "substantial" following for his public criticism of the KSA and the Saudi royal family.

The Complaint describes Plaintiff Abdulrahman Al-Sadhan as an aid worker and citizen of Saudi Arabia.  Compl. ¶ 11.  After attending middle school in the United States, he returned to Saudi Arabia for a few years, after which he moved back to the United States in 2008 to attend college.  *Id.*  In 2011, while still living in the United States, he created a Twitter account with the handle @sama7ti.  *Id.* ¶¶ 11, 64.  He used the account to criticize the KSA and Saudi royal family, including Crown Prince Mohammed bin Salman, and to "retweet" dissident journalists and activists.  *Id.* ¶¶ 64–65.  He built a "substantial" following for his account, which "was known for its scorching and entertaining sarcasm" in criticizing the KSA.  *Id.* ¶ 64.

### B.    Ahmad Abouammo and Ali Alzabarah engage in espionage against Twitter and its accountholders on behalf of the KSA.

In 2014, the KSA allegedly recruited two Twitter employees, Ahmad Abouammo and Ali Alzabarah, to access Twitter account information in an act of state-sponsored espionage.  *Id.* ¶ 38.  Abouammo, a U.S. citizen, worked at Twitter from November 2013 to May 2015 as a Media Partnerships Manager responsible for the Middle East and North Africa region, assisting notable Twitter accountholders in those regions with their content and strategy.  *Id.* ¶¶ 39, 44; Pl.

Ex.[2] 2 (Superseding Indictment, ECF No. 53, *United States v. Abouammo, et al.*, No. 19-cr-0621-EMC (N.D. Cal. Jul. 28, 2020) at ¶ 12.  Alzabarah joined Twitter in August 2013 and worked as a Site Reliability Engineer, a role in which he was responsible for maintaining Twitter's hardware and software.  Compl. ¶ 45.

From approximately January through November of 2015, Abouammo and Alzabarah allegedly provided the KSA with information about thousands of Twitter accountholders, including Mr. Al-Sadhan.  *Id.* ¶¶ 6, 38, 49, 55.  In late 2015, U.S. intelligence agencies informed Twitter that Alzabarah and Abouammo had transmitted data to the KSA.  *Id.* ¶ 51.  Upon learning of this misconduct, Twitter promptly acted to protect its accountholders.  Twitter immediately confronted Alzabarah (who was then still a Twitter employee), seized his Twitter-owned laptop, and escorted him from the building.  Pl. Ex. 2 ¶ 26(s); Pl. Ex. 3; *see also* Criminal Complaint, *United States v. Abouammo, et al.*, No. 3:19-cr-000621-EMC (N.D. Cal. Nov. 5, 2019), ECF No. 1, ¶ 85.  Abouammo had already resigned in May 2015.  Pl. Ex. 2 ¶ 26(k).  Twitter cooperated with the FBI's confidential investigation into Abouammo and Alzabarah's activities.  *See, e.g.*, Pl. Ex. 2 ¶¶ 14–16 (discussing internal company documents obtained from Twitter); *id.* ¶¶ 12–13 (discussing Abouammo's and Alzabarah's employment details obtained from Twitter).

In November 2019, the United States Attorney's Office indicted Abouammo, Alzabarah, and Ahmed Almutairi.  Compl. ¶ 62.  In the July 2020 superseding indictment, those defendants were charged with numerous criminal acts, including wire fraud and conspiracy to commit wire fraud and honest services fraud, based on their acts of fraud against Twitter.  *Id.*; Pl. Ex. 2.  They were also charged with acting as agents of a foreign government without notice, money laundering, and falsifying records to obstruct an investigation.  Compl. ¶ 62; Pl. Ex. 2.

According to the indictment, Abouammo and Alzabarah "fraudulently" and "without Twitter's approval" "used their positions and access to information at Twitter" to provide the KSA government, the Saudi Royal Family, and related individuals "with nonpublic information

---

[2] Throughout this Motion, "Pl. Ex." citations refer to the exhibits attached to Plaintiffs' Complaint.  *See* ECF No. 1-2.  Because Plaintiffs attach these exhibits to their Complaint and rely upon them, the Court may consider the contents of Plaintiffs' exhibits when ruling on this Motion.  *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

about Twitter users." Pl. Ex. 2 ¶ 21. This unauthorized disclosure of confidential information was contrary to their employment agreements with Twitter and, in fact, was part of a scheme to "defraud Twitter." *Id.* ¶ 14–15, 36, 38. Neither individual's job duties involved a need to access any Twitter user's private information, *id*. ¶ 18, nor were they authorized to disclose user information in response to any government's disclosure requests, *id*. ¶ 19. *See also id.* ¶ 23 (Abouammo and Alzabarah operated "beyond the scope of their job duties" in accessing Twitter accountholder information on behalf of the KSA). The DOJ alleged that in exchange for Abouammo's and Alzabarah's criminal conduct against Twitter, a foreign official compensated them with gifts, cash payments, and promises of future benefits. *Id*. ¶ 24.

Abouammo was convicted in August 2022. Compl. ¶ 62. Alzabarah and Almutairi have not been arrested and are believed to be in Saudi Arabia. *Id*.

**C.**   **Twitter promptly notifies individuals whose accounts may have been compromised.**

On or about December 11, 2015, Twitter sent an email notice to holders of accounts that appeared to have been accessed on behalf of the KSA. *See* Twitter Employee Decl. ¶¶ 2–3; *id.* Exs. 1–2. Twitter notified Mr. Al-Sadhan via the email address that he had provided to Twitter, advising that: "As a precaution, we are alerting you that your Twitter account is one of a small group of accounts that may have been targeted by state-sponsored actors." *Id.* ¶ 3; *id.* Ex. 1; *id.* Ex. 2 at 1.

**D.**   **In March 2018, the KSA kidnaps Mr. Al-Sadhan.**

In March 2018—more than two years after Abouammo and Alzabarah allegedly accessed Mr. Al-Sadhan's account information, and approximately four years after he returned to Saudi Arabia—the KSA allegedly kidnapped him. Compl. ¶¶ 11, 68–75. For the following two years, he was allegedly detained, tortured, and kept in solitary confinement. *Id*. ¶¶ 36, 76, 115. In 2021, after a "sham" trial, he was sentenced by the KSA to 20 years in prison. *Id*. ¶¶ 11, 111–119. His family has been unable to contact him. *Id*. ¶¶ 11, 120–121.

**E.**   **Ms. Al-Sadhan publicly criticizes the KSA over its treatment of her brother.**

Plaintiff Areej Al-Sadhan describes herself as a human rights activist who has spoken out publicly against the KSA's abuse of her brother. *Id*. ¶¶ 12, 103–105. She filed a complaint with

2169615

the United Nations and petitioned federal, state, and local officials for assistance.  *Id.* ¶ 100.  She also publicly decries the KSA's treatment of her brother on Twitter, which she uses as "a dedicated tool of her advocacy."  *Id.* ¶ 103.  Ms. Al-Sadhan's persistent efforts have proven effective: "Because of" her "public activism, United States officials and international organizations began pressuring" the KSA to account for Mr. Al-Sadhan's whereabouts "and allow him to communicate with his family."  *Id.* ¶ 107.  But her advocacy efforts have also carried unfortunate costs.  As a result of her public criticism of the KSA, she alleges she has been harassed, stalked, and threatened by the KSA, and fears being kidnapped.  *Id.* ¶¶ 8, 37, 101–108, 129.  To make additional time for her advocacy, Ms. Al-Sadhan says she has chosen to take leaves of absence from her job and to forgo promotions.  *Id.* ¶¶ 8, 125–128.

Ms. Al-Sadhan has not alleged that Alzabarah or Abouammo accessed her Twitter account information or that it was otherwise obtained by the KSA from Twitter.  *See generally* Compl.

### F.    Ms. Al-Sadhan brings this suit on behalf of herself and her brother.

Ms. Al-Sadhan filed this lawsuit against Twitter, the former employees Abouammo and Alzabarah, the KSA, and several of its agents.  She alleges that under Federal Rule of Civil Procedure 17, she is the "next friend" of Mr. Al-Sadhan because he is detained in Saudi Arabia and unavailable, and accordingly that Mr. Al-Sadhan is the real party in interest to claims she asserts on his behalf.  *Id.* ¶ 12.  Mr. Al-Sadhan (through Ms. Al-Sadhan) brings a RICO conspiracy claim and asserts the Court's jurisdiction, *id.* ¶¶ 135-39, via the ATS, as to a claim that Twitter aided and abetted his torture in Saudi Arabia, *id.* ¶ 148–157.  Ms. Al-Sadhan also asserts civil RICO claims on her own behalf.  *Id.* ¶¶ 140–47.

### G.    Procedural History

Plaintiffs' lawsuit follows on two prior (and unsuccessful) actions brought against Twitter in this court by other Saudi dissidents who assert claims based upon the 2014–2015 data breach by the KSA.  The *Abdulaziz* and *Al-Ahmed* actions alleged substantially the same conduct by Twitter alleged by Mr. and Ms. Al-Sadhan here.  In all three actions, the plaintiffs are Saudi dissidents and Twitter accountholders who claim that, in 2014 and 2015, the KSA targeted and recruited the same two Twitter employees to secretly and illegally access Twitter account

information on the KSA's behalf.[3]  From this starting point, the parallel allegations proliferate: in all three actions, the complaints allege that the KSA's breach of Twitter's security was part of a scheme to "silence" dissidents, including the plaintiffs, who were vocal critics of the KSA;[4] that the breach was accomplished only because Twitter permitted its employees "access" to its resources, which those employees then exploited[5]; that the KSA and/or high-ranking Saudi officials own significant shares of Twitter stock,[6] and as such, Twitter stood to gain financially from enabling and/or concealing the KSA's breach;[7] that these pecuniary ties are further evidenced by (former) Twitter CEO Jack Dorsey's alleged relationships with KSA officials;[8] that the KSA-directed Twitter breach led to the loss of allegedly private information belonging to dissidents (including plaintiffs) such as telephone numbers and IP addresses;[9] and that given such loss, Twitter breached its own terms of service.[10]  Also, each complaint relies on the DOJ's allegations from *United States v. Abouammo, et al.*, No. 3:19-cr-000621-EMC (N.D. Cal.), the criminal case against the rogue former Twitter employees.[11]  Thus, while the specific causes of action may differ, the gravamen of each case is comprised of the same allegations as to Twitter.

These prior actions against Twitter were both unsuccessful.  In *Abdulaziz*, over the course of five complaints and successive motions to dismiss by Twitter, the court ultimately dismissed with prejudice the plaintiff's complaint on grounds applicable here: (1) lack of Article III standing "because Twitter's alleged misconduct did not cause the harm;" (2) failure to plead plausibly that Twitter ratified its rogue employees' misconduct or that *respondeat superior*

---

[3] *Compare Al-Ahmed* Compl. ¶¶ 21–23, 39–40, 47, *with Abdulaziz* Fourth Amended Complaint ("4AC") ¶¶ 9, 12–14, 32–47, *and Al-Sadhan* Compl. ¶¶ 6, 38–49, 52, 55, 59–60.

[4] *Compare Al-Ahmed* Compl. ¶¶ 1, 22 *with Abdulaziz* 4AC ¶ 104, *and Al-Sadhan* Compl. ¶¶ 31, 54, 58, 107, 142.

[5] *Compare Al-Ahmed* Compl. ¶ 24 *with Abdulaziz* 4AC ¶¶ 12, 34, 46, 54, *and Al-Sadhan* Compl. ¶ 6.

[6] *Compare Al-Ahmed* Compl. ¶ 3 *with Abdulaziz* 4AC ¶¶ 3, 110, *and Al-Sadhan* Compl. ¶¶ 34, 50.

[7] *Compare Al-Ahmed* Compl. ¶ 4 *with Abdulaziz* 4AC ¶¶ 110–111, *and Al-Sadhan* Compl. ¶ 34.

[8] *Compare Al-Ahmed* Compl. ¶ 37–42 *with Abdulaziz* 4AC ¶¶ 116–117, *and Al-Sadhan* Compl. ¶ 56.

[9] *Compare Al-Ahmed* Compl. ¶¶ 23, 49 *with Abdulaziz* 4AC ¶¶ 76, 90, 94, *and Al-Sadhan* Compl. ¶ 52.

[10] *Compare Al-Ahmed* Compl. ¶¶ 29, 33, 87 *with Abdulaziz* 4AC ¶ 82, *and* Pl. Ex. 1 ¶ 43.

[11] *Compare Al-Ahmed* Compl. ¶ 25, 39–40 *with Abdulaziz* 4AC ¶¶ 46, 48, 55, 63, 90–92, *and Al-Sadhan* Compl. ¶¶ 38 n.20, 39–48.

2169615

liability should apply; (3) that the claims were barred by the statute of limitations; and (4) that the plaintiff's claims were not plausibly alleged. *See Abdulaziz v. Twitter, Inc.*, 2021 WL 2986400 (N.D. Cal. July 15, 2021) (*"Abdulaziz III"*); *Abdulaziz v. Twitter, Inc.*, 2021 WL 633812 (Feb. 18, 2021) (*"Abdulaziz II"*); *Abdulaziz v. Twitter, Inc.*, 2020 WL 6947929 (Aug. 12, 2020) (*"Abdulaziz I"*). Mr. Abdulaziz has appealed the district court's judgment.

Likewise in *Al-Ahmed*, over the course of two complaints and two motions to dismiss by Twitter, the court ultimately dismissed with prejudice the plaintiff's claims against Twitter on multiple, independent grounds, including several applicable here: (1) lack of Article III standing because the plaintiff "failed to establish a causal nexus between Twitter's actions and his injuries"[12]; (2) that the claims were barred by the statute of limitations; and (3) that Section 230 of the Communications Decency Act immunizes Twitter. *Al-Ahmed v. Twitter, Inc.,* 2023 WL 27356 (N.D. Cal. Jan. 3, 2023) (*"Al-Ahmed II"*); *Al-Ahmed v. Twitter, Inc.*, No. 4:21-cv-08017-EMC, ECF No. 52 (N.D. Cal. Jun. 15, 2022) (*"Al-Ahmed I"*). Mr. Al-Ahmed declined to appeal.

## III.    ARGUMENT

### A.    Plaintiffs fail to establish Article III standing to pursue claims against Twitter related to the alleged 2014–2015 data breach.

Plaintiffs' Complaint describes a brutal and unconscionable campaign of state-sponsored abuse carried out by the KSA. That campaign included the KSA's arrest, torture, and detention of Mr. Al-Sadhan in 2018, followed by its harassment, threatening, and stalking of Ms. Al-Sadhan. While Plaintiffs' alleged injuries are several and harrowing, those injuries were inflicted at the hands of the KSA—not Twitter.

To establish Article III standing, "[a] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs bear the burden to plead (and ultimately prove) "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations omitted).

---

[12] In *Al-Ahmed*, one of the plaintiff's many claims (for invasion of privacy) survived the court's standing analysis, but that claim was dismissed for other reasons. *See Al-Ahmed II* at *13.

Further, "the line of causation between the [alleged] illegal conduct and injury" must not be "too attenuated." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (concluding that a weak demonstration of causation precludes Article III standing), *overruled on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S. Ct. 1377, 1388 (2014). Although Plaintiffs have pleaded various injuries, none is "fairly traceable" to Twitter's alleged conduct. Plaintiffs therefore lack Article III standing to advance their claims against Twitter.

> ### 1.   Mr. Al-Sadhan lacks Article III standing to sue Twitter because the KSA, not Twitter, caused his arrest, torture, and detention.

According to the Complaint, Mr. Al-Sadhan has suffered a litany of terrible injuries, including kidnapping, torture, unfair conviction, and imprisonment in Saudi Arabia. Compl. ¶ 36; Pl. Ex. 1 (Affidavit of Plaintiff Areej Al-Sadhan) ¶ 4. Yet none of these alleged harms is "fairly traceable" to Twitter's alleged conduct.

As in *Abdulaziz*, Plaintiffs' factual allegations make clear that Mr. Al-Sadhan's injuries were perpetrated by the KSA, not by Twitter. *See, e.g.*, Pl. Ex. 1 ¶ 4 (Mr. Al-Sadhan "was kidnapped by KSA secret police," who then "tortured" him before he was put through a "sham trial" and sentenced to a further term of imprisonment); Compl. ¶ 76 (detailing torture suffered at the hands of KSA secret police); *see also Abdulaziz I* at *4 (recounting allegations that "Saudi agents"—not Twitter—raided the plaintiff's family home and arrested and tortured the plaintiff's bothers). Mr. Al-Sadhan has not established any causal nexus between Twitter's alleged conduct and the various physical abuses he suffered at the hands of the KSA. *See Spokeo*, 136 S. Ct. at 1547 (the plaintiff's injury must be "fairly traceable to the challenged conduct of the defendant"). Those abuses were carried out by a foreign police force, at the behest of a foreign sovereign, not at the behest of Twitter. Accordingly, the Court should dismiss Mr. Al-Sadhan's claims against Twitter for lack of Article III standing. *See, e.g., Novak v. United States*, 795 F.3d 1012, 1019 (9th Cir. 2015) (dismissing claim for lack of standing where plaintiff alleged that third parties "may well have engaged in the[] injury-inflicting actions").

The lack of a causal nexus between Twitter's alleged conduct and Mr. Al-Sadhan's alleged injuries is further shown by the lack of temporal proximity. The Complaint's allegations regarding Twitter focus in particular on 2013, when Twitter hired Abouammo and Alzabarah, and

9

2014–2015, when the KSA undertook its campaign to compromise Twitter accountholder data with the assistance of those two rogue employees.  *See, e.g.*, Compl. ¶¶ 35, 38–60, 132, 136, 143. However, the alleged harms suffered by Mr. Al-Sadhan did not begin until years later, starting on March 12, 2018, when he was kidnapped by KSA secret police from his place of employment in Saudi Arabia.  *See* Pl. Ex. 1 ¶ 4.

The lack of temporal proximity between the alleged 2014–2015 breach of Twitter's security by the KSA and the KSA's subsequent persecution of Mr. Al-Sadhan years later in 2018 is nearly identical to what was alleged in *Abdulaziz*.  *Abdulaziz* involved allegations by a different Saudi dissident related to the 2014–2015 breach, which similarly alleged harm to the plaintiff that occurred years later in 2018.  As the *Abdulaziz* court explained, "[t]here is no temporal proximity. And the plaintiff's allegation that [the injury inflicted by the KSA] is related to the Twitter breach is a conclusion, not a fact allegation."  *Abdulaziz II* at *5; *see also Abdulaziz I* at *6 (same). Thus, "the plaintiff has not shown a causal link between the compromise of his Twitter account and his persecution three years later."  *Abdulaziz II* at *6 (dismissing complaint for lack of Article III standing); *see also Abdulaziz III* at *2 (same); *Abdulaziz I* at *6 (same).  The reasoning of *Abdulaziz* applies equally here, and dismissal is again warranted for lack of Article III standing.

### 2. Ms. Al-Sadhan lacks Article III standing to sue Twitter because the KSA, not Twitter, is responsible for stalking and harassing her.

Ms. Al-Sadhan, like her brother, claims to have suffered several injuries at the hands of the KSA.  Yet her claims as to Twitter are even more attenuated, as she never alleges that her Twitter data was ever accessed or otherwise used by the KSA.  Like her brother, her claims against Twitter fail for lack of Article III standing.

According to the Complaint, once Ms. Al-Sadhan began to speak out against the KSA and to publicly criticize the Saudi regime in 2019, the KSA launched a relentless campaign of abuse and harassment against her.  She alleges she was stalked, Compl. ¶¶ 102–103, 122; received threatening phone calls, *id.* ¶ 101; and was subjected to a long-running "stream of threats" from a "digital army" allegedly controlled by Defendant Saud Al-Qahtani, including threats of rape and kidnapping, *id.* ¶¶ 106, 123.

Yet, as with Mr. Al-Sadhan, the harms alleged by Ms. Al-Sadhan—while disturbing—are

not "fairly traceable" to Twitter's alleged conduct.  *See Spokeo*, 136 S. Ct. at 1547.  By her own admission, Ms. Al-Sadhan was targeted because of her public advocacy—not because of any conduct undertaken by Twitter.  *See, e.g.*, Compl. ¶ 37 (she "became a target of the Saudi Criminal Enterprise" after she "tried to save her brother by speaking out"); *id.* (alleging that the KSA "stalked, harassed, threatened, and intimidated" her "[b]ecause she dared call out [the] KSA's history of repression, petition her U.S. representatives to help her brother, and condemn the Saudi criminal Enterprise's" conduct); *id.* ¶ 97 (she "became a target" of the KSA after she "began speaking out against" the KSA); Pl. Ex. 1 ¶ 17 (attesting that the KSA's harassment of her began after she started speaking out against the KSA's "human rights abuses"); *id.* ¶ 21 (attesting that she "began" receiving threats on Twitter "in response" to her tweeting about the KSA's repression of her brother).  The same was true for the plaintiff in *Abdulaziz*, who was targeted *as a result of* his own public criticism of the KSA, and who accordingly lacked Article III standing to sue Twitter.  *See Abdulaziz* II at *6 (noting that the plaintiff had become a "vocal critic" of the KSA before being persecuted by the KSA and holding that the plaintiff "has not shown a causal link between the compromise of his Twitter account and his persecution three years later").

The Complaint does not allege that Ms. Al-Sadhan suffered these harms as a result of Twitter's own conduct in connection with the 2014–2015 data breach.  Nor could it plausibly do so: she does not allege that her Twitter data was exposed as a result of that breach.  Moreover, the Complaint makes clear that numerous other parties—i.e., the KSA and various of its agents, including John Doe defendants—undertook the numerous acts of abuse and harassment towards her.  Those other parties, several of whom are named as defendants in this action, are responsible for Ms. Al-Sadhan's alleged injuries.[13]

Because neither Plaintiff can establish a causal nexus between Twitter's own alleged conduct and Plaintiffs' alleged injuries, they lack Article III standing to pursue their claims

---

[13] Ms. Al-Sadhan's decision to use Twitter as one platform for her advocacy does not transform Twitter into a wrongdoer responsible for her injuries.  Moreover, as explained in Section III.D.2.f, *infra*, Section 230 of the Communications Decency Act immunizes Twitter against liability arising from content created by third parties using Twitter's services.

against Twitter, which must accordingly be dismissed.[14]  *See Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011).

### B.    Plaintiffs' claims also should be dismissed for lack of proximate causation.

Plaintiffs' claims also should be dismissed for failure to plead proximate causation, which imposes an even *higher* causation standard than the Article III inquiry.  *Lexmark*, 572 U.S. at 134 n.6.  As in *Abdulaziz*, "[f]or the reasons that the plaintiff[s] did not plead causation for standing," they also fail to plead proximate causation.  *Abdulaziz III* at *3.  Causation is a required element for each of Plaintiffs' claims.  *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 595–96 (N.D. Cal. 2020) (RICO); *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013, 1022, 1026 (9th Cir. 2014) (ATS). For the same reasons Plaintiffs fail to establish Article III standing, they also fail to meet the higher bar required to plead proximate causation.  *See Lexmark*, 572 U.S. at 134 n.6; *Abdulaziz III* at *3.  Their claims should therefore be dismissed.

### C.    As the district court held in *Abdulaziz*, Twitter did not authorize or ratify Abouammo's and Alzabarah's rogue actions and is not liable for them.

Plaintiffs' RICO and ATS claims seek to hold Twitter liable for Abouammo and Alzabarah's misconduct under a *respondeat superior* theory—an argument that the district court in *Abdulaziz* rejected as to the same former Twitter employees' conduct.  *Abdulaziz I* at *7.

For a claim in tort, "an employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally authorized tort."  *Ventura v. ABM Indus. Inc.*, 212 Cal. App. 4th 258, 272 (2012).  Likewise, *respondeat superior* may apply under RICO only if the alleged conduct occurred within the course and scope of the employee's employment *and* if the employer benefited from the employee's RICO violation.  *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775–76 (9th Cir. 2002). "Within the course and scope of employment means: (1) the conduct occurred substantially

---

[14] Plaintiffs additionally allege that the KSA harmed various third parties, including Jamal Khahshoggi, Omar Abdulaziz (the plaintiff in the *Abdulaziz* action), and other dissidents. *See, e.g.*, Compl. ¶¶ 63, 78–96. But alleged injuries to third parties are irrelevant to whether Plaintiffs have Article III standing. *See Lujan*, 504 U.S. at 563. ("[T]he 'injury in fact' test requires . . . that the party seeking review be himself among the injured."); *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) ("[T]he Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party."  (citation omitted)).

2169615

within the time and space limits authorized by the employment; (2) the employee was motivated, at least in part, by a purpose to serve the employer; *and* (3) the act was of a kind that the employee was hired to perform." *Id.* (emphasis added).

In *Abdulaziz I*, the court considered the same factual allegations as to Abouammo and Alzabarah's misconduct, holding that "Alzabarah and Abouammo are—under the complaint's allegations—demonstrably not acting in the scope of their employment and instead were acting as agents for the Saudi regime." *Abdulaziz I* at *7. The court reasoned that "providing [them] a job and access to [Twitter's] platform and user information does not establish Twitter's respondeat superior liability for its rogue employees' unauthorized spying for Saudi operatives." *Id.*

Likewise, here, *respondeat superior* liability cannot be maintained. Plaintiffs' complaint and the incorporated superseding indictment show that Twitter did not authorize or ratify the former employees' conduct.[15] By Plaintiffs' own account, the employees "used their positions" at Twitter to "*fraudulently*" disclose Mr. Al-Sadhan's identifying information to the KSA. Compl. ¶ 38 (emphasis added); *see also id.* ¶ 48 (acknowledging Alzabarah's access was for "non-work" purposes). The DOJ's superseding indictment—which is incorporated as an exhibit to and forms the factual basis of Plaintiffs' Complaint—makes clear Alzabarah and Abouammo's illegal conduct was "beyond the scope of their job duties" and "contrary to Twitter's policies." Pl. Ex. 2 ¶¶ 23, 24. When Twitter learned of their acts, Twitter put Alzabarah on administrative leave, seized his Twitter-owned laptop, and escorted him from the building. *Id.* ¶ 26(s); *Abouammo*, ECF No. 1, ¶ 85. *See also* Compl. ¶ 6 (alleging that the rogue employees "exploited their access to Defendant Twitter's data"); *id.* ¶¶ 136(b) & 143(b) (alleging "unauthorized" access of Twitter accountholder data); Pl. Ex. 2 ¶ 18 (alleging that neither rogue employee's "job duties

---

[15] The Court may consider the contents of the superseding indictment, as it is attached to the Complaint. *See Hal Roach Studios, Inc.*, 896 F.2d at 1555 n.19. Even if that charging instrument were not attached to the Complaint, it would still be incorporated by reference because Plaintiffs rely heavily on the superseding indictment for the Complaint's allegations against Twitter. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."); *see also, e.g.*, Compl. ¶¶ 39–48 (advancing various allegations regarding Twitter's internal workings, and the details of specific meetings and communications between KSA agents, that were derived from the DOJ's allegations in the *Abouammo* charging instruments).

involved a need to access a Twitter user's private information, and doing so was a reportable violation of the Twitter Playbook policies regarding handling and protecting user data"); *id.* ¶ 19 ("Neither ABOUAMMO nor ALZABARAH had authority from Twitter to receive, access, or produce user information pursuant to any governmental emergency disclosure request.").  Indeed, the fact that Twitter notified Mr. Al-Sadhan and other affected accountholders that their data may have been "targeted by a state-sponsored effort," *see* Twitter Employee Decl., ¶¶ 2–3; *id.* Exs. 1–2, defeats any claim that Twitter condoned or ratified their illegal conduct, *Abdulaziz I* at *7 ("[T]he December 2015 notice defeats any claim that Twitter ratified its employees' conduct").

As in *Abdulaziz*, Plaintiffs' Complaint and the superseding indictment incorporated therein establish that Twitter was a victim of Abouammo's and Alzabarah's conduct; that Twitter did not benefit from its rogue employees' misconduct; and that their transmission of nonpublic data to the KSA was outside the scope of their Twitter employment and contrary to Twitter's policies.  Accordingly, Plaintiffs fail to state RICO and ATS claims on a *respondeat superior* theory, and their Complaint should be dismissed as to Twitter.  Because no amendment can cure these deficiencies, the Complaint should be dismissed with prejudice.

### D.    Plaintiffs' RICO claims fail for several additional reasons.

The Complaint asserts two civil RICO claims: a claim by Ms. Al-Sadhan alone alleging a substantive RICO violation under 18 U.S.C. § 1962(c), and a claim by both Plaintiffs alleging a RICO conspiracy under § 1962(d).  In addition to the reasons set forth in Sections III.A–C above, these claims fail for several additional reasons, including that they are untimely, and that the Complaint fails to allege facts to support several essential elements for each claim.

### 1.    Plaintiffs' RICO claims against Twitter are untimely.

The statute of limitations for civil RICO claims is four years.  *See Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156 (1987).  Under the "injury discovery" rule for civil RICO claims, the limitations period "begins to run when a plaintiff knows or should know of the injury that underlies his cause of action."  *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (internal quotations omitted).  "Thus, the 'injury discovery' rule creates a disjunctive two-prong test of actual or constructive notice, under which the statute begins running under

1   either prong." *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001).

2          Plaintiffs' RICO claims accrued no later than December 11, 2015, when Twitter notified

3   Mr. Al-Sadhan via email that his account information may have been targeted by a state-

4   sponsored actor.  *See* Twitter Employee Decl. ¶ 2–3; *id.* Ex. 1; *see also* Pl. Ex. 12 (describing the

5   notices sent to affected accountholders by Twitter on December 11, 2015).  That notice (which

6   was also widely covered by the press at the time)[16] put Plaintiffs on constructive notice of the

7   purported injury underlying their claims against Twitter.  *See Rotella v. Wood*, 528 U.S. 549, 555,

8   (2000) (holding that "discovery of the injury, not discovery of the other elements of a claim, is

9   what starts the clock" on a civil RICO claim); *Pincay*, 238 F.3d at 1109–10 (holding that a

10  plaintiff's receipt of a written disclosure of purported injury constitutes constructive notice

11  sufficient to start the clock on a civil RICO claim); *Noland v. Chua*, 816 F. App'x 202, 203 (9th

12  Cir. 2020) (same).

13         In the *Abdulaziz* and *Al-Ahmed* actions, those courts held that the dissident plaintiffs'

14  claims against Twitter pertaining to that breach accrued on December 11, 2015, when Twitter

15  sent the very same email notice that Mr. Al-Sadhan (like other affected accountholders) received.

16  *See Abdulaziz II* at *7 ("The December 2015 notice—that state actors potentially compromised

17  the plaintiff's Twitter account—was sufficient notice to trigger the statute of limitations."); *Al-*

18  *Ahmed II* at *9 (same).  The Court should reach the same conclusion here and hold that Plaintiffs'

19  RICO claims accrued in December 2015, rendering those claims—which were filed in May

20  2023—untimely by several years.

21              **2.        Plaintiffs fail to plead adequate facts to support their RICO claims.**

22         Plaintiffs' RICO claims against Twitter—alleging violations of 18 U.S.C. §§ 1962(c) and

23  (d)—each arise under 18 U.S.C. § 1964(c), which creates a private right of action for "[a]ny

24  person injured in his business or property by reason of a violation of section 1962."  "To state a

25  civil RICO claim under 18 U.S.C. § 1964(c), a plaintiff must allege (1) conduct (2) of an

26  enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing

27

28  ───────────────────
    [16] *See* Exhibits A through D to Twitter's contemporaneously filed Request for Judicial Notice
    ("RJN").

[domestic] injury to the plaintiff's 'business or property.'[17]   *Abcarian v. Levine*, 972 F.3d 1019, 1028 (9th Cir. 2020) (quotation marks omitted); *see RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 346 (2016) (specifying that a civil RICO plaintiff must "allege and prove a *domestic* injury to its business or property").

The Complaint fails to allege well-pleaded facts showing that Twitter was part a qualifying RICO "enterprise," or that either Plaintiff suffered a domestic injury to their "business or property" as a result of any alleged RICO violation.  The Complaint also lacks any well-pleaded facts establishing that Twitter entered into any agreement to commit predicate RICO acts, or that it was aware of the essential nature and scope of the alleged enterprise, both of which are additionally required under § 1962(d).

> a. **The Complaint fails to allege a RICO "enterprise" including Twitter.**

As an initial matter, the Complaint fails to plausibly allege that Twitter is part of a qualifying RICO "enterprise."  Because the alleged "Saudi Criminal Enterprise" is not a real legal entity, *see* Compl. ¶¶ 13–25 (describing the composition of the alleged enterprise), Plaintiffs must plead the existence of an "associated-in-fact" enterprise.  *See Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007).  This requires facts sufficient to demonstrate that Twitter, the KSA, and its agents formed a joint entity with a common, enduring purpose of engaging in a course of conduct, and that this entity exists independently of the alleged racketeering activity.  *Boyle v. U.S.*, 556 U.S. 938, 946 (2009); *Doan v. Sing*h, 617 F. App'x 684, 685–86 (9th Cir. 2015); *see also Odom*, 486 F.3d at 552 (describing the requirement that the "various associates function as a continuing unit," which "focuses on whether the associates' behavior was 'ongoing' rather than isolated activity").  Allegations of mere commercial relationships entered into for ordinary business reasons are insufficient.  *See Fraser v. Team Health Holdings, Inc.*, 2022 WL 971579, at *11 (N.D. Cal. Mar. 31, 2022) ("Courts routinely reject attempts to characterize routine

---

[17] Because Plaintiffs' RICO claims "sound in fraud," they must be pleaded with particularity under Rule 9(b).  *Vess v. Ciba–Geigy Corp.*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).  But these claims fail even under Rule 8's more liberal pleading standard, as they fail to allege any well-pleaded facts that Twitter engaged in a "criminal enterprise" or conspired with the KSA to commit any illegal acts.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

commercial relationships as RICO enterprises.").

As discussed in Section III.C above, the well-pleaded facts in the Complaint and accompanying exhibits demonstrate that Twitter and the KSA are far from partners in an enduring, common entity, but in fact are diametrically *opposed* with respect to the allegations in the Complaint: Twitter itself was defrauded by the KSA, which enlisted Abouammo and Alzabarah to undertake covert acts of espionage against Twitter, and which were beyond the scope of their employment and in contravention of their obligations to Twitter.  *See supra*, Section III.C; Pl. Ex. 2 ¶¶ 14–15, 18–19, 21, 23.  When Twitter learned of Abouammo and Alzabarah's covert acts, Twitter put a stop to them, cooperated with the DOJ's investigation, and notified affected accountholders.  Pl. Ex. 2 ¶ 26(s); *Abouammo*, ECF No. 1, ¶ 85.

Ignoring these facts, Plaintiffs rest their enterprise claim on an alleged "commercial relationship" between Twitter and the KSA, Compl. ¶¶ 33–34, based only on two facts: (1) an investment by Saudi Prince Alwaleed Bin Talal's private investment firm Kingdom Holding Company ("KHC") in Twitter in 2011—several years before Abouammo and Alzabarah's misconduct in this case; and (2) KHC (which is alleged to be partially owned by the KSA) having owned a substantial amount of Twitter stock as of October 28, 2022[18]—the day Twitter stock stopped trading publicly.  Compl. ¶ 13; *see* RJN Ex. E at 2 (SEC filing showing that Twitter shares "were suspended from trading before market open on October 28, 2022").  These allegations amount to nothing more than an investment firm allegedly associated with the KSA having bought Twitter stock—and either Twitter or secondary-market shareholders having offered it—for the ordinary purpose of seeking investment returns.  *See Fin. Corp. Mortg.-Backed Sec. Litig.*, 2012 WL 10731957, at *8 (C.D. Cal. June 29, 2012) (collecting cases and holding that "parties that enter commercial relationships for their own gain or benefit" do not constitute an enterprise) (cleaned up).  What is more, the ordinariness (and attenuated nature) of the parties' commercial relationship is further confirmed by the fact that Twitter's stock was *publicly available* on secondary markets from November 2013 through October 2022—a period that more

---

[18] The Complaint does not identify when the stock held as October 28, 2022 was purchased, nor whether the October 28, 2022 holdings included any of the stock originally purchased in 2011.

than spans the entirety of the conduct alleged in Plaintiffs' complaint.  *See* RJN Ex. F at 41–42 (SEC filing showing Twitter's Initial Public Offering date).

Thus, the Complaint alleges nothing more than an ordinary commercial investment relationship.  Those allegations fail to establish, as they must, that Twitter forged an enterprise with the KSA and its agents to engage in racketeering activity, and that they functioned as a "continuing unit" through "ongoing" (rather than "isolated") activity.  *See Odom*, 486 F.3d at 552; *see also Boyle*, 556 U.S. at 946 ("An 'enterprise' must have some longevity, since the provision demands proof that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through 'a pattern of racketeering activity.'"  (alterations omitted) (quoting 18 U.S.C. § 1962(c)).  Indeed, the Complaint is devoid of well-pleaded allegations that Twitted forged *any* agreements or shared *any* common goals with any of the enterprise's alleged members, much less that it participated in any "affairs" of the alleged enterprise.  Plaintiffs' failure to plausibly allege a qualifying "enterprise" including Twitter requires dismissal of both RICO claims against Twitter.  *See Abcarian*, 972 F.3d at 1028.

### b. Plaintiffs fail to allege that they suffered a domestic injury to their business or property.

Plaintiffs' RICO claims should be dismissed also for failure to allege facts showing that each Plaintiff suffered an injury that qualifies for relief under the statute.  ***First,*** although each Plaintiff claims to have suffered several injuries, neither Plaintiff pleads facts showing an injury to their *business* or *property*.  *See* 18 U.S.C. § 1964(c) (creating a private right of action for a plaintiff "injured in his business or property by reason of a violation of section 1962"); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (discussing this requirement).  Allegations of personal injuries, such as emotional distress, harassment, or physical injury, are not cognizable under RICO.  *Oscar v. Univ. Students Coop. Assn.*, 965 F.2d 783, 785–87 (9th Cir. 1992) (en banc) (collecting cases), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005) (en banc).  To satisfy this required element, a plaintiff's alleged injury must be concrete and non-speculative, and must have been proximately caused by the alleged RICO violation.[19]

---

[19] As already explained in Sections III.A–B above, the Complaint fails to plausibly allege that Twitter proximately caused any of Plaintiffs' injuries.

1    *See Keel v. Schwarzenegger*, 2009 WL 1444644, at *5–*6 (C.D. Cal. May 19, 2009).

2          Mr. Al-Sadhan alleges physical injury and kidnapping, which, while abhorrent, cannot

3    maintain a RICO claim, as they are physical injuries.  *See* Compl. ¶¶ 11, 68–76, 115.  Meanwhile,

4    Ms. Al-Sadhan alleges that her decision to focus on human rights advocacy "takes away from her

5    ability to earn more at her primary place of employment." *Id.* ¶ 126.  But this allegation is both

6    highly attenuated and falls far short of a concrete loss of property or business opportunity

7    proximately caused by the alleged RICO violation.  *See Keel*, 2009 WL 1444644 at *6, *8

8    (dismissing civil RICO claim where plaintiff did not allege concrete loss of employment or

9    employment opportunities).

10         ***Second***, Plaintiffs do not allege facts establishing a "domestic injury," which RICO

11   requires because it does not apply extraterritorially.  In *RJR Nabisco*, the Supreme Court held that

12   a RICO claimant must allege "a domestic injury to business or property."  579 U.S. at 354.

13   Because the parties there had stipulated that the plaintiff suffered only foreign injuries, however,

14   the Court did not decide what satisfies the "domestic injury" requirement.  *Id.* at 354.  In its most

15   recent term, the Supreme Court answered that question in agreeing with the Ninth Circuit's

16   "context-specific" test and holding that "determining whether a plaintiff has alleged a domestic

17   injury [for purposes of RICO] is a context-specific inquiry that turns largely on the particular

18   facts alleged in a complaint." *Yegiazaryan v. Smagin*, 599 U.S. ___, 2023 WL 4110234, at *7

19   (2023).

20         Applying that standard here, Plaintiffs allege only foreign injuries.  The district court's

21   application of the Ninth Circuit's "context-specific" test in *Doe v. Tapang* is instructive.  *See*

22   2019 WL 3576995 (N.D. Cal. Aug. 6, 2019).  In *Tapang*, the plaintiff brought a RICO claim

23   against a U.S. resident and others, alleging that the U.S. resident aided and abetted fighters in

24   Cameroon who killed his family members in Cameroon.  *Id.* at *1–*2.  The district court held that

25   the plaintiffs had failed to allege a "domestic injury" because the alleged conduct occurred

26   primarily in Cameroon—meaning that the individuals who harmed the family member, and the

27   family members themselves, were all located in Cameroon.  *Id.* at * 7.  Likewise, here, Mr. Al-

28   Sadhan alleges that *all* his injuries were suffered in Saudi Arabia and at the hands of individuals

2169615

located in and directed by the KSA, a foreign sovereign; this includes being kidnapped in 2018; being tortured; and ultimately being subject to a "sham trial" and extended incarceration.  Compl. ¶¶ 11, 36 68–76, 115, 111–119, 120–121.  In addition, Mr. Al-Sadhan alleges that the KSA directed—from Saudi Arabia—the rogue former Twitter employees' theft of confidential information, and onward transmission to Saudi Arabia.  *Id.* ¶¶ 40–54.  The only conduct alleged to have occurred in the United States is Abouammo and Alzabarah's theft of data, which was directed by the KSA from Saudi Arabia, and—as is discussed above in Sections III.A–B—is not even the proximate cause of Mr. Al-Sadhan's alleged injuries.  *See Tapang*, 2019 WL 3576995 at *6–*7 (finding no "domestic injury" where U.S. resident who allegedly aided and abetted foreign misconduct was not alleged to be proximate cause of that conduct).

Likewise, although Ms. Al-Sadhan resides in the U.S., she alleges injuries similarly directed by the KSA in Saudi Arabia and perpetrated by the KSA's Saudi-based agents.  The only conduct she alleges occurred in the United States was her being followed and "menaced" by a KSA agent in a restaurant in Washington D.C, Compl. ¶ 122.  But even this latter conduct she alleges was directed from Saudi Arabia.

Accordingly, because the Complaint alleges overwhelmingly "foreign" rather than "domestic" injuries—and because none of those injuries are to Plaintiffs' "business or property" in any event—Plaintiffs' RICO claims should be dismissed.  *See, e.g.*, *Pac. Recovery Sols. V. United Behav. Health*, 508 F. Supp. 3d 606, 619 (N.D. Cal. 2020) (dismissing with prejudice civil RICO claims under §§ 1962(c) and (d) for failure to plead an injury to business or property).

### c.     Plaintiffs fail to plausibly allege that Twitter entered into any agreement with its purported co-conspirators.

Plaintiffs additionally claim that Twitter violated § 1962(d), which makes it "unlawful for any person to conspire to violate" RICO.  But this claim necessarily fails because the Complaint does not state a colorable RICO claim for the reasons explained above, and a RICO conspiracy claim under § 1962(d) cannot survive where a plaintiff fails to plead a RICO violation in the first place.  *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *Metaxas v. Lee*, 503 F. Supp. 3d 923, 946 (N.D. Cal. 2020) (dismissing

§ 1962(d) claim because plaintiff failed to plead a "substantive" violation under § 1962(c)).

Even if Plaintiffs' RICO conspiracy claim could stand alone, it would still fail because § 1962(d) requires that Plaintiffs plead the existence of a conspiratorial agreement, and the Complaint lacks any well-pleaded factual allegations plausibly alleging that Twitter entered into an agreement with its purported co-conspirators to do *anything*—much less that it agreed with them to undertake a criminal enterprise. *See Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("To establish a violation of section 1962(d), Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses."). Conclusory allegations to this effect must be disregarded. *See, e.g.*, Compl. ¶ 136 (alleging that each defendant "agreed and conspired to conduct and participate in the conduct of the affairs of the Saudi Criminal Enterprise"); *id.* ¶ 137 (alleging that each defendant "knowingly engaged in and agreed to [a] pattern of racketeering activity and agreed to the commission of multiple acts of statutory violations to further their conspiracy"); *see also Gianelli v. Schoenfeld*, 2021 WL 4690724, at *11, n.15 (E.D. Cal. Oct. 7, 2021) ("It is not enough to simply parrot [RICO's] statutory language by pleading that two people 'conspired to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity.'"). And aside from such conclusory allegations, there are no well-pleaded factual allegations that Twitter entered into a qualifying agreement with its purported co-conspirators. Accordingly, Plaintiffs' RICO conspiracy claim must be dismissed.

### d. Plaintiffs fail to plausibly allege that Twitter had the requisite knowledge of the alleged enterprise and intended to participate.

Plaintiffs also fail to allege facts giving rise to a plausible inference that Twitter was "aware of the essential nature and scope of the" alleged Saudi Criminal Enterprise "and intended to participate in it," which is another essential element required by § 1962(d). *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993); *see also Salinas v. United States*, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."). Just as the Complaint fails to establish that Twitter and the KSA were engaged in a qualifying enterprise with a common and enduring purpose, *see* Section

2169615

III.D.2.a, the Complaint is devoid of any factual allegations suggesting that Twitter had any knowledge whatsoever of the purported co-conspirators' scheme to target and brutalize dissidents who spoke out against the Saudi regime.  Instead, Plaintiffs advance the outrageous and conclusory assertion that Twitter's alleged "participation in the racketeering activity was either knowing or based on its conscious avoidance and/or deliberate indifference to the criminality occurring within Defendant Twitter as it abetted acts of murder, kidnapping, and torture."  *See* Compl. ¶ 32.  That bare legal conclusion finds ***no*** support in the well-pleaded allegations of the Complaint.  An inference of knowledge through willful blindness generally requires that the defendant "believe that there is a high probability that a fact exists" and "take deliberate actions to avoid learning of that fact," *Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  Yet nowhere does the Complaint plausibly allege that Twitter did either of these things.  To the contrary, as soon as Twitter learned of Abouammo and Alzabarah's illegal conduct, it acted swiftly to stop the wrongdoing, *see* Pl. Ex. 2 ¶ 26(s); *see also Abouammo*, ECF No. 1, ¶ 85, after which Twitter cooperated with the government's investigation and notified affected accountholders.  *See* Twitter Employee Decl. ¶¶ 2–3, Exs. 1–2.  The Court should dismiss Plaintiffs' § 1962(d) claim for this additional reason.

> **e.**   **Section 230(c)(1) of the Communications Decency Act precludes Plaintiffs' RICO claims to the extent they seek to hold Twitter liable for the KSA's use of Twitter's services.**

Lastly, the Complaint asserts that a number of John Doe defendants and other defendants (but not Twitter) made threatening posts directed at Ms. Al-Sadhan using Twitter's social media platform.  Compl.  ¶¶ 105–106, 122–123.  These assertions appear irrelevant to Plaintiffs' actual causes of action against Twitter.  However, to the extent they could be read as a component of Plaintiffs' RICO claims against Twitter, "Section 230 of the Communications Decency Act ('CDA') immunizes providers of interactive computer services against liability arising from content created by third parties." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016) (quotation marks omitted).  Specifically, section 230(c)(1) "shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009).  Immunity under

2169615

1   Section 230(c)(1) applies where the defendant is "(1) a provider or user of an interactive

2   computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a

3   publisher or speaker (3) of information provided by another information content provider."  *Al-*

4   *Ahmed II* at *11 (citation omitted).

5          Here, all three prongs for immunity are satisfied.  First, "[a]s numerous courts have held,

6   Twitter is a provider of an interactive computer service."  *Zhang v. Twitter Inc.*, 2023 WL

7   3919546, at *2 (N.D. Cal. June 8, 2023); *see also, Al-Ahmed II* at *11 (concluding Twitter is an

8   interactive computer service).  Moreover, the second and third prongs are met because Plaintiffs'

9   claims would seek to hold Twitter liable for publishing content alleged to have been created by

10  third parties.  Compl.  ¶¶ 105–106, 122–123.  Accordingly, Plaintiffs cannot state a claim against

11  Twitter based on the allegedly threatening messages posted by others.

12          **E.      Mr. Al-Sadhan's ATS claim fails for several additional reasons.**

13          In addition to his civil RICO claims, Mr. Al-Sadhan (but not Ms. Al-Sadhan) asserts a

14  claim under the ATS alleging that Twitter aided and abetted his torture.  This claim is

15  categorically false, is unsupported by any well-pleaded facts, and fails for all the reasons set forth

16  in Sections III.A–C above.  It must also be dismissed for several additional, independent reasons.

17          **1.      Mr. Al-Sadhan fails to plead facts sufficient to establish that Twitter
                      conspired to, or aided and abetted, his torture.**

18

19          To state an aiding and abetting ATS claim, a plaintiff must allege the requisite mens rea

20  *and* actus reus—i.e., knowingly providing substantial assistance to an international crime with a

21  substantial effect on the perpetration of an international law violation.  *Doe I v. Cisco Sys.*, ___

22  F.4th ___, 2023 WL 4386005 (9th Cir. 2023).  Moreover, "assuming [*arguendo*] that [ATS] . . .

23  conspiracy claims are cognizable, they require proof of an agreement."  *Mohamed v. Jeppesen

24  Dataplan, Inc.*, 614 F.3d 1070, 1085 n.7 (9th Cir. 2010).  Here, none of these elements is pleaded:

25  there are no well-pleaded factual allegations that Twitter took any action that assisted KSA and its

26  agents in torturing Mr. Al-Sadhan, much less subject to any agreement or with the knowledge of

27  aiding that torture.  Moreover, even if Twitter could be held responsible for the conduct of its

28  former rogue employees (which, as explained in Section III.C above, it cannot), the Complaint

does not allege that even those individuals shared information with the KSA knowing that it

1   would aid the torture which occurred several years later.  Compl. ¶¶ 76, 132.  Accordingly, Mr.

2   Al-Sadhan fails to state a claim that Twitter is responsible for his alleged torture.

3                    **2.       Mr. Al-Sadhan fails to establish jurisdiction under the ATS.**

4          "The ATS is strictly jurisdictional and does not by its own terms provide or delineate the

5   definition of a cause of action for violations of international law." *Jesner v. Arab Bank, PLC*, 138

6   S. Ct. 1386, 1397 (2018) (cleaned up and citation omitted).  To establish ATS jurisdiction at the

7   pleading stage, the plaintiff must allege that (1) he is an alien, (2) he is suing in tort, and (3) the

8   tort was committed in violation of the law of nations.  *Morales v. Brown*, 2015 WL 6167451, at

9   *4 (E.D. Cal. Oct. 20, 2015).  The requirement that the plaintiff be an alien is a matter of subject

10  matter jurisdiction.  *See Serra v. Lappin*, 600 F.3d 1191, 1197–98 (9th Cir. 2010) ("The ATS

11  admits no cause of action by non-aliens."); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d

12  1168, 1222–23 (S.D. Cal. 2019) (dismissing claim for lack of subject matter jurisdiction because

13  plaintiff was not an alien).

14         Mr. Al-Sadhan fails to establish jurisdiction over his ATS claim.  Mr. Al-Sadhan alleges

15  that he is a citizen of Saudi Arabia but does not allege he is an alien—*i.e.*, that he is not *also* a

16  United States citizen or national.  Compl. ¶ 11.  The district court's holding in *SSikhs for Justice*

17  *v. Nath* is instructive.  893 F. Supp. 2d 598, 619 (S.D.N.Y. 2012).  In *Nath*, the plaintiffs alleged

18  they were citizens of India, but did not allege they were aliens.  *Id.*  The Court dismissed their

19  ATS claims, recognizing that the plaintiffs had failed to affirmatively allege they were aliens.  *Id.*;

20  *cf. e.g.*, *Kanter v. Warner–Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) (holding that a party

21  seeking to assert diversity jurisdiction must affirmatively allege facts supporting jurisdiction).

22  Here, the Court likewise should not presume Mr. Al-Sadhan's non-U.S. citizenship status,

23  especially given further context in the Complaint: Mr. Al-Sadhan is alleged to have attended

24  middle school in the United States and to have later lived again in the United States for

25  approximately six years.  Compl. ¶ 11.  The Complaint does not explain the legal basis for his

26  extended U.S. residency.  *See id.*  Moreover, Ms. Al-Sadhan, who is Mr. Al-Sadhan's sister,

27  alleges that she is a United States citizen.  *Id.* ¶ 12.  Taken together, Mr. Al-Sadhan's pleading

28  does not foreclose that he is a U.S. citizen or national.  Because it does not adequately plead facts

                                                      24

2169615

1  to support jurisdiction, the Court should dismiss the Complaint's ATS claim.

2  **3.    The Complaint improperly seeks to apply the ATS extraterritorially.**

3  As with his RICO claim, Mr. Al-Sadhan's ATS claim must be dismissed because he seeks

4  to apply it to extraterritorial conduct.  The Supreme Court has determined that, like RICO, the

5  ATS may not be applied extraterritorially.  *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1936 (2021).

6  Thus, an ATS plaintiff must allege that "the conduct relevant to the statute's focus occurred in the

7  United States."  *Id*.  In *Nestle*, the Supreme Court did not decide what the ATS's "focus" is

8  because it held that the complaint there impermissibly sought extraterritorial application of the

9  ATS under any standard.  *Id*. at 1937.  Central to the Court's analysis was the fact that "[n]early

10  all the conduct [plaintiffs] allege[d] aided and abetted forced labor—providing training,

11  equipment, and cash to overseas farmers—. . . occurred [abroad]."  *Id*.

12  As in *Nestle,* here, nearly all the alleged misconduct occurred abroad.  For example, Mr.

13  Al-Sadhan alleges that the KSA directed the theft of Twitter's confidential information from

14  Saudi Arabia, as well as its onward transmission to Saudi Arabia, and that this ultimately enabled

15  the KSA to kidnap, torture, and falsely imprison him in Saudi Arabia years after he had moved

16  back to Saudi Arabia.  Compl. ¶¶ 40–54.  Likewise, he alleges that he was tortured in Saudi

17  Arabia—by agents of the KSA and at the direction of the KSA.  *Id*. ¶¶ 11, 36, 68–76, 115, 111–

18  119, 120–121.  As with his RICO claim, the only conduct alleged to have occurred in the United

19  States is Abouammo and Alzabarah's theft of data, which was directed by the KSA from Saudi

20  Arabia, and—as is discussed above in Sections III.A–B—is not even alleged to be the proximate

21  cause of Mr. Al-Sadhan's torture at the hands of the KSA.  *See Tapang*, 2019 WL 3576995 at *6–

22  *7 (discounting domestic conduct for purposes of extraterritoriality analysis where the conduct

23  did not proximately cause alleged injuries).  Thus, because Mr. Al-Sadhan seeks an

24  extraterritorial application of the ATS, his claim must be dismissed as to Twitter.

25  **IV.    CONCLUSION**

26  Twitter respectfully requests that the Court dismiss the Complaint as against Twitter in its

27  entirety and with prejudice.

28

2169615

1    Dated:  July 12, 2023                          KEKER, VAN NEST & PETERS LLP

2

3                                          By:    /s/ Benjamin Berkowitz
                                                  BENJAMIN BERKOWITZ
4                                                 ANJALI SRINIVASAN
                                                  W. HAMILTON JORDAN
5                                                 RYAN J. HAYWARD

6                                                 Attorneys for Defendant X Corp.,
                                                  as Successor in Interest to Named
7                                                 Defendant Twitter, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT X CORP.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT
Case No. 4:23-cv-02369-HSG

2169615