Jim Walden (pro hac vice), jwalden@wmhlaw.com
Avni P. Patel (pro hac vice), apatel@wmhlaw.com
Deanna Paul (pro hac vice), dpaul@wmhlaw.com
Peter A. Devlin (pro hac vice), pdevlin@wmhlaw.com
Catherine Weiss (pro hac vice), cweiss@wmhlaw.com
Walden Macht & Haran LLP
250 Vesey Street
New York, NY 10281
(212) 225-2030

Marc Van Der Hout (SBN 80778), mv@vblaw.com
Johnny Sinodis (SBN 290402), jsin@vblaw.com
Van Der Hout LLP
360 Post Street, Suite 800
San Francisco, CA 94108
(415) 821-8820

Andrea J. Prasow (pro hac vice to be filed), andrea@thefreedomi.org
The Freedom Initiative
1101 New York Avenue, NW, Suite 1000
Washington, DC 20005
(917) 842-5109

Attorneys for Plaintiff Areej Al-Sadhan

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| AREEJ AL-SADHAN, and ABDULRAHMAN AL-SADHAN, an Incompetent, by his Sister and Next Friend AREEJ AL-SADHAN, <br><br> Plaintiffs, <br><br> -against- <br><br> X CORP., f/k/a/ TWITTER, INC., KINGDOM OF SAUDI ARABIA, SAUD AL-QAHTANI, AHMAD ABOUAMMO, ALI ALZABARAH, AHMED ALMUTAIRI a/k/a AHMED ALJBREEN, BADER AL-ASAKER, SAUDI ARABIAN CULTURAL MISSION, and JOHN DOES 1-10. <br>        Defendants. | Case No.: 3:23-cv-02369-EMC <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF UNDER THE CIVIL RACKETEERING INFLUENCED ACT AND ALIEN TORT STATUTE** <br><br> **DEMAND FOR JURY TRIAL** |

**"[Transnational repression] is most often portrayed as a feature of America's enemies, even as authoritarian allies of the United States have become increasingly emboldened in their efforts to curtail rights and freedoms abroad."**

- The Freedom Initiative, In the Shadows of Authoritarianism, Egyptian and Saudi Transnational Repression in the U.S. (2023).

**"Twitter gave my brother's identifying information to the government of Saudi Arabia, which blatantly violates its terms and conditions.  This puts every Twitter user at risk.  As a result, Saudi Arabia kidnapped, tortured, imprisoned, and—through a sham trial— sentenced my brother to 20 years in prison, simply for criticizing Saudi repression on his Twitter account.  The Saudi government has since denied him contact with his family or access to his attorney.  I am not sure if he is alive.  After I began to speak out against Saudi repression, my life became a living hell."**

- Plaintiff Areej Al-Sadhan Affidavit, Exhibit 1.

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

PRELIMINARY STATEMENT ................................................................................................1

THE PARTIES..................................................................................................................5

A.    Plaintiffs...............................................................................................................5

B.    Members of the Saudi Criminal Enterprise .........................................................6

JURISDICTION AND VENUE .........................................................................................12

DIVISIONAL ASSIGNMENT............................................................................................12

FACTUAL ALLEGATIONS ..............................................................................................12

A.    Defendant Twitter and the Arab Spring...............................................................12

B.    Defendant KSA's Response to the Arab Spring:  Transnational Repression ...................13

C.    The Pattern of Racketeering Activity ..................................................................17

    1.    Overview of the Saudi Criminal Enterprise's Racketeering Acts ........................17

    2.    Racketeering Acts 1 to 30,892:  The Saudi Criminal Enterprise Accessed Confidential Identifying Data from Defendant Twitter. .......................................18

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. 3:23-cv-02369-EMC
COMPLAINT – DEMAND FOR JURY TRIAL

a. The Leak of Confidential User Data at Defendant Twitter........................18

b. The Saudi Criminal Enterprise Deploys Defendants Almutairi, Al-Asaker, and Abouammo..................................................................21

c. The Saudi Criminal Enterprise Assigns Defendant Alzabarah to Assume Defendant Abouammo's Duties..................................................24

d. The Leaked User Data Enabled the Saudi Criminal Enterprise to Identify and Target Dissidents...................................................26

e. Defendant Twitter Knew Of or Was Deliberately Ignorant to Defendants Abouammo and Alzabarah Leaking Confidential User Data........................................................................28

   i. Introduction.......................................................28

   ii. A Visit From the FBI Confirms Defendant Twitter Knew or Was Deliberately Ignorant All Along............................30

   iii. The Flagrancy of Defendants Abouammo's and Alzabarah's Conduct..................................................31

   iv. Defendant Twitter's "Notification" About the Leak of Confidential User Data Corroborates its Criminal Alignment with the Saudi Criminal Enterprise..........................34

   v. Defendant Twitter's Complicity is Confirmed by its CEO Months After the FBI Meeting.....................................35

f. Defendant Twitter Directly Benefited From the Leak of Confidential User Data ...................................................36

3. Racketeering Acts 30,893 to 30,895:  The Saudi Criminal Enterprise Kidnapped, Tortured, and Conspired to Kill Plaintiff Abdulrahman. .................38

   a. Background Facts..................................................38

   b. Defendant Twitter Reveals Plaintiff Abdulrahman's Identity and Brutality Ensues.......................................................39

4. Racketeering Acts 30,896 to 30,898:  Conspiracy to Kidnap, Torture, and Kill Omar Abdulaziz and Other Exposed Twitter Users. .....................................42

5. Racketeering Acts 30,899 to 30,905 and Continuing:  The Saudi Criminal Enterprise Stamped Out Other Dissenting Voices in the United States and Abroad Through Criminal Activity. .................................................43

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. 3:23-cv-02369-EMC
COMPLAINT – DEMAND FOR JURY TRIAL

a.   Racketeering Acts 30,899 to 30,901:  Kidnapping, Torturing, and Killing Jamal Khashoggi..................................................................44

b.   Racketeering Acts 30,902 to 30,904: Conspiracy to Kidnap, Torture, and Kill Saad Aljabri. ................................................45

c.   Racketeering Act 30,905:  Kidnapping Saad Almadi..............................46

6.   Racketeering Acts 30,906 to 30,908:  The Saudi Criminal Enterprise Stalks, Threatens, Terrorizes, and Conspires to Kidnap, Torture, and Kill Plaintiff Areej.......................................................................................46

a.   The Saudi Criminal Enterprise Stalks and Threatens to "Throw Away" Plaintiff Areej Like Her Brother After She Speaks Out...............46

b.   The Saudi Criminal Enterprise Holds Plaintiff Abdulrahman Hostage to Terrorize Plaintiff Areej in Retaliation for Her Speech..........51

c.   The Saudi Criminal Enterprise Again Stalks Plaintiff Areej and Threatens to Kill Plaintiff Areej in Graphic and Violent Messages. .........54

D.   The Saudi Criminal Enterprise's Unlawful Activities Have Caused Substantial Injuries to Plaintiff Abdulrahman, Including to His Business Opportunities...................56

E.   The Saudi Criminal Enterprise's Unlawful Activities Have Caused Plaintiff Areej to Severely Suffer, Including By Losing Substantial Business Opportunities. .................56

F.   The Saudi Criminal Enterprise's Actions Are Continuous and Related...........................58

FIRST CAUSE OF ACTION ........................................................................................60

SECOND CAUSE OF ACTION ....................................................................................62

THIRD CAUSE OF ACTION ........................................................................................64

PRAYER FOR RELIEF .................................................................................................65

JURY DEMAND ............................................................................................................66

Plaintiffs Areej Al-Sadhan, by and through her undersigned counsel, and Abdulrahman Al-Sadhan, an incompetent, by and through his sister and next friend, Areej Al-Sadhan, for their Complaint, allege as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Areej Al-Sadhan ("Plaintiff Areej"), a U.S. citizen, is an activist decrying the disappearance and torture of her brother, Plaintiff Abdulrahman Al-Sadhan ("Plaintiff Abdulrahman").  Plaintiff Abdulrahman, who resided and studied in the United States for several years, was kidnapped, tortured, and imprisoned in Saudi Arabia by the government of the Kingdom of Saudi Arabia ("Defendant KSA") for operating an anonymous Twitter account critical of Defendant KSA.  Plaintiff Abdulrahman's family has not heard from him since 2021.  Because of Plaintiff Areej's advocacy, Plaintiff Areej has been targeted by Defendant KSA and its agents, including non-party Prime Minister and Crown Prince Mohammed bin Salman ("MBS"), as well as Defendants John Does 1-10.

2.     The racketeering enterprise in this suit is a group of individuals and entities with the shared goal of transnational repression (the "Saudi Criminal Enterprise").  The Saudi Criminal Enterprise seeks to extend Defendant KSA's authoritarian control beyond Saudi Arabia's borders, including by reaching into U.S.-based businesses and commerce, and stifling discourse critical of Defendant KSA and the Saudi royal family around the world.  The members of the Saudi Criminal Enterprise unlawfully surveilled, killed, tortured, disappeared, kidnapped, extorted, and threatened perceived dissidents to suppress speech globally and to export terror and repression into the world's democracies, including within the United States.

3.     Most infamously, several members of the Saudi Criminal Enterprise lured Jamal Khashoggi, a U.S. Person within the meaning of Section 105A(c) of the National Security Act of

1947 and a former Washington Post columnist critical of Defendant KSA, to the Saudi Consulate in Istanbul, under the guise of issuing papers necessary for his then-impending marriage. Once Khashoggi entered the consulate, members of the Saudi Criminal Enterprise tortured, executed, and dismembered him on the orders of non-party MBS, disposing of his body in a way to ensure that many of its parts would never be found.

4.       The Saudi Criminal Enterprise has since targeted numerous supposed dissidents, including Plaintiffs Areej and Abdulrahman, by infiltrating the United States market, accessing Defendant Twitter's confidential data on its users—with assistance from two of Defendant Twitter's own employees—and supplying that data to Defendant KSA to target and retaliate against its critics by kidnapping, torturing, imprisoning, and killing perceived dissidents.

5.       Defendant Twitter was once the chosen platform for the revolutionizing Arab youth to liberate their countries from despotic leadership during the Arab Spring. For that reason, Defendant Twitter had information on these political and social dissidents that was valuable to Defendant KSA. In addition, Saudi Arabia was one of Defendant Twitter's fastest growing markets, presenting tremendous opportunity. Defendant KSA was able to recruit Defendant Twitter to the Saudi Criminal Enterprise with a carrot and a stick: the promise of large investment and powerful business connections, and the threat of excluding Defendant Twitter from its vast market. Indeed, during the conspiracy, Defendant Ahmed Almutairi told Defendant Ahmad Abouammo that their malign collaboration would help "achieve the goals of Twitter in the region," demonstrating quite clearly that Defendant Twitter would benefit from the illegal activity described herein. Defendant Twitter thus enabled its co-conspirators in the Saudi Criminal Enterprise to crush that very dissent by providing information to its co-conspirators that Arab

youth, including Plaintiff Abdulrahman, had entrusted to it.  Defendant Twitter even permitted Defendant KSA to enjoy an equity stake in Defendant Twitter through its private investment funds.

6.      The conspiracy and malign activities of the Saudi Criminal Enterprise came to light when the United States Department of Justice indicted three of its members.  In November 2019, the United States Attorney's Office for the Northern District of California revealed that Defendants KSA, Almutairi, and Bader Al-Asaker recruited two California-based employees of Defendant Twitter to the Saudi Criminal Enterprise.[1]  The employees, Defendants Abouammo and Ali Alzabarah, exploited their access to Defendant Twitter's data to advance the Saudi Criminal Enterprise's goal of transnational repression.  They transmitted the confidential names of individuals using anonymous accounts, which Defendant Saud Al-Qahtani had identified for them at non-party MBS's direction.  These accounts belonged to voices critical of the Saudi royal family and Defendant KSA's policies.  Plaintiff Abdulrahman's name was among the roughly 6,000 users whose personally identifying information Defendant Twitter provided to Defendants KSA, Al-Asaker, and Almutairi and non-party MBS.

7.      In 2018, Plaintiff Abdulrahman, a target of the Saudi Criminal Enterprise, disappeared.  Plaintiff Areej and her family were devastated, helpless, and fearful for Plaintiff Abdulrahman safety.  For two years, Plaintiff Areej did not know where he was or if he was alive.  Plaintiff Areej did what she could—she spoke out loudly against Defendant KSA.  After Plaintiff Areej's activism brought international pressure on Defendant KSA and highlighted how Plaintiff Abdulrahman was arbitrarily detained without charges against him, Defendant KSA brought baseless allegations against him—primarily related to his U.S.-based, protected speech on

---

[1] *See* Exhibits 2, 3.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. 3:23-cv-02369-EMC
COMPLAINT – DEMAND FOR JURY TRIAL

3

Twitter—in a sham trial before sentencing him to 20 years in prison, with the principal purpose of silencing Plaintiff Areej and others who challenged Defendant KSA.

8.      Today, Plaintiff Areej is once again in the dark about the fate of her brother and she is now herself a target of the Saudi Criminal Enterprise's conspiracy alongside him.  Members of the Saudi Criminal Enterprise have stalked her openly and with impunity.  They have harassed her online and threatened her and her brother's lives.  They have held her brother hostage, lording their control over him to keep her silent.  She has taken leaves of absence from work, missing promotion opportunities, to ensure that she and her family remain safe and healthy and to advocate for her brother.  She remains constantly vigilant and must craft travel plans to reduce the risk of being kidnapped, incurring heavy financial and psychosocial tolls.  Plaintiff Areej suffers daily as a target of the Saudi Criminal Enterprise, in what she can only describe as a "living nightmare."

9.      The Saudi Criminal Enterprise's pattern of unlawful racketeering to quell political dissent, including by deploying confidential information for unlawful purposes and threatening human life, violates the Racketeering Influenced and Corrupt Organizations Act ("RICO") and the Alien Tort Statute.

10.      Indeed, the stakes for those who dare to criticize the country's leadership could not be higher or more apparent:  On Tuesday, August 29, 2023, a Saudi man was sentenced to death for Twitter statements that were critical of Defendant KSA and non-party MBS.

11.      The allegations in this Complaint are pled on information and belief throughout, except to the extent certain allegations are verified by Plaintiff Areej's affidavit.  *See* Exhibit 1.

**THE PARTIES**

A.    **Plaintiffs**

12.    **Plaintiff Abdulrahman Al-Sadhan**, a noncitizen who previously held lawful nonimmigrant status in the United States, and an incompetent under Federal Rule of Civil Procedure 17(c), is a humanitarian aid worker and citizen of Saudi Arabia.  Plaintiff Abdulrahman attended middle school in the United States and, after returning to Saudi Arabia for a few years, moved to the United States in or around 2009 to attend college.  Plaintiff Abdulrahman then lived in the United States for approximately six years.  While living in the United States, Plaintiff Abdulrahman created an anonymous Twitter account that he used to call out hypocrisy in Saudi Arabia and its royal family.  Plaintiff Abdulrahman returned to Saudi Arabia in or around late 2014.  After being monitored for years by members of the Saudi Criminal Enterprise, in March 2018, Plaintiff Abdulrahman was kidnapped by Defendant KSA's secret police for operating his anonymous Twitter account.  Plaintiff Abdulrahman was last seen imprisoned in Saudi Arabia but has not been heard from since 2021, when he was sentenced to 20 years in prison followed by a 20-year travel ban.  Because Plaintiff Abdulrahman is believed to be incarcerated in Saudi Arabia and his family is unable to contact him, Plaintiff Abdulrahman is unable to assist counsel in the preparation of the case.[2]  Further, due to the circumstances of his disappearance, caused by the very conduct at the heart of this case, Plaintiff Abdulrahman lacks the practical and financial ability to access American courts.

13.    **Plaintiff Areej Al-Sadhan** is a United States citizen and a resident of San Francisco, California where she works in project management for an American multinational

---

[2] *AT&T Mobility, LLC v. Yeager*, 143 F. Supp. 3d 1042, 1050 (E.D. Cal. 2015) ("In California, a party is incompetent if he or she . . . is unable to assist counsel in the preparation of the case.").

technology conglomerate that owns numerous social media platforms. She was born in Washington State. Growing up, she lived in both Saudi Arabia and the United States before settling in the United States. She has not returned to Saudi Arabia since early 2009. Plaintiff Areej is a human rights activist campaigning against Defendant KSA's oppression whose primary objective at this time is to rescue her brother from unlawful detention, torture, and disappearance in Saudi Arabia. It is because of her advocacy against the Defendants that she became a direct target of the Saudi Criminal Enterprise. Plaintiffs Areej and Abdulrahman are siblings and always enjoyed a close emotional bond and were in contact regularly until Plaintiff Abdulrahman disappeared. Up until the time that Plaintiff Abdulrahman was kidnapped, and despite living across the world from each other, Plaintiffs Areej and Abdulrahman spoke to each other a few times per week to check in with each other, tell each other that they missed the other, and discuss work opportunities and share advice. Plaintiff Areej deeply misses her brother every single day. Plaintiff Areej is also the next friend of Plaintiff Abdulrahman and is dedicated to pursuing her brother Plaintiff Abdulrahman's best interests in this litigation.[3]

## B. Members of the Saudi Criminal Enterprise

14. **Defendant Twitter, Inc.** is a Delaware corporation with its principal place of business located in San Francisco, California. Defendant Twitter owns and operates a free-access social-networking website that can be accessed at http://www.twitter.com or http://www.x.com.[4]

---

[3] *Jurgens v. Dudendorf*, No. 2:14-cv-2780, 2015 WL 4910536, at *2 (E.D. Cal. Aug. 17, 2015) (permitting "next friend standing" where the next friend shows "(1) an adequate explanation . . . why the real party in interest cannot appear on his own behalf to prosecute the action, and (2) dedication to the best interests of the person on whose behalf he seeks to litigate." (internal quotation marks omitted)).

[4] Defendant Twitter, Inc. has merged into "X Corp." Accordingly, X Corp. has appeared as Successor in Interest to Defendant Twitter. *See* ECF No. 26.

Defendant Twitter was founded in and operates largely from the United States, including maintaining the software and hardware to ensure uninterrupted service. Defendant Twitter is a member of the Saudi Criminal Enterprise whose employees—in their roles at Defendant Twitter—accessed and sent confidential account data to members of the Saudi Criminal Enterprise. Defendant Twitter has more than 10 million users in Saudi Arabia, making Saudi Arabia its most important market in the Middle East.[5]   Moreover, Defendant KSA has been heavily invested in Defendant Twitter throughout the period of the conspiracy.

    a. In 2011, Saudi Prince Alwaleed Bin Talal's private investment firm Kingdom Holding Company ("KHC") invested $300 million in Defendant Twitter. On May 22, 2022, Bin Talal sold 16.87% of KHC to the sovereign wealth fund of Defendant KSA, the Saudi Public Investment Fund, for $1.5 billion.

    b. As of October 28, 2022, KHC owned approximately 35 million shares, valued at $1.89 billion, in Defendant Twitter. KHC is the second largest shareholder of Defendant Twitter behind Elon Musk.

15.    **Defendant KSA** is a nation in the Arabian Peninsula with an embassy located in the United States. Defendant KSA, through its agents, directed individuals to reside in or enter the United States and recruit employees of Defendant Twitter, then deployed those employees in

---

[5] *See* Exhibit 4 ("This crackdown began, in part, on Twitter, which is used by approximately 10 million people in Saudi Arabia, making it the service's largest Middle Eastern market. . . . . After a brief honeymoon of unfettered speech, pro-regime trolls and surveillance emerged on the site. Now as popular with members of the Saudi ruling family as the public, Twitter is no longer a place where ordinary Saudis feel comfortable speaking freely. Much the same could be said of Saudi dissidents and exiles, who talk of constant harassment, death threats, and attempts to hack their accounts. In their view, Twitter bears some responsibility for how its service has been abused.").

the U.S. market through Defendant Twitter in aid of transnational repression, including by accessing and transmitting confidential personal information of Twitter users.

16.    **Defendant Saud Al-Qahtani** is a citizen of Saudi Arabia who has served as a trusted adviser to non-party MBS and was considered his enforcer.  He coordinated Defendant KSA's access and transmittal of Twitter users' confidential data and helped develop Defendant KSA's online anti-dissent strategy.  Non-party MBS personally gave Defendant Al-Qahtani the mission and resources to suppress critical or embarrassing social media content with an "electronic army" of media posters.  Defendant Al-Qahtani is a member of the Saudi Criminal Enterprise.  In August 2017, Defendant Al-Qahtani posted an ominous warning against anonymous critics of Defendant KSA using his own verified Twitter account asserting that Defendant KSA could access personal information through various means.[6]

17.    **Defendant Ahmad Abouammo** is a dual citizen of the United States and Lebanon. While working at Defendant Twitter, he resided in Walnut Creek, California from at least November 4, 2013, until May 22, 2015, and then resided in Seattle, Washington.  Defendant Abouammo is a member of the Saudi Criminal Enterprise and a former employee of Defendant Twitter.  Defendant Abouammo transmitted Twitter users' confidential account data to members of the Saudi Criminal Enterprise.  Defendant Abouammo was charged by federal indictment on November 19, 2019, for acting as an agent of Defendant KSA.  He is currently serving a 42-month prison sentence.

18.    **Defendant Ali Alzabarah** is a citizen of Saudi Arabia.  Defendant Alzabarah worked at Defendant Twitter and resided in San Bruno, California from at least August 12, 2013,

---

[6] *See* Exhibit 5.

until December 3, 2015.  Defendant Alzabarah is a member of the Saudi Criminal Enterprise and transmitted Twitter users' confidential account data to members of the Saudi Criminal Enterprise. Defendant Alzabarah, before he began working for Defendant Twitter, was a recipient of a scholarship from Defendant KSA through Defendant Saudi Arabian Cultural Mission ("SACM"). Defendant Alzabarah was charged by federal indictment on November 19, 2019, for acting as an agent of Defendant KSA.

19.    **Defendant Ahmed Almutairi a/k/a Ahmed Aljbreen** is a citizen of Saudi Arabia. He was present in the United States between approximately August 2014 and May 2015. Defendant Almutairi is a member of the Saudi Criminal Enterprise and an agent of Defendant KSA.  Defendant Almutairi helped recruit Defendants Abouammo and Alzabarah and facilitated their transmissions of confidential account data from California to Defendant KSA.  Defendant Almutairi was charged by federal indictment on November 19, 2019, for acting as an agent of Defendant KSA.

20.    **Defendant Bader Al-Asaker** is Secretary General of non-party MBS's non-profit organization, the Mohammed bin Salman Foundation ("MISK Foundation").  The MISK Foundation is non-party MBS's personal multi-billion-dollar foundation operating under his control and direction.  The MISK Foundation, as part of its cultural "programming" in Saudi Arabia and abroad, supports Defendant SACM and its scholars in the United States by funding and organizing student events across U.S. school campuses.  The MISK Foundation also has ongoing business with a technology company, Samaat, founded by Defendant Almutairi. Defendant Al-Asaker is a member of the Saudi Criminal Enterprise.  He helped recruit and pay Defendants Abouammo and Alzabarah to transmit Twitter users' confidential account data to the Saudi Criminal Enterprise.

21.     **Defendant SACM** is a U.S.-based entity.  Since at least 2013, Defendant SACM has been headquartered in Fairfax, Virginia.  Defendant SACM's ostensible purpose is to administer KSA-funded scholarships for Saudi students to study in the United States.[7]  To advance the illegal and malign activities of the Saudi Criminal Enterprise, Defendant KSA leverages Defendant SACM to surveil, stalk, and harass dissidents in the United States.  Defendant SACM's Committee for Support and Oversight monitors and reports on dissident students' activities back to other members of the Saudi Criminal Enterprise.  Defendant SACM engages in transnational repression by encouraging scholarship students to target and harass other Saudi students in the United States if they criticize Defendant KSA.[8]

22.     The Saudi Criminal Enterprise has other members, who joined the racketeering enterprise as co-conspirators, including **Defendants John Does 1-10**.

23.     Most notable among the non-party conspirators is non-party MBS, the Prime Minister and Crown Prince of Saudi Arabia.  At his direction, Defendant KSA's secret police and other foreign agents have repressed political dissent by kidnapping, disappearing, torturing, killing, and terrorizing Saudi Arabian and foreign citizens.  Most infamously, as the U.S. Office of the Director of National Intelligence found, "Saudi Arabia's Crown Prince Muhammad bin Salman approved an operation in Istanbul, Turkey to capture or kill Saudi journalist Jamal Khashoggi."[9]

---

[7] *See, e.g.*, Exhibit 6 ("Figures obtained from the Office of International Affairs show that 83 percent of Saudi Arabian students at [Portland State University] received scholarship funding from the Saudi Arabian Cultural Mission in fall 2015.").

[8] *See* Exhibit 7 (". . . [P]rosecutors say Ibrahim Alhussayen, 42, who was studying at a Mississippi university on a scholarship funded by the Saudi Royal Court and Saudi Cultural Mission, used the @samar16490 Instagram account to harass Saudi Arabian citizens in the US and Canada who were known critics of their government.  Most of the alleged victims are women.").

[9] *See* Exhibit 8.

Non-party MBS also directed Defendants Abouammo and Alzabarah to access the confidential account data of Twitter users who were critical of Defendant KSA.[10]

24.     The Saudi Criminal Enterprise conspired to quell speech, activism, and the lawful petitioning of government representatives in the United States.  It conscripted a U.S. corporation, Defendant Twitter, into the conspiracy to obtain access to confidential personal information of the corporation's consumers.  The Saudi Criminal Enterprise then used that information to attack political dissidents, including U.S. residents, citizens, and green card holders, on U.S. soil and abroad.

25.     The common goal of the Saudi Criminal Enterprise is transnational repression. Transnational repression is the strategy through which an authoritarian regime controls freedoms beyond its own borders to protect its power at home.[11]  Transnational repression can be carried out in many ways, including by wrongfully detaining, physically or digitally surveilling, harassing, threatening, or taking hostage critics of the state.[12]  The goal of transnational repression is to intimidate and chill political and social dissenters from voicing their criticism or otherwise exercising their fundamental civil and human rights.

---

[10] The U.S. District Court for the District of Columbia held that non-party MBS was immune from prosecution for the Khashoggi murder under the Head of State immunity doctrine, a finding that was supported by the Biden Administration.  *See Cengiz v. Salman*, No. 20-3009, 2022 WL 17475400, at *4-7 (D.D.C. Dec. 6, 2022).

[11] *See* Exhibit 9 at 14 ("Transnational repression is not the mere exacting of violence beyond national borders, but a mode of governance:  To the modern authoritarian state, borders extend to the body of the furthest subject they can reach, or presenting even more complex challenges, to the behaviors, speech or criticisms that may form outside of their own sovereign control.").

[12] *See id.* at 6-8 (listing various forms of transnational repression carried out by Defendant KSA in the United States).

26.     Here, each member of the Saudi Criminal Enterprise participated in a conspiracy to chill anti-authoritarian advocacy by, among other conduct, unlawfully obtaining personal identifying information of political dissidents to identify and target them and kidnapping, torturing, stalking, harassing, threatening, and killing other political dissidents.  The conspiracy repeatedly violated U.S. laws and terrorized political dissidents in the United States and abroad.  Plaintiffs Areej and Abdulrahman are two of the many victims of the conspiracy.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO") of 1970, Pub. L. 91–45, 84 Stat. 922 (codified at 18 U.S.C. § 1962 et seq.), and the Alien Tort Statute, 18 U.S.C. § 1350.

28.     Venue is properly laid in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims set forth herein occurred in this District.  Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because there is no district in which this action may otherwise be brought and because Defendants are subject to the Court's personal jurisdiction with regard to this action.

## DIVISIONAL ASSIGNMENT

29.     San Francisco is the appropriate division because a substantial part of the events giving rise to the claims set forth herein occurred in this Division.

## FACTUAL ALLEGATIONS

**A.     Defendant Twitter and the Arab Spring**

30.     Social media and the Internet have become borderless and ubiquitous tools of political organization and speech.  The rise of the Internet age has strained the power of authoritarian regimes to suppress dissent and control speech.  Previously, dissenters were largely

within arm's reach, inside a state's borders under its oppressive police state.  Now, undesirable speech can originate from foreign countries and reach the state with a mere click.

31.     Beginning in the early 2010s, the Arab Spring roiled the Arab world, unseating brutal dictators while promising liberal reform.  The Arab Spring was a series of anti-government protests, uprisings, and armed rebellions that spread across much of the Arab world to challenge authoritarian regimes.   Young people largely built this grassroots movement on Defendant Twitter's platform, often using aliases to protect themselves and their families as they organized and voiced their anger.

32.     Anonymity was a shield to protect protestors against authoritarian repression. During the Arab Spring, Defendant Twitter empowered such persons, allowing them to use "pseudonymous accounts, meaning an account's profile is not required to use the name or image of the account owner."[13]  Defendant Twitter described itself as being from the "free speech wing of the free speech party."[14]  But, unfortunately, this also gave Defendant Twitter invaluable information about the identities and activity of political and social dissidents in authoritarian states.

33.     As a result of the Arab Spring and its protest movement, leaderships toppled and regimes changed, sparking a furious fear among authoritarian rulers that their control could be stormed next.

**B.     Defendant KSA's Response to the Arab Spring:  Transnational Repression**

34.     In the wake of the Arab Spring, Defendant KSA doubled down on its strategies to silence domestic and international dissidents.  Defendant KSA developed a catch-and-kill tactic to

---

[13] *See* Exhibit 10.

[14] *See* Exhibit 11.

eliminate critics whose identities were known.  Among countless other heinous acts, non-party MBS approved the brutal torture and assassination of Washington Post columnist Jamal Khashoggi and authorized his "Tiger Squad" to kidnap, torture, and kill Saad Aljabri, a former Saudi intelligence officer and vocal critic of the regime.

35.    But many dissidents located outside Defendant KSA's borders were anonymous voices using Defendant Twitter as their platform.  To target these individuals, Defendant KSA launched an online anti-dissent strategy with pro-regime trolls and surveillance on the site. Defendant KSA initially sought user information from Defendant Twitter through its Emergency Disclosure Request ("EDR") process, which allows law enforcement to obtain documentation with account information when there is an exigent emergency that involves a risk of death or serious physical injury to a person.  But this method proved far too ineffective and cumbersome for Defendant KSA to effectively monitor and attack the vast number of anonymous critics on Defendant Twitter's platform voicing their dissent of the Saudi regime.[15]

36.    Intent on stomping out dissent by any means necessary, Defendant KSA sought another method to achieve its goals.  Knowing that Defendant Twitter was struggling to make a profit, relying on emerging markets for growth, and needed investment injections, it coopted Defendant Twitter into its transnational repression campaign with a two-pronged strategy: Defendant KSA offered a sizeable equity investment while threatening to block access to Defendant Twitter within its borders.  In 2013, Saudi Arabia was one of Defendant Twitter's fastest growing markets and, accordingly, Defendant Twitter had sought to expand advertising and other

---

[15] Before January 2015, Defendant Twitter's compliance with Defendant KSA's requests was less than 10%, while the worldwide rate was in the 50th percentile.  After January 2015, compliance for Defendant KSA's information requests went up to 69% in the first half of 2015 (while the worldwide rate at 58.5%) and 85% in second half (while the worldwide rate was 63%).

services there.   Defendant KSA had the power to either encourage that growth or undo it completely.   Defendant KSA could invest and partner with Defendant Twitter, or it could block the platform entirely, as it had done or threatened to do to other platforms harboring perceived dissidents[16] and as other countries had done to Defendant Twitter.[17]

37.     In return, Defendant Twitter allowed or deliberately turned a blind eye to Defendant KSA accessing information through back channels, unseen to the rest of the world.

    a.   Defendant Twitter hired Defendant Abouammo, a Saudi agent, gave him unfettered access to confidential user data, and enabled him to find another accomplice within the company:  Defendant Alzabarah.

    b.   Together, Defendants Abouammo and Alzabarah, with Defendant Twitter's knowledge or deliberate ignorance, weaponized Defendant Twitter's confidential user data on behalf of the Saudi Criminal Enterprise.

    c.   They accessed, between them, more than 6,000 users' anonymous profiles, obtained personally identifying information, and handed it over to Defendant KSA, oftentimes through Defendant Al-Asaker.

    d.   As the conspiracy progressed, Defendant Alzabarah expanded the scope of malign services to Defendant KSA.  Defendant Alzabarah used Defendant Twitter's other databases and systems to conduct additional research on Defendant KSA's targets and served information exposing anonymous dissidents to Defendant KSA in real time, including, at times, on the very

---

[16] Exhibits 12, 13.

[17] Exhibit 14.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. 3:23-cv-02369-EMC
COMPLAINT – DEMAND FOR JURY TRIAL

same day that the dissidents posted critical comments about Defendant KSA or the Saudi royal family on Twitter.

    e.   To provide Defendant KSA with official documentation to pursue sham charges against some dissidents in secret "terrorism courts" (Defendant KSA has defined advocacy for democratic reform as "terrorism"), Defendant Alzabarah also ensured that Defendant KSA's EDRs were usually and rapidly approved, a practice that contrasted with EDRs submitted by some other countries.

    f.   All together, these actions—which would have been and were completely visible to Defendant Twitter's senior management—allowed the Saudi Criminal Enterprise to detain, disappear, torture, imprison, surveil, and harass many Saudi citizens and ex patriots who had committed the grave sins of criticizing Defendant KSA or the Saudi royal family or advocating for democratic reform in the country.

    g.   In other words, Defendant Twitter—once the communications backbone of the Arab Spring movement—became an implement of brutal repression to improve its corporate fortunes.

38.    The fair inferences from the evidence and allegations stated herein demonstrate that Defendant Twitter's participation in the racketeering activity of the Saudi Criminal Enterprise was either knowing or based on its deliberate ignorance to the criminality occurring within Defendant

Twitter as it abetted Defendant KSA's efforts to identify, muzzle, and disappear dissidents, including acts of murder, kidnapping, and torture.[18]

**C.     The Pattern of Racketeering Activity**

       **1.     Overview of the Saudi Criminal Enterprise's Racketeering Acts**

     39.     The overall goal of the Saudi Criminal Enterprise was to identify and silence dissenting voices and chill advocates for democratic reform within Saudi Arabia through murder, torture, kidnapping, forced disappearances, sham trials, travel bans, asset forfeitures, physical and electronic surveillance, stalking, harassment, and acts of retaliation against dissenters' family members living in Saudi Arabia.

     40.     When those goals were frustrated by the anonymity dissenters enjoyed on Twitter, the Saudi Criminal Enterprise and its members coopted and corrupted Defendant Twitter to join, aid, abet, and assist in its goals by accessing the confidential personal information of anonymous dissenters and advocates.  This enabled the Saudi Criminal Enterprise to execute further acts of criminal retribution, as it did with Plaintiff Abdulrahman.  The allegations related to the corruption of Defendant Twitter in weaponizing the confidential user data of anonymous Saudi dissenters and reformers—all to aid the Saudi Criminal Enterprise in its goal of transnational repression—are described in Section C(2) *infra* and form the basis of Racketeering Acts 1 through 30,892, violate 18 U.S.C. § 1028(a)(7) and 18 U.S.C. § 1029(a)(7), and contribute to the pattern of racketeering engaged in by the Saudi Criminal Enterprise in violation of 18 U.S.C. § 1962(c) and (d).

---

[18] *See United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) ("[D]eliberate ignorance and positive knowledge are equally culpable."); *United States v. Asefi*, 788 F. App'x 449, 452 (9th Cir. 2019) (holding, in a RICO conspiracy case, that a deliberate ignorance instruction "is proper in specific-intent cases," including conspiracy cases); *United States v. Ramos-Atondo*, 732 F.3d 1113, 1120 (9th Cir. 2013) (rejecting the argument that "it is impossible to conspire to be deliberately ignorant").

41.     When the Saudi Criminal Enterprise knew the identity of dissenters or reform advocates—either through the public-facing nature of their advocacy or through Defendant Twitter's malign actions—the Saudi Criminal Enterprise and its conspirators took action in the form of murder, torture, kidnapping, stalking, harassment and other malign action meant to silence or chill speech.  Section C(3) *infra* outlines some of these acts of brutality and harassment, which form the basis of Racketeering Acts 30,893 to 30,908, violate California law, and contribute to a pattern of racketeering engaged in by the Saudi Criminal Enterprise in violation of 18 U.S.C. § 1962(c) and (d).

**2.      Racketeering Acts 1 to 30,892:  The Saudi Criminal Enterprise Accessed Confidential Identifying Data from Defendant Twitter.**

**a.      The Leak of Confidential User Data at Defendant Twitter**

42.     Defendant Twitter, which was founded and launched in the United States and operates largely from its corporate headquarters in California and its U.S.-based offices, enabled the Saudi Criminal Enterprise to identify and target dissidents and obtain their confidential Twitter user data.  The California Twitter offices employ high-level executives, software and privacy engineers, operations and marketing managers, and security risk analysts.  Defendant Twitter also maintains hardware and software in its U.S.-based offices, including California.

43.     As explained in paragraphs 31-33 above, the regime changes and wide-spread protests fomented by the Arab Spring roiled the Saudi royal family.  As a result, the leaders of the Saudi Criminal Enterprise, including non-party MBS, adopted an official policy of domestic and transnational repression, aiming to silence further dissent and calls for democratic reform.  The Saudi Criminal Enterprise enforced this policy with a brutal hand, including by ordering and causing executions, torture, and murder.

44.     But, during the period between 2011 and 2014, the leaders of the Saudi Criminal Enterprise, including non-party MBS, realized that Defendant Twitter continued to be a primary hub of dissent, where advocates of freedom and democracy were free to—and did—call out the authoritarian Saudi government and its many acts of brutality and hypocrisy.  Many dissidents used anonymous accounts so the leaders of the Saudi Criminal Enterprise, including non-party MBS, had no effective means to identify and silence them.

45.     Defendant Twitter was on notice of Defendant KSA's concerns about Saudi dissenters on Twitter as early as January 2013.  One published report specifically identified the issues as follows:

> Nonetheless, the Wahhabi religious establishment that dominates not only Saudi religious institutions but also the judiciary and some parts of the Interior Ministry at the behest of the Saudi royal family views Twitter as giving voice to unconventional perspectives and eroding traditional authority.  As a result, these and other associated government bodies approach Twitter as a threat to be tamed, patrolled, and used as a means for taking action against dissenters.[19]

Ominously, this report detailed that the rates of Twitter usage by the Saudi population skyrocketed between 2011 to 2013, growing from a few hundred thousand users to nearly 4.8 million.

46.     In an official statement, Defendant KSA framed the problem clearly:  "the ministry cannot monitor everything published on Twitter" and "censorship [on Twitter] is difficult due to the big number of users."[20]

---

[19] *See* Exhibit 15.

[20] *Id.*

47.     The 2013 report also put Defendant Twitter on specific notice that Defendant KSA was both monitoring reform advocates and taking action against them for their Twitter-related advocacy:

> Saudi authorities have targeted political and civil activists, their supporters, and other semipublic figures for judicial and other action due to tweets deemed illegal or offensive.  Acting against such individuals for tweets is often part of a wider campaign against them.  For example, in March, two famous Saudi human rights activists, Muhammad al-Qahtani and Abdullah al-Hamid, who cofounded the Saudi Civil and Political Rights Association, were sentenced to prison for a number of offenses including "internet crimes" because they had used Twitter and other media to promote their cause.  Another case is that of Saudi journalist Iman al-Qahtani, who was forced to shut down her Twitter account after being harassed by security forces over her human rights activities, according to the Gulf Center for Human Rights.  At the time, she had more than 73,000 Twitter followers.  Qahtani had reported on human rights activists in detention and had live-tweeted their trials.[21]

48.     The leaders of the Saudi Criminal Enterprise, including non-party MBS, tried to gain limited access to some anonymous Twitter accounts through EDRs (*see* paragraph 35), which were only intended for requests based on imminent harm or death.  Defendant KSA submitted various EDRs—for reasons purely related to political activities by targeted Saudi Twitter users—only to have those requests rejected or delayed.

49.     Indeed, so concerned was Defendant KSA about anonymous voices of dissent on Defendant Twitter that Defendant KSA explored ways to block anonymous functionality within Saudi Arabia.  Defendant Twitter knew this because it was publicly reported.[22]

_____

[21] *Id.*

[22] *See* Exhibit 16.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. 3:23-cv-02369-EMC          20
COMPLAINT – DEMAND FOR JURY TRIAL

50.     The leaders of the Saudi Criminal Enterprise needed to find another way to reach into the United States—and deeply into this U.S. company—to get their hands on confidential user data.  Members of the Saudi Criminal Enterprise devised a long-term plan, which started with financial inducements:  a large share purchase of Defendant Twitter's stock in late 2011 and additional financial commitments in Twitter, as detailed below, all to induce Defendant Twitter to succumb to its malign intent.  This effort was primarily designed to co-opt or corrupt Defendant Twitter.  Indeed, Defendant Twitter knew that many Twitter users worried that these commercial transactions would give Defendant KSA undue influence over Twitter, *because they posted these concerns on Twitter*.

51.     As Defendant KSA, through the leaders of the Saudi Criminal Enterprise, began to negotiate another equity stake in 2013, it entered the next phase of its expropriation of transnational repression to Defendant Twitter:  corrupting Defendant Twitter to gain access to confidential user data.

          **b.     The Saudi Criminal Enterprise Deploys Defendants Almutairi, Al-Asaker, and Abouammo**

52.     In the first phase, having assented to or deliberately ignored infiltration by members of the Saudi Criminal Enterprise, Defendant Twitter agreed to hire Defendant Abouammo, who worked closely with Defendants Almutairi and Al-Asaker, to illegally access and obtain confidential user data for thousands of Saudi anonymous Twitter users.

53.     Defendant Twitter hired Defendant Abouammo on November 4, 2013.  Defendant Abouammo was hired as a Media Partnerships Manager responsible for the Middle East and North Africa ("MENA") region.  In that role, he, among other things, collaborated with the product, sales, and operations teams to ensure that operations were consistent and effective.  He also provided assistance for notable accounts, including accounts of public interest or belonging to brands,

journalists, and celebrities in the MENA region.   Defendant Twitter provided Defendant Abouammo direct access to confidential user data.

54.     Defendant Abouammo needed to find a way to introduce executives from Defendant Twitter to meet Defendant Al-Asaker, his main point of contact in the criminal scheme. Toward that end, Defendant Abouammo arranged a meeting, purportedly at the request of a representative of a U.S.-Saudi Arabian trade organization in Washington D.C., to arrange a tour for a delegation of "entrepreneurs" from Saudi Arabia at Defendant Twitter's headquarters in California.   On June 13, 2014, Defendant Al-Asaker, with other employees of the Saudi royal family, joined the delegation.   During that meeting, Defendant Al-Asaker discussed the goals of the Saudi Criminal Enterprise with Defendant Twitter's representatives.

55.     With this meeting, Defendant Abouammo inarguably acted as an agent of Defendant KSA, yet Defendant Twitter did not ensure that Defendant Abouammo had registered as an agent of a foreign government under the Foreign Agents Registration Act, 22 U.S.C. § 611.

56.     Later that year, on or around November 15, 2014, Defendant Almutairi emailed Defendant Abouammo.  He requested an "urgent meeting" to discuss their "mutual interest."  They met in San Francisco in front of Defendant Twitter's headquarters.   During that meeting, Defendants Almutairi and Abouammo discussed the goals of the Saudi Criminal Enterprise, including directions about obtaining confidential user data from Defendant Twitter.

57.     On or around December 1, 2014, Defendant Almutairi emailed Defendant Abouammo—*using Defendant Abouammo's Twitter account email*—stating:  "I'm quite confident that by both of us cooperating and working together, we'll achieve the goals of Twitter in the region."

58.     Defendants Almutairi and Abouammo continued to communicate by phone and email in late 2014 to coordinate a meeting with Defendant Al-Asaker.  Defendants Al-Asaker and Abouammo met on December 5, 2014, in London.  At the meeting, Defendant Al-Asaker gave Defendant Abouammo a watch worth at least $20,000.  During that meeting, Defendants Al-Asaker and Abouammo discussed the goals of the Saudi Criminal Enterprise, including directions about obtaining confidential Twitter user data.

59.     After the meeting on December 5, 2014, Defendant Abouammo began accessing and sending confidential data from Defendant Twitter's U.S.-based offices to Defendant KSA officials.  Defendant Abouammo sent Defendant Al-Qahtani a message on Twitter proclaiming, "proactively and reactively we will delete evil, my brother," a reference to the goal of the Saudi Criminal Enterprise to identify and harm perceived dissidents.  Defendant Twitter was either aware of this message—brazenly sent on its own platform—or was deliberately ignorant to it.

60.     Defendants Almutairi, Al-Asaker, and Al-Qahtani were acting at non-party MBS's direction.[23]  Defendant Almutairi told Defendant Abouammo that he was working on behalf of

---

[23] Defendant Al-Asaker personally advised non-party MBS.  Defendant Al-Qahtani held a seat on the board of directors of the MISK Foundation and also advised non-party MBS.

and advising a "very important" member of the Saudi royal family. Defendant Almutairi, in May

2015, posted a photo on Instagram with non-party MBS at a meeting in Washington, D.C.

61.     Defendant Abouammo resigned from his position at Defendant Twitter in May

2015 but continued to contact Defendant Twitter to field requests, including for confidential

information on users, from Defendant Al-Asaker. Defendant Abouammo made it clear to

Defendant Twitter that his requests were on behalf of Defendant KSA. Indeed, on one occasion,

Defendant Abouammo contacted Twitter Support and indicated that his request was on behalf of

his "old partners in the Saudi Government" and, in multiple instances, that his requests would be

used by "the King's team." Additionally, in July 2015, Defendant Al-Asaker sent Defendant

Abouammo a direct message—again, *using Defendant Twitter's platform*—with a photograph of

a wire transfer receipt for $100,000.

> **c.     The Saudi Criminal Enterprise Assigns Defendant Alzabarah to Assume Defendant Abouammo's Duties**

62.     To carry on the conspiracy, in or around February 2015, Defendant Abouammo

introduced Defendant Almutairi to Defendant Alzabarah. Defendant Alzabarah had been working

as a Site Reliability Engineer in Defendant Twitter's California offices since August 2013.

63.     In that role, Defendant Alzabarah was responsible for maintaining Defendant Twitter's hardware and software to ensure uninterrupted service.  He had access to, and routinely used, engineering and technology tools to monitor and observe software reliability on Defendant Twitter's database.  Duties in Defendant Alzabarah's position included managing IT infrastructure. As part of this role, Defendant Twitter provided Defendant Alzabarah with direct access to confidential user data.   Moreover, Defendant Twitter lacked security measures to protect confidential user data, such that even employees with no need to access such data could gain access to it.

64.     Defendant Alzabarah openly touted his close relationship with Defendant Almutairi.  Indeed, on or about February 20, 2015, Defendant Almutairi posted a photograph of himself and Defendant Alzabarah on Defendant Almutairi's Twitter account.

65.     On or about May 14, 2015, Defendant Alzabarah met with Defendant Almutairi in Fairfax, Virginia at a SACM-related property.  Defendant Al-Asaker orchestrated the meeting. During the meeting, Defendants Alzabarah and Almutairi discussed the goals of the Saudi Criminal Enterprise, including how to obtain confidential Twitter user data.

66.     After the meeting, Defendant Alzabarah returned to San Francisco, where Defendant Alzabarah, like Defendant Abouammo, began accessing and transmitting confidential Twitter user data from Defendant Twitter's U.S.-based offices.

67.     In the period between May 2015 and November 18, 2015, Defendant Alzabarah accessed over 6,000 confidential user profiles for Twitter users, including 33 user profiles for which Defendant KSA had previously submitted EDRs to Defendant Twitter.  Beginning in June 2015, in notes he made to himself and to Defendant Al-Asaker, Defendant Alzabarah made

reference to multiple operatives from Defendant KSA also working at Defendant Twitter to pursue the goals of the Saudi Criminal Enterprise.

68.     Over the ensuing months, Defendant Alzabarah's conduct became exceedingly flagrant.  He was able to obtain more detailed information on users and, in fact, started using Twitter's other databases and systems to investigate those users.  Defendant Alzabarah repeatedly passed on this information to the Saudi Criminal Enterprise, usually through Defendant Al-Asaker.

69.     Defendant Twitter permitted Defendant Alzabarah to continue his malign activities even when he was physically present in Saudi Arabia.  During the summer of 2015 (July 13 to August 11), Defendant Alzabarah requested permission from Defendant Twitter to take personal leave and travel to Saudi Arabia.  Defendant Twitter agreed.  Knowing or being deliberately ignorant to the fact that Defendant Alzabarah would continue his malign activities from Saudi Arabia, Defendant Twitter furthered its contribution to the Saudi Criminal Enterprise's goals and took no action to disable or restrict his access to sensitive and confidential user data.

70.     While in Saudi Arabia, Defendant Alzabarah accessed nonpublic account information of hundreds of Twitter users, including on July 29, 2015, when Defendant Alzabarah connected his laptop—issued by Defendant Twitter—to Defendant Almutairi's company's wireless local area network in Saudi Arabia.

### d.     The Leaked User Data Enabled the Saudi Criminal Enterprise to Identify and Target Dissidents

71.     A fundamental purpose of the conspiracy was to gather intelligence on anonymous Twitter users who were critical of Defendant KSA and the Saudi royal family so that the Saudi Criminal Enterprise could terrorize and punish people into silence.  The campaign to silence dissent was done directly by threatening, harassing, kidnapping, torturing, and killing political dissenters at home and abroad, and indirectly by creating an example of such persons.

72.     Over the course of the conspiracy, Defendant Al-Asaker and other members of the Saudi Criminal Enterprise sent Defendants Abouammo and Alzabarah the Twitter handles of users who posted criticism of Defendant KSA and the Saudi royal family.  Defendants Abouammo and Alzabarah unlawfully transmitted back identifying information, birthdates, device identifiers, phone numbers, IP addresses, and session IP histories associated with these accounts.

73.     With this user data, Defendant KSA could identify anonymous critics of the government and silence them.  Among many accounts, the conspirators identified Plaintiff Abdulrahman's @sama7ti Twitter handle and provided information, including personally identifying information, to Defendant KSA.

74.     Among the exposed account users were (i) Plaintiff Abdulrahman, (ii) Ali Al-Ahmed, who resides on asylum in the United States, (iii) Omar Abdulaziz, who resides on asylum in Canada, (iv) Turki bin Abdulaziz Al-Jasser, who was reportedly arrested and tortured while imprisoned in Saudi Arabia, and (v) an account operated by the well-known whistleblower of Defendant KSA, Mujtahid.  Each of these individuals had posted criticism of Defendant KSA or members of the Saudi Criminal Enterprise.

75.     In total, the Saudi Criminal Enterprise, through Defendants' collective efforts, unlawfully accessed and transmitted confidential Twitter user data 30,892 times.[24]  Defendants Abouammo and Alzabarah primarily committed these acts from Defendant Twitter's U.S.-based offices.  Each access occurred close in time to the prior access—within minutes, hours, or days, and occasionally weeks—and constituted a separate racketeering act in violation of 18 U.S.C. §§ 1028(a)(7), 1029(a)(7).

---

[24] *See* Exhibit 17 (Tr. Ex. No. 352, *United States v. Abouammo*, 19-CR-0621, N.D. Cal. July 26, 2022).

76.     Additionally, Defendants Abouammo and Alzabarah, while they were employees of Defendant Twitter, received cash, gifts, and promises from the head of non-party MBS's affairs and operator of non-party MBS's foundation.  Defendant Abouammo received over $300,000 from the Saudi Criminal Enterprise and Defendant Alzabarah, after fleeing the United States, received a lucrative position at the MISK Foundation.

> **e.     Defendant Twitter Knew Of or Was Deliberately Ignorant to Defendants Abouammo and Alzabarah Leaking Confidential User Data**

> > **i.     Introduction**

77.     As pled in great detail above, Defendant Twitter was aware of, or deliberately ignorant to, Defendants Abouammo and Alzabarah accessing and transmitting confidential user data to Defendant KSA and its agents.

78.     By the time Defendant Twitter hired Defendants Abouammo and Alzabarah, it had ample notice (1) of security risks to users' personal data and (2) that there was a clear and present threat of insiders illegally accessing confidential user data.

> a.  For example, news stories in 2011 and 2013 reported substantial hacks of Defendant Twitter, including one by the Syrian Electronic Army.

> b.  As early as 2010, Defendant Twitter was sparring with the Federal Trade Commission ("FTC") over charges that it put user privacy at risk by failing to safeguard their personal information.

> c.  Although the FTC settled with Defendant Twitter in 2011, last year the agency took new action against the social media platform for violating its 2011 order that explicitly prohibited the company from misrepresenting its privacy and security practices.

d.   Indeed, while lauding its protection of confidential user data, Defendant Twitter demonstrated that profits were more important than its promises to users, since it was secretly selling their personal and confidential information to marketing companies.

79.   By the time Defendant Twitter hired Defendants Abouammo and Alzabarah, it also had ample notice that Defendant KSA was concerned about anonymous criticism on Twitter, was attempting to monitor posts by dissidents, took acts of retaliation against them when it could identify them, and even explored blocking the anonymous functionality within Saudi Arabia. Defendant Twitter knew this because it was all publicly reported.

80.   More significantly, Defendant Twitter was aware in 2014 and 2015 that the Saudi Criminal Enterprise routinely used Defendant Twitter's platform to identify and target political dissidents.  Defendants KSA and Al-Qahtani directed and oversaw hundreds of Twitter users who hunted for voices to silence on Defendant Twitter's platform.

a.   Members of this virtual army scoured conversations on Twitter for assigned topics and posted messages to threaten and mock dissenters of Defendant KSA and non-party MBS.

b.   Defendant Al-Qahtani did not hide his efforts to identify and target political dissidents via Defendant Twitter.  On one occasion, he encouraged his followers to add names to "The Black List" to be tracked by Defendant KSA.

c.   Defendant Twitter knew that Defendant KSA, Defendant Al-Qahtani, and their agents engaged hundreds of individuals to target political dissidents using its platform:  The virtual army was reported by credible news sources

and heavily publicized.   Moreover, social media specialists who
participated in the virtual army found jobs through Defendant Twitter itself.

81.   As previously pleaded, Defendant Twitter did not simply ignore all these red flags. Defendant Twitter was aware, or deliberately ignorant, of the Saudi Criminal Enterprise's malign campaign throughout 2014 and 2015.

82.   And with all this, on or about November 5, 2015—days before the Federal Bureau of Investigation ("FBI") confronted Defendant Twitter about allowing Saudi espionage on the platform for the first time, as explained below—Defendant Twitter actually promoted Defendant Alzabarah to its "technical team," causing Defendant Alzabarah to send an elated note to Defendant Al-Asaker to convey his "unimaginable happiness" for the promotion, with an implication that Defendant Al-Asaker had either arranged it or been influential in it.

### ii.   A Visit From the FBI Confirms Defendant Twitter Knew or Was Deliberately Ignorant All Along

83.   On or about November 29, 2015, shortly after Defendant Twitter promoted Defendant Alzabarah, the FBI officially informed Defendant Twitter of the "Saudi espionage problem."[25]   In sum and substance, FBI agents said someone inside Defendant Twitter was conveying confidential personal data on Saudi dissidents to Defendant KSA.   Defendant Twitter played dumb, disclaiming knowledge of who within the company could be at fault.

84.   Within *48 hours* of this FBI contact, Defendant Twitter took two steps:

a.   Defendant Twitter placed the newly promoted Defendant Alzabarah on leave and confiscated his company laptop.   However, Defendant Twitter allowed Defendant Alzabarah to keep the cellphone he was using for

---

[25] Exhibit 4.

Twitter business—the very cellphone he had used, and continued to use, for malign activities.

b. Defendant Twitter reported to the FBI that it had "discovered" the individuals responsible for the allegedly unauthorized access:  Defendants Abouammo and Alzabarah.

85.     Defendant Twitter was only able to act this swiftly because it either already knew about or was deliberately ignorant to Defendants Abouammo's and Alzabarah's unlawful activities, and instead was primarily concerned with keeping its cash cow—Defendant KSA—in its good graces.

86.     Defendant Twitter had every reason to expect that Defendant Alzabarah would immediately flee to Saudi Arabia.  Which is exactly what he did.

87.     On December 2, 2015, Defendant Alzabarah tried to contact Defendant Almutairi. When he could not reach Defendant Almutairi, Defendant Alzabarah used that phone to contact Defendant Al-Asaker, who quickly coordinated Defendant Alzabarah's departure from the United States with the Saudi Arabian consulate in Los Angeles, California.  The next day, Defendant Alzabarah flew to Saudi Arabia and resigned from Defendant Twitter.

### iii.  The Flagrancy of Defendants Abouammo's and Alzabarah's Conduct

88.     Finally, the most salient evidence that Defendant Twitter knew, or was deliberately ignorant, of Defendants Abouammo's and Alzabarah's conduct was the extent to which it was on full display for Defendant Twitter to observe.  The overall scope of the compromises at Defendant Twitter was staggering:  Defendants Abouammo and Alzabarah used multiple systems within Defendant Twitter to investigate users.  They then disseminated that intelligence to other members

of the Saudi Criminal Enterprise, oftentimes during calls or communications from within Twitter's own U.S.-based offices.

89.     Defendants Abouammo and Alzabarah also mined confidential user data in real-time, responding to tweets that were critical of Defendant KSA and the royal family.  Again, this concurrent work for the Saudi Criminal Enterprise would have been obvious to Defendant Twitter. For example:

    a.  On May 21, 2015, a Twitter user ("User 1") posted on Defendant Twitter about the Saudi royal family.

    b.  That same day, Defendant Al-Asaker posted on Defendant Twitter that User 1's post was false.

    c.  Later that day, Defendant Alzabarah accessed User 1's confidential profile, mining personal and confidential data, which revealed User 1's email address, phone number, and IP address.

    d.  User 1 also had a second Twitter account that displayed the individual's name.  Defendant Alzabarah accessed that account, too, continuing to search for information that could assist the Saudi Criminal Enterprise.

    e.  After gathering information from both of User 1's accounts, Defendant Alzabarah had several calls with Defendant Almuitari, during which Defendant Alzabarah disclosed User 1's true identity and the conspirators discussed retaliation against User 1.

90.     On or about September 28, 2015, Defendant Twitter received a complaint from User 1, stating that the account(s) had been compromised.  Even then, Defendant Alzabarah's access to confidential user data was not cut off or restricted.  In fact, Defendant Twitter took no

action.  Clearly, this was not new information to Defendant Twitter, which already knew of or was deliberately ignorant of Defendant Alzabarah's malign activities.

91.   On several occasions, after Defendant Alzabarah provided the Saudi Criminal Enterprise with confidential user data, officials from Defendant KSA followed up with information requests, including EDRs, seeking physical documentation that confirmed a user's identity that could be used in retaliatory court proceedings.

92.   Although, in earlier periods, Defendant Twitter complied with fewer of Defendant KSA's requests for information, including EDRs, once Defendant Twitter joined the conspiracy, that number increased significantly.  Indeed, between July and December 2015, Defendant Twitter complied with 85% of Defendant KSA's requests—the rate of requests granted was not only higher than before the conspiracy began but also higher than Defendant Twitter's rate for granting similar requests made by most other countries.

a.   Often, Saudi EDRs were approved the very same day.  For example, on May 29, 2015, two Twitter users tweeted about Defendant KSA, which Defendant Al-Asaker found objectionable.   Over the course of approximately three hours, Defendants Al-Asaker and Alzabarah exchanged three phone calls and Defendant Alzabarah accessed user data for the two Twitter users.  Defendant KSA submitted EDRs to Defendant Twitter for the same two accounts, which Defendant Twitter immediately approved.  At the time, Defendant Alzabarah was located in the United States.

b.   Between July and December 2015, Twitter granted Defendant KSA's information requests significantly more often than most other countries at

that time, including Canada, the United Kingdom, Australia, and Spain. As a result of the conspiracy, Defendant KSA had one of the highest positive response rates in the world.

93.     Again, Defendant Twitter did not respond to or prevent Defendant Alzabarah's accessing of confidential data for Saudi-based users about whom Defendant KSA filed EDRs. This was because, in reality, Defendant Twitter was aware of, or deliberately ignorant of, Defendant Alzabarah's malign activities.

### iv.   Defendant Twitter's "Notification" About the Leak of Confidential User Data Corroborates its Criminal Alignment with the Saudi Criminal Enterprise

94.     Defendant Twitter's response to the leak of confidential user data further corroborates its desire to protect the Saudi Criminal Enterprise, and itself, against discovery of the malign activity. On December 11, 2015, Defendant Twitter emailed a small group of accounts (the "Alleged Notification"), advising them that their accounts "*may* have been targeted by state-sponsored actors" and that the actors "*may*" have been "trying to obtain information" about the users. (emphasis added). The Alleged Notification was false and misleading because Defendant Twitter was fully aware of the scope of Defendant Abouammo's and Alzabarah's mining of confidential user data and transmission to Defendant KSA.

95.     Plaintiff Abdulrahman, like other targeted account holders, did not receive or see the Alleged Notification. Indeed, to this day, Defendant Twitter has never produced a copy of the Alleged Notification it sent to Plaintiff Abdulrahman.

96.     The Alleged Notification did not inform its recipients that their accounts had been hacked by agents of Defendant KSA or that their personal information had been sent to Defendant

KSA.  In fact, the Alleged Notification did not even mention Defendant KSA, as Defendant Twitter was fully in league with the Saudi Criminal Enterprise's goals and did not want to expose it.

    a.   The Alleged Notification lacked crucial information despite the fact that, at the time, Defendant Twitter knew of Defendants Abouammo's and Alzabarah's malign activities.

    b.   By failing to give this crucial information, Defendant Twitter put thousands of Twitter users at risk.  Those users who might have otherwise escaped Defendant KSA before the Saudi Criminal Enterprise could weaponize the confidential information that Defendants Abouammo and Alzabarah handed over to the Saudi Criminal Enterprise.

    c.   Defendant Twitter knew of this risk, but—again—chose its conspiratorial agreement with Defendant KSA over the very lives of 6,000 of its users whose accounts were compromised.

### v.    Defendant Twitter's Complicity is Confirmed by its CEO Months After the FBI Meeting

97.    As further evidence of Defendant Twitter's conspiratorial alignment with the Saudi Criminal Enterprise, even after its close call with the FBI, Defendant Twitter continued to meet with and strategize with Defendant KSA and its agents, illustrating that Defendant Twitter had been aware of and did not admonish Defendant KSA's involvement in the leak of information.

98.    For example, in June 2016—merely six months after Defendant Twitter's correspondence with the FBI—Defendant Twitter's then-CEO Jack Dorsey met with non-party

MBS and discussed how the two could cooperate to "train and qualify Saudi cadres,"[26] an implicit reference to the exact work Defendants Twitter and KSA achieved with Defendants Abouammo and Alzabarah.  This meeting and statement indicate a clear conspiratorial allegiance between Defendant Twitter and Defendant KSA.   Brazenly, Defendant Al-Asaker tweeted about the meeting, with photographs.





### f.   Defendant Twitter Directly Benefited From the Leak of Confidential User Data

99.     Defendant Twitter directly benefitted from Defendant Alzabarah's activities, as it was—during this same period—negotiating to allow members of the Saudi Criminal Enterprise to significantly increase its equity stake in Defendant Twitter.  In fact, on October 7, 2015, Defendant KSA increased its equity stake to over 5%, double its prior stake.[27]  This significant financial

---

[26]   *See* Exhibit 18; *see also Cadre*, Cambridge Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/cadre (defining "cadre" as "a small group of trained people who form the basic unit of a military, political, or business organization").

[27] *See* Exhibit 19.

*Al-Sadhan, et. al. v. Twitter, Inc. et. al.*, No. 3:23-cv-02369-EMC
COMPLAINT – DEMAND FOR JURY TRIAL

36

incentive, which Defendant Twitter needed at the time, was sufficient motivation for Defendant Twitter to allow Defendant Alzabarah to continue his work, unimpeded by Defendant Twitter's mission statement to its users: "Twitter takes privacy very seriously and does not share your non-public personal information, including your contact information, without your consent, or in the limited ways outlined in our Privacy Policy."[28]

100.    For over a decade, Defendant Twitter has relied heavily on investments of Defendant KSA's agents, including Defendant KSA's holding company and Prince Alwaleed bin Talal, who, together, are the second largest investors in Defendant Twitter.  Defendant Twitter therefore sees the crucial benefit in maintaining a positive relationship with Defendant KSA and its agents.  That is, Defendant KSA *bought* Defendant Twitter's participation in the goals of the Enterprise.

101.    Because of the benefits that Defendant Twitter reaped from maintaining a strong relationship with Defendant KSA, Defendant Twitter agreed to participate, and was fully complicit, in the leak of confidential Twitter user data.

102.    Defendant Twitter continued to maintain a strong relationship with Defendant KSA and its agents for many years.  Press accounts of Defendant KSA's official, malign activities utilizing Defendant Twitter began circulating by 2018.  Even after the Justice Department charged Defendants Abouammo, Alzabarah, and Almutairi with spying on Twitter users on behalf of the Saudi government, Defendant Twitter allowed Defendant Al-Asaker to maintain his Twitter account.  Similarly, despite being warned of the dangerous activity occurring on its platform, Defendant Twitter only banned Defendant Al-Qahtani on or about September 20, 2019, well after

---

[28] *See* Exhibit 20.

his malign activities had been revealed and after much of the damage had been done, including to Plaintiff Abdulrahman.

### 3. Racketeering Acts 30,893 to 30,895:   The Saudi Criminal Enterprise Kidnapped, Tortured, and Conspired to Kill Plaintiff Abdulrahman.

103.    Although other anonymous Twitter users, whose confidential and personal data Defendant Twitter corruptly provided to the Saudi Criminal Enterprise, were spared direct retaliation, Plaintiff Abdulrahman was targeted.

#### a.    Background Facts

104.    In 2011, while living in the United States, Plaintiff Abdulrahman created his anonymous Twitter account @sama7ti, on which he used to call out hypocrisy in Defendant KSA and by the Saudi royal family.  His account was known for its scorching and entertaining sarcasm. Over several years, he built a substantial following.  He, like many others, kept his account anonymous to avoid reprisal from Defendant KSA.

105.    The Saudi royal family was a frequent subject of his tweets.  Through his @sama7ti account, Plaintiff Abdulrahman tweeted, for example, political cartoons and commentary featuring non-party MBS, issues of gas prices and taxes, and other topical stories and critique.

106.    Plaintiff Abdulrahman also retweeted dissident journalists and activists in Saudi Arabia, including Turki bin Al-Jasser (@coluche_ar) and Omar Abdulaziz (@say_it_and_walk and @i5beearmy).  Today, only Abdulaziz, who is in exile in Canada, still tweets.  Al-Jasser is missing, reported as being held at the Al Ha'ir prison in Riyadh.

107.    Plaintiff Abdulrahman returned to Saudi Arabia in late 2014.  He primarily focused on his humanitarian work for the Red Crescent Society, where he was employed up until the time

of his forced disappearance.[29]  His long-term goal was to return to the United States after gaining work experience abroad, with the intention of attending a U.S.-based business school and pursuing post-graduate employment thereafter.

> **b.  Defendant Twitter Reveals Plaintiff Abdulrahman's Identity and Brutality Ensues**

108.  Plaintiff Abdulrahman's business and educational goals were all for naught.  As of 2015, Plaintiff Abdulrahman was already a target of the Saudi Criminal Enterprise.  Once Defendant Twitter leaked Plaintiff Abdulrahman's confidential identity, the Saudi Criminal Enterprise knew that he was behind the anonymous @sama7ti Twitter account.[30]  Critically, however, Plaintiff Abdulrahman did not know that he was a target of the leaked information and continued to tweet criticism of non-party MBS and Saudi Arabia government decisions, such as imposing higher taxes, lessening transparency, and increasing citizen imprisonment, and using what he believed was his anonymous Twitter account.

109.  As a result of Defendant Twitter enabling Defendants Abouammo and Alzabarah to access and transmit Plaintiff Abdulrahman's personal information to Defendant KSA, the Saudi Criminal Enterprise continuously surveilled Plaintiff Abdulrahman from the time the data was

---

[29] The Red Crescent Society is a member of the global Red Cross and Red Crescent network.  The network is composed of the Geneva-based International Committee of the Red Cross and the International Federation of Red Cross and Red Crescent Societies, as well as national societies in more than 180 countries, including the American Red Cross.

[30] Defendant Twitter's privacy policy, effective 2015, states in relevant part:  "We may share or disclose your non-private, aggregated or otherwise non-personal information, such as your public user profile information, public Tweets, the people you follow or that follow you, or the number of users who clicked on a particular link (even if only one did), or reports to advertisers about unique users who saw or clicked on their ads after we have removed any private personal information (such as your name or contact information)."  Another provision of the policy states that Twitter will preserve user information "if we believe that it is reasonably necessary . . . to protect the safety of any person."  *See* Exhibit 21.

transmitted through the time Plaintiff Abdulrahman was arrested.  Defendant KSA routinely surveils its targets, sometimes for several years, before arresting them in droves.  This period of surveillance permits Defendant KSA and its agents to continue gathering information about political dissidents, both through the dissidents themselves, such as the dissidents identified in the Twitter leak, and by identifying those with whom they communicate.  Here, Defendant KSA and its agents surveilled the political dissidents targeted during the Twitter leak for several years to continue to gather such information.

110.  Two years after the Saudi Criminal Enterprise accessed Defendant Twitter's confidential files on its users, Defendant KSA launched a wave of arrests, many of which targeted individuals behind the anonymous Twitter accounts, including Plaintiff Abdulrahman.  He was 34 years old when he was kidnapped from his office at the Red Crescent Society on March 12, 2018.  Plaintiff Areej and her family could not reach him.  Before Plaintiff Abdulrahman disappeared, Plaintiff Areej's family and Plaintiff Abdulrahman spoke daily.  The next day, messages, emails, and phone calls stopped going through.

111.  Plaintiff Areej began to panic.  She checked with her family who was residing in Saudi Arabia, but nobody knew where her brother was.

112.  Plaintiff Abdulrahman's coworker at the Red Crescent Society told the family that Plaintiff Abdulrahman was taken by Defendant KSA's secret police, the State Security Presidency.

113.  On March 13, 2018, neighbors observed men in police uniforms break into Plaintiff Abdulrahman's house and leave with a laptop and personal belongings.  Plaintiff Abdulrahman had been taken to an unknown location.  He had not been shown any arrest warrant.

114.  Plaintiff Areej, with her family, hoped that the government had only taken Plaintiff Abdulrahman to ask a few questions and that he would be released.  Her family contacted the

secret police, but the police denied holding Plaintiff Abdulrahman or knowing where he was. Plaintiff Abdulrahman's name did not appear in searches of any of the government's online prison databases.

115.   After a month, a government clerk responded to a request from a member of Plaintiff Areej's family—Plaintiff Abdulrahman was in the "system," the clerk said, and under investigation.  The clerk would give no information about where he was held.  Nor was Plaintiff Areej, or anyone, allowed to communicate with Plaintiff Abdulrahman.  The clerk said they could request a phone call or visit, but that a visit would not be permitted, and, even if it were, it could be "after years, not months."

116.   Plaintiff Areej's family submitted three more requests to see or speak with Plaintiff Abdulrahman—in April, August, and October 2018.  On the fourth request, they were told that "there is no point of you calling us and you should just stop and wait until we respond to you."  To this day, Plaintiff Areej and her family's requests have been ignored.

117.   Plaintiff Areej and her family were not entirely in the dark.  They received information about Plaintiff Abdulrahman from inside sources.  They were told that Plaintiff Abdulrahman was seen by co-detainees in Dhahban prison in Jeddah—a prison known for torturing its inmates.  They called Dhahban but were told to speak with the Presidency of State Security.  On November 25, 2018, the National Society for Human Rights informed Plaintiff Abdulrahman's family that Plaintiff Abdulrahman had been transferred to Al Ha'ir prison in Riyadh.

118.   Plaintiff Areej eventually learned that Defendant KSA's secret police broke Plaintiff Abdulrahman's hand and smashed his fingers, taunting him that "this is the hand you write and tweet with."  The secret police also tortured Plaintiff Abdulrahman with electric shocks,

flogged and hung him from his feet, suspended him in contorted positions, deprived him of sleep, threatened to behead him, insulted him, and kept him in solitary confinement for years.

119.     Plaintiff Abdulrahman's kidnapping, torture, and confinement—all of which were a direct and proximate result of the leak of confidential data from Defendant Twitter—conferred permanent injustices upon his life.  Among them:  he has been unable to, as he planned, use his U.S.-based education, receive a graduate-level degree in business in the United States, or explore work opportunities in the United States, and, thereby, earn a living.

120.     The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of kidnapping Plaintiff Abdulrahman, in violation of Cal. Penal Code § 207(a), and torturing and conspiring to kill Plaintiff Abdulrahman, in violation of Cal. Penal Code §§ 187, 189.

**4.      Racketeering Acts 30,896 to 30,898:  Conspiracy to Kidnap, Torture, and Kill Omar Abdulaziz and Other Exposed Twitter Users.**

121.     Omar Abdulaziz is a Twitter user whose account information, like Plaintiff Abdulrahman's, was exposed in the Saudi Criminal Enterprise's conspiracy.  Between April and June 2017, Abdulaziz was approached by an agent of non-party MBS to persuade Abdulaziz to return to Saudi Arabia.  In mid-May 2018, two Saudi agents told Abdulaziz that non-party MBS was not pleased with his online criticism, but that if Abdulaziz stopped criticizing KSA and returned to Saudi Arabia, he would have a bright future there.

122.     The Saudi Criminal Enterprise targeted him because he posted criticism of Defendant KSA and the Saudi royal family on Twitter, including criticism of Defendant KSA's human rights abuses.  Had Abdulaziz returned to Saudi Arabia, as the Saudi Criminal Enterprise's agents urged, Abdulaziz would have been kidnapped, tortured, and killed.  The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of conspiring to kidnap, torture, and kill Abdulaziz, in violation of Cal. Penal Code §§ 187, 189, 207(a).

123.    The Saudi Criminal Enterprise has similarly conspired to kidnap, torture, and kill other persons among the nearly 6,000 exposed Twitter users.  Persons were targeted because they posted criticism of Defendant KSA, non-party MBS, or the Saudi royal family.

124.    In addition to Abdulaziz, as alleged above, at least five other instances of documented kidnappings—including of Plaintiff Abdulrahman—occurred amidst the 2017 and 2018 wave of arrests of individuals operating Twitter accounts whose private user data was transmitted.  The kidnappings in those five instances were a result of the Saudi Criminal Enterprise's access to confidential data illegally disclosed by Defendant Twitter.

125.    The Saudi Criminal Enterprise has conspired to or in fact kidnapped, tortured, and killed numerous others among the 6,000 exposed individual Twitter accounts, in violation of Cal. Penal Code §§ 187, 189, 207(a).  The Saudi Criminal Enterprise's campaign to terrorize perceived political dissidents is continuing and ongoing.  The Saudi Criminal Enterprise continues to use confidential data that was illegally disclosed by Defendant Twitter.

**5.    Racketeering Acts 30,899 to 30,905 and Continuing:  The Saudi Criminal Enterprise Stamped Out Other Dissenting Voices in the United States and Abroad Through Criminal Activity.**

126.    Beginning in 2017, the Saudi Criminal Enterprise's campaign to crush undesirable speech escalated.  Having obtained confidential information illegally disclosed by Defendant Twitter, members of the Saudi Criminal Enterprise began to harass, threaten, kidnap, torture, and kill exposed users.  Among the victims of the Twitter breach were Plaintiff Abdulrahman and individuals using the Twitter handles @mahwe13, @albna57, @ArabicMark, @coluche_ar, and @as_asg, all of whom were critical of the Saudi regime and detained, arrested, or abducted by the Saudi Criminal Enterprise between 2017 and 2018.

127.    These users and others whom the Saudi Criminal Enterprise have targeted in its conspiracy continue to face threats from the Saudi Criminal Enterprise.    The Saudi Criminal Enterprise's illegal activity and assault on speech and democracies worldwide shows no signs of abating.

128.    In addition to the exposed Twitter users, the Saudi Criminal Enterprise has targeted numerous other perceived dissidents.  These dissidents spoke out publicly against the repressive regime in Saudi Arabia and the Saudi Criminal Enterprise punished them for it.

   **a.    Racketeering Acts 30,899 to 30,901:   Kidnapping, Torturing, and Killing Jamal Khashoggi.**

129.    Jamal Khashoggi was a United States-based columnist for the Washington Post. He was well-known for his reporting and advocacy on democratic reform in the Arab world.  He challenged the Saudi Criminal Enterprise, which surveilled Khashoggi, waiting to strike.

130.    In October 2017, non-party MBS's senior lieutenant, Defendant Al-Qahtani, called Khashoggi in the United States.  Defendant Al-Qahtani made thinly veiled threats during the call. The plan to kill Khashoggi then began at the Saudi Embassy in Washington, D.C., where Defendant KSA lured Khashoggi to travel to Istanbul, Turkey, to obtain necessary documents.[31]

131.    The United States-based Saudi ambassador falsely told Khashoggi that he would be safe during his travels.  Khashoggi was tortured and killed at the Saudi Consulate in Istanbul. Non-party MBS directed and ordered the execution.

132.    The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of kidnapping, torturing, and killing Khashoggi, in violation of Cal. Penal Code §§ 187, 189, 207(a).

---

[31] Notwithstanding Defendant Abouammo's Twitter message to Defendant Al-Qahtani in 2015, proclaiming, "proactively and reactively we will delete evil, my brother," as of October 2017, Defendant Twitter had not even restricted Defendant Al-Qahtani's account.

### b.    Racketeering Acts 30,902 to 30,904: Conspiracy to Kidnap, Torture, and Kill Saad Aljabri.

133.    On or around October 2018, non-party MBS sent members of the Saudi Criminal Enterprise known as the "Tiger Squad"—the same team that assassinated Khashoggi—to Canada to kidnap, torture, and kill another person critical of his regime, Saad Aljabri.  The Tiger Squad entered Canada through the United States.  Not surprisingly, Defendant Al-Qahtani oversaw the Tiger Squad's malign activities, as he did with so many other racketeering acts.[32]

134.    Aljabri is a former Saudi intelligence official who the Saudi Criminal Enterprise believes defected and betrayed non-party MBS.  In or around the spring of 2015—several years before non-party MBS directed members of the Saudi Criminal Enterprise to locate and kill Aljabri—non-party MBS implied to Aljabri that he had a covert agent inside Twitter who took action to silence Twitter users critical of non-party MBS.

135.    Prior to the attempted assassination, Defendant KSA deployed three members of the Saudi Criminal Enterprise in the United States to gather information on Aljabri's whereabouts and habits to facilitate the attempt.  The three members were affiliated with Defendant SACM in the United States and participated in MISK-sponsored programming in the United States.

136.    Two of Aljabri's children were also taken hostage in Saudi Arabia because of his dissident activities.  On March 16, 2020, they were kidnapped in a raid by over fifty armed men from their residence in Saudi Arabia and held incommunicado.

137.    The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of conspiring to kidnap, torture, and kill Aljabri, in violation of Cal. Penal Code §§ 187, 189, 207(a).

---

[32] Exhibit 22.

### c.    Racketeering Act 30,905:  Kidnapping Saad Almadi.

138.    In 2021, the Saudi Criminal Enterprise kidnapped and detained Saad Almadi when he visited Saudi Arabia.  Almadi is a dual United States-Saudi citizen who lived in Florida.

139.    The Saudi Criminal Enterprise targeted him because he sent a tweet in 2015 that non-party MBS "has taken over the economy, defense and everything under the king."  He received a 16-year sentence—increased to 19 years after he appealed his sentence and his son petitioned U.S. officials for help.  Almadi was released from prison in March 2023 but is banned from leaving Saudi Arabia.

140.    The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of kidnapping Almadi, in violation of Cal. Penal Code § 207(a).

### 6.    Racketeering Acts 30,906 to 30,908:  The Saudi Criminal Enterprise Stalks, Threatens, Terrorizes, and Conspires to Kidnap, Torture, and Kill Plaintiff Areej.

141.    When Plaintiff Areej began speaking out against Defendant KSA to share what happened to Plaintiff Abdulrahman, she raised her profile with the Saudi Criminal Enterprise.  She became a target of its conspiracy of transnational repression.

### a.    The Saudi Criminal Enterprise Stalks and Threatens to "Throw Away" Plaintiff Areej Like Her Brother After She Speaks Out.

142.    Plaintiff Abdulrahman was being held in a secret prison with others who had spoken out against non-party MBS and the Saudi regime on Twitter.  Saudi officials gloated about obtaining confidential information from Defendant Twitter about Plaintiff Abdulrahman and the other prisoners.

143.    Plaintiff Areej began speaking out publicly against the Saudi Criminal Enterprise and her brother's unlawful disappearance.

144.    Plaintiff Areej filed a complaint with the United Nations and shared details of her concerns with many organizations, including the American Bar Association and human rights groups MENA Rights Group, ALQST, the Freedom Initiative, Amnesty International, Human Rights Watch, and Human Rights Foundation.  Plaintiff Areej also petitioned the United States Department of State and her local county and state representatives.

145.    Around April 9, 2019, a woman activist publicly referenced Plaintiff Areej's efforts to shed light on her brother's kidnapping.  Plaintiff Areej received an influx of online threats, frightening messages, and a phone call from Defendants John Doe 1-9, saying Defendant KSA killed her brother and warning her that she and her family would meet the same fate.

146.    In May 2019, Plaintiff Areej visited Oslo to attend the Oslo Freedom Forum hosted by the Human Rights Foundation, where an agent of the Saudi Criminal Enterprise, Defendant John Doe 10, threatened her.  At 5:00 a.m. on May 29, 2019, Plaintiff Areej was walking to the train station in Oslo.  When she left the hotel, she noticed a car with heavily tinted windows parked across from the hotel with its engine running.

   a.   The streets were empty, except for a man, Defendant John Doe 10, in a suit walking parallel to her on the other side of the street keeping the exact same pace as her stride.  Defendant John Doe 10 was speaking into a headset and staring pointedly at her as she walked.  Plaintiff Areej stopped a passerby, who she asked to walk with her.  The man continued to follow Plaintiff Areej.

   b.   When Plaintiff Areej and her companion had to part ways, Plaintiff Areej decided that continuing to the train station was too dangerous.  She turned into the first building with security inside because she was fearful that

Defendant John Doe 10 was an agent of the Saudi Criminal Enterprise tasked with following her.  The moment she did, her fears were confirmed—Defendant John Doe 10 yelled at her in Arabic with a Saudi accent, "Where are you going?!"

147.    Plaintiff Areej was rattled by being stalked but decided her only option was to be louder in protest.  Plaintiff Areej began consistently tweeting about her brother on her Twitter account @AreejASadhan.  The account has since been a dedicated tool for her advocacy.



148.    Plaintiff Areej had first begun tweeting in March 2019, expressing frustration that her continued silence has made the situation with her brother worse.  In April 2019, she tweeted: ". . . I will speak out of necessity, as silence has become more dangerous than speaking in an environment where speech is forbidden.  I will tell you about the case of my brother[.]"  In one early tweet, she asked:  ". . . [A]fter a year of trying all possible methods that did not work . . . I no longer have any other choice.  [W]here is my brother?"

149.    Since then, she has been tweeting and speaking out regularly about the Saudi Criminal Enterprise's transnational repression of her brother.  Immediately, she received threats to her life in response.  Defendant John Doe 1, using the Twitter handle @9198Turky, replied to one tweet "God willing, it will be your turn."



150.    Other tweets, published on Twitter by Defendants John Does 2 through 9, threatened her life and sadistically taunted her:  "In the sewer and you will follow him."  "Any word or trying to amplify opinion, you'll regret it."  "If it was up to me I'd let you see him while

I torture him."   The stream of threats from Defendant Al-Qahtani's "digital army" has been unrelenting:





151. From the moment that Plaintiff Areej received the first threat, she knew that she was in danger and that the Saudi Criminal Enterprise would try to silence her. Because of Plaintiff Areej's public activism, U.S. officials and international organizations began pressuring Defendant KSA to account for Plaintiff Abdulrahman's whereabouts and allow him to communicate with his family.

152. Two years after Plaintiff Abdulrahman had vanished, in early 2020, the family received its first call from Plaintiff Abdulrahman. Plaintiff Abdulrahman was allowed to speak with a family member for one minute.

153. Plaintiff Abdulrahman told the family member that he was being held in Al Ha'ir prison in Riyadh. The family member urged him to be strong and patient and said that the family was praying for him.

154. A year passed before the family heard from Plaintiff Abdulrahman again. On March 2, 2021, Plaintiff Abdulrahman called the family member. He shared positive news: the prosecutors had told him he would be released from prison soon. Plaintiff Abdulrahman said he felt hopeful and that he could not wait to see his family. Plaintiff Areej's family was excited and happy and believed that his indefinite detention would soon be over—that he would be able to return to his family.

**b.   The Saudi Criminal Enterprise Holds Plaintiff Abdulrahman Hostage to Terrorize Plaintiff Areej in Retaliation for Her Speech.**

155. Despite what prosecutors had told him, Plaintiff Abdulrahman was not released. Instead, the Saudi Criminal Enterprise put him through a sham trial and shattered his expectation and hope that he would soon be released when they convicted and sentenced him to 20 years in prison followed by a 20-year travel ban. Until Plaintiff Abdulrahman was sentenced, he and his family believed that he might return home. Their hopes were dashed. As a result of Plaintiff

Abdulrahman's baseless conviction and sentence, he would likely never be able to return to work and, even if he could, his conviction would impose restrictions on employment opportunities and have immigration consequences for work visas.

156.    On March 3, 2021, the Saudi Criminal Enterprise reportedly presented the case in secret before the Specialized Criminal Court ("SCC") for a first hearing—approximately three years after he had been detained.  Plaintiff Abdulrahman had no legal representation and his family members were denied access to the hearing.  Plaintiff Areej followed these events from the United States, awaiting updates from her family.  Following the first hearing, a family member was permitted to meet with Plaintiff Abdulrahman outside of the courtroom.  The meeting happened within ear shot of security guards and lasted only five minutes.

157.    On March 4, 2021, Speaker Nancy Pelosi's office received a call from Defendant KSA's Embassy.  A Saudi Embassy official said that Plaintiff Abdulrahman was in "good health," that his "arrest and trial relate to a national security matter of transferring funds to problematic individuals designated as terrorists," and that he had been "appointed a lawyer and will receive due process under Saudi law."  Plaintiff Abdulrahman's "legal rights and health," the Embassy official said, "will always be guaranteed, and if there was a conviction there is a right to appeal."

158.    A week later, there was a second hearing.  Plaintiff Abdulrahman received a court-appointed lawyer, and a family member was permitted to attend.

159.    Plaintiff Abdulrahman's legal representative noticed that he had trouble walking and focusing, his toenails were missing, his hand was mutilated, and his body showed other signs of torture.  Plaintiff Abdulrahman had spent five days in an Intensive Care Unit ("ICU").

160.    Plaintiff Abdulrahman was forced to sign confessions and evidentiary documents blindfolded.  And he had been threatened not to speak of the torture inflicted upon him in court or

he would endure more.  Plaintiff Abdulrahman's legal representative was forced to remove details about torture from Plaintiff Abdulrahman's defense filing in court.

161.   The proceedings lasted one month.  The public prosecutor presented as evidence 200 printed tweets from Plaintiff Abdulrahman's account @Sama7ti—the same anonymous account for which Defendant Twitter illegally disclosed confidential, personally identifying data for Plaintiff Abdulrahman.  Plaintiff Abdulrahman's lawyer was allowed to review the Twitter posts for less than an hour after they were introduced as evidence at the proceeding.

162.   Over five hearings, Defendant KSA accused Plaintiff Abdulrahman of funding and supporting terrorism and sending tweets that would prejudice the public order and religious values of Saudi Arabia, including the formal charge of "storing and sending what would prejudice public order and religious values which is declared criminal and punishable under paragraph 1 of article 6 of Anti-Cyber Crime Law issued by Royal Decree no. 17/M dated 08/03/1428 H through publishing tweets on his Twitter accounts[.]"  His tweets violated this law, the charges stated, because they were allegedly "contempt[uous] of religion," "adopting an extremist approach calling for the exclusion of women and depriving them of the rights guaranteed to them by law," and "offending state institutions and officials and spreading false rumors about them."

163.   The Saudi Criminal Enterprise's agenda was on full display throughout the sham trial.  On April 5, 2021, Plaintiff Abdulrahman was sentenced to 20 years in prison followed by a 20-year travel ban.  Plaintiff Areej had to watch her brother reappear, find hope, and be cruelly shut down.

164.   After Plaintiff Abdulrahman was sentenced, and his sentence affirmed, Defendant KSA disappeared him once again.  His family has had no contact with him since.  The family has

asked government officials to speak with Plaintiff Abdulrahman many times but was either summarily denied or ignored.

### c.   The Saudi Criminal Enterprise Again Stalks Plaintiff Areej and Threatens to Kill Plaintiff Areej in Graphic and Violent Messages.

165.   Defendant KSA has offered no information about Plaintiff Abdulrahman—where he is held or if he is alive.  Instead, the Saudi Criminal Enterprise continues to intimidate, taunt, stalk, and threaten to kidnap, torture, and kill Plaintiff Areej and her family.

166.   In October 2022, Ahmed Alobaid followed Plaintiff Areej while she was attending a human rights event with the Freedom Initiative in Washington, D.C.  An agent of the Saudi Criminal Enterprise, Alobaid, who worked for the Saudi Ministry of Foreign Affairs, followed Plaintiff Areej and her three companions, also human rights activists, to a restaurant.  Alobaid menaced Plaintiff Areej and her companions.  Alobaid was sent to the restaurant by members of the Saudi Criminal Enterprise to intimidate or track her whereabouts and activism.

167.   The attacks from Defendant Al-Qahtani's "digital army" have continued and escalated.  For example, Defendant John Doe 2 sent a Tweet on August 18, 2022, threatening to "rape" Plaintiff Areej and "throw [her] head under MBS's foot."  And on October 16, 2022, Defendant John Doe 2 further warned:  "Keep barking in Twitter and you'll get the fate of your brother, God willing."



168.     The Saudi Criminal Enterprise's activities constituted unlawful racketeering acts of conspiring to kidnap, torture, and kill Plaintiff Areej, in violation of Cal. Penal Code §§ 187, 189, 207(a).

**D.     The Saudi Criminal Enterprise's Unlawful Activities Have Caused Substantial Injuries to Plaintiff Abdulrahman, Including to His Business Opportunities.**

169.     The Saudi Criminal Enterprise's conduct has caused substantial harm to Plaintiff Abdulrahman's U.S.-based business opportunities.  As a result of the Saudi Criminal Enterprise accessing and transmitting his data to Defendant KSA, which enabled Defendant KSA to identify him, Plaintiff Abdulrahman was kidnapped and sentenced to a term of imprisonment that would prevent him from earning a living.  The Saudi Criminal Enterprise's conduct has entirely halted Plaintiff Abdulrahman's ability to further his education, which he planned to continue in the United States within four years, and develop business opportunities that he sought in the United States.

170.     Although Plaintiff Abdulrahman was held captive for several years before his sentencing, his prosecutors continuously assured him that he would be released from prison soon.  Thus, Plaintiff Abdulrahman held hope that he would soon be freed from captivity and able to pursue his business and educational aspirations in the United States.

171.     On April 5, 2021, Plaintiff Abdulrahman was sentenced to 20 years' imprisonment followed by a 20-year travel ban.  It was on that date that Plaintiff Abdulrahman discovered his injury:  that he would be unable to pursue business opportunities in the United States or obtain post-graduate employment in the United States for nearly the rest of his lifetime.

**E.     The Saudi Criminal Enterprise's Unlawful Activities Have Caused Plaintiff Areej to Severely Suffer, Including By Losing Substantial Business Opportunities.**

172.     The Saudi Criminal Enterprise's conduct has caused Plaintiff Areej to take time away from her employment to care for her health and advocate for her and her family's safety and

her brother's release.  Plaintiff Areej's efforts to combat the Saudi Criminal Enterprise's threats, stalking, and mistreatment of her brother have resulted in her losing countless opportunities at work and the right to earn and pursue more.

173.   Plaintiff Areej's advocacy against the human rights abuses by the Saudi Criminal Enterprise is a second job and takes away from her ability to earn more at her primary place of employment due to her inability to put in more work and focus on development projects, which would likely have led to promotions and pay increases.  She has also been forced to take a leave of absence, which was partially unpaid, as well as paid time off.  But for the actions of the Saudi Criminal Enterprise and its targeting of Plaintiffs Areej and Abdulrahman, she would not have been deprived of these rights and opportunities.

174.   Since approximately 2019, Plaintiff Areej has devoted much of her focus and energy toward traveling across the country and abroad to speak out against human rights abuses by the Saudi Criminal Enterprise and for her safety and her brother's release.  The time that she has spent advocating for her brother is time that she would have otherwise spent furthering her career and pursuing employment and educational opportunities; Plaintiff Areej had planned to pursue higher education before her brother's kidnapping, however, she no longer has the time or capacity to do so.  For example, in or around September 2019 through December 2019, Plaintiff Areej took a three-month leave to care for her health and safety and to advocate for her brother. While she was on leave, Plaintiff Areej's colleagues replaced her on teams and projects.  She could not complete projects that ultimately contributed to her peers—who replaced Plaintiff Areej on those initiatives—being promoted within the company over her.  This has been a recurring experience.  In order around late 2019, Plaintiff Areej took sick days and time off to care for her health and to gain strength to advocate against the Saudi Criminal Enterprise and for her brother's

release after receiving a message about his torture.  As a result of Plaintiff Areej's leave of absences from work, Plaintiff Areej lost opportunities for professional advancement and was replaced on projects that were integral to securing career progression within her company.

175.    Because of the time she has taken away from opportunities to develop her skills and take leads on new initiatives, Plaintiff Areej has missed opportunities for promotions, networking, and bonuses.

176.    The Saudi Criminal Enterprise's actions have impacted Plaintiff Areej's ability to work in other ways as well.  For example, the incessant and gruesome messages that Plaintiff Areej received from Defendant Al-Qahtani's "digital army" have dissuaded her from leaving her house and going to work.  In one instance, after Plaintiff Areej received a message that her brother had been killed, Plaintiff Areej was so devastated and fearful for her own safety if she left her house that she had to request time off from work.

177.    Plaintiff Areej every day bears the responsibility to protect herself and her family from the Saudi Criminal Enterprise's actions.  They have failed, however, at silencing her.  She will continue to fight for human rights that the Saudi Criminal Enterprise seeks to diminish.

**F.      The Saudi Criminal Enterprise's Actions Are Continuous and Related.**

178.    The fair inferences from the evidence and allegations stated herein demonstrate that the Saudi Criminal Enterprise's racketeering acts and behavior are related and continuous.

179.    As described above, the racketeering acts have continued from 2015 through the present and all involve the Saudi Criminal Enterprise's efforts to engage in transnational repression.  For example, in 2014 and 2015, members of the Saudi Criminal Enterprise facilitated the access of confidential Twitter user data and unlawfully transmitted it to Defendant KSA to identify and target Defendant KSA's political dissidents and critics.  Members of the Saudi

Criminal Enterprise then used Twitter data to conspire to threaten, arrest, kidnap, torture, and kill other exposed Twitter users.

180.    Members of the Saudi Criminal Enterprise have conspired and attempted to kidnap, or in fact kidnapped, three additional U.S. citizens or residents:

      a.    In 2019, U.S. citizen Carly Morris was lured to Saudi Arabia, charged baselessly, and detained in Saudi Arabia because she spoke out about Defendant KSA's oppressive male guardianship system.  She then faced a 10-year travel ban.

      b.    In 2021, Anonymous No. 1, a Saudi citizen residing in the United States, reported to the Freedom Initiative that an employee of Defendant KSA's embassy in Washington D.C. grabbed and pulled her towards the embassy until she was able to break free.

      c.    In 2022, Anonymous No. 2, a dual United States-Saudi citizen, reported to police that she had received a phone call from an individual aligned with the Saudi government who threatened that "they," the Saudi Criminal Enterprise, could kidnap her and her child from the United States and forcibly return them to Saudi Arabia "even though they were U.S. citizens."

181.    In addition to these three U.S. residents and/or citizens, the Saudi Criminal Enterprise's transnational repression continues to threaten innocent individuals.  Last year, Prince Abdullah bin Faisal al Saud—a graduate student at Boston's Northeastern University—was arrested on a trip to Saudi Arabia after discussing his cousin's imprisonment at the hands of Defendant KSA.  Prince Abdullah was sentenced to 30 years' imprisonment in August 2022.

**FIRST CAUSE OF ACTION**

(RICO Conspiracy, 18 U.S.C. § 1962(d))
***Plaintiffs Abdulrahman and Areej Against All Defendants***

182.     Plaintiffs Abdulrahman and Areej repeat and reallege the allegations in paragraphs 1-181 as if fully set forth herein.

183.     Each individual Defendant agreed and conspired to conduct and participate in the conduct of the Saudi Criminal Enterprise through a pattern of racketeering activity, specifically:

   a.   Acts 1 to 30,892:  Conspiracy to access and transfer nearly 6,000 third-party users' confidential personally identifying information 30,892 times from Twitter users, including that of Plaintiff Abdulrahman and Omar Abdulaziz, without the third-party users' permission, to identify and target third-party Twitter users who communicated and published political dissent of Defendant KSA, in violation of 18 U.S.C. § 1028(a)(7).

   b.   Acts 1 to 30,892:  Conspiracy to use modified telecommunications instruments to obtain unauthorized access and use of nearly 6,000 third-party user accounts with the intent to defraud third-party Twitter users 30,892 times, including Plaintiff Abdulrahman and Omar Abdulaziz, and affecting interstate commerce, in violation of 18 U.S.C. § 1029(a)(7).

   c.   Acts 30,893 to 30,895:  Conspiracy to kidnap Plaintiff Abdulrahman, in violation of Cal. Penal Code § 207(a), and torturing and conspiring to kill Plaintiff Abdulrahman, in violation of Cal. Penal Code §§ 187, 189.

   d.   Acts 30,896 to 30,898:  Conspiracy to kidnap, torture, and kill Omar Abdulaziz, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

e.   <u>Acts 30,899 to 30,901:</u>   Conspiracy to kidnap, torture, and kill Jamal Khashoggi, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

f.   <u>Acts 30,902 to 30,904:</u>   Conspiracy to kidnap, torture, and kill Saad Aljabri, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

g.   <u>Act 30,905:</u>   Conspiracy to kidnap Saad Almadi, in violation of Cal. Penal Code § 207(a).

h.   <u>Acts 30,906 to 30,908:</u>   Conspiracy to kidnap, torture, and kill Plaintiff Areej, in violation of Cal. Penal Code §§ 187, 189, 207(a).

184.   Each individual Defendant knowingly engaged in and agreed to this pattern of racketeering activity and agreed to the commission of multiple acts of statutory violations to further their conspiracy to identify and target perceived political dissidents of Defendant KSA and strengthen the commercial relationship between Defendants Twitter and KSA.

185.   As a direct and proximate result of the Defendants' conspiracy, the racketeering activities of their enterprise, the overt acts taken in furtherance of the conspiracy, and the violations of 18 U.S.C. § 1962(d), Plaintiffs Abdulrahman and Areej have been severely harmed in their business and property.   Defendants' activities have directly and proximately caused severe financial and professional harms.

186.   Plaintiffs Abdulrahman and Areej are entitled to damages, costs, and fees as allowed by law.

## SECOND CAUSE OF ACTION

(RICO, 18 U.S.C. § 1962(c))

*Plaintiffs Areej and Abdulrahman Against Defendants Twitter, KSA, Al-Qahtani, Abouammo, Alzabarah, Almutairi, and Al-Asaker*

187.     Plaintiffs Abdulrahman and Areej repeat and reallege the allegations in paragraphs 1-186 as if fully set forth herein.

188.     Defendants are members of an enterprise engaged in and whose activities affect interstate commerce.  The purpose of the Saudi Criminal Enterprise is to identify political dissidents of Defendant KSA, thereby strengthening the commercial relationship between Defendants Twitter and KSA, and suppress dissent and criticism of Defendant KSA, non-party MBS, and the Saudi royal family.

189.     Defendants agreed to and did participate in the conduct of the Saudi Criminal Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of accessing third parties' identifying information to conspire to retaliate against dissenters, including the kidnapping and torture of Plaintiff Abdulrahman and to threaten, harass, and silence Plaintiff Areej.

190.     The following acts of the Saudi Criminal Enterprise constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5):

      a.   <u>Acts 1 to 30,892</u>: Accessing and transferring nearly 6,000 third-party users' confidential personally identifying information 30,892 times from Twitter users, including that of Plaintiff Abdulrahman and Omar Abdulaziz, without the third-party users' permission, to identify and target third-party Twitter users who communicated and published political dissent of Defendant KSA, in violation of 18 U.S.C. § 1028(a)(7).

     b.   <u>Acts 1 to 30,892</u>: Using modified telecommunications instruments to obtain unauthorized access and use of nearly 6,000 third-party user accounts with intent to defraud third-party Twitter users 30,892 times, including Plaintiff Abdulrahman and Omar Abdulaziz, and affecting interstate commerce, in violation of 18 U.S.C. § 1029(a)(7).

     c.   <u>Acts 30,893 to 30,895</u>:  Kidnapping Plaintiff Abdulrahman, in violation of Cal. Penal Code § 207(a), and torturing and conspiring to kill Plaintiff Abdulrahman, in violation of Cal. Penal Code §§ 187, 189.

     d.   <u>Acts 30,896 to 30,898</u>:  Conspiracy to kidnap, torture, and kill Omar Abdulaziz, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

     e.   <u>Acts 30,899 to 30,901</u>:  Kidnapping, torturing, and killing Jamal Khashoggi, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

     f.   <u>Acts 30,902 to 30,904</u>:  Conspiracy to kidnap, torture, and kill Saad Aljabri, in violation of Cal. Penal Code § 207(a) and Cal. Penal Code §§ 187, 189.

     g.   <u>Act 30,905</u>:  Kidnapping Saad Almadi, in violation of Cal. Penal Code § 207(a).

     h.   <u>Acts 30,906 to 30,908</u>:  Conspiracy to kidnap, torture, and kill Plaintiff Areej, in violation of Cal. Penal Code §§ 187, 189, 207(a).

191.   Defendants have directly and indirectly conducted and participated in the conduct of the Saudi Criminal Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

192.    Defendants intended to cause injury to Plaintiff Areej, a public and vocal dissident of Defendant KSA's authoritarian regime.

193.    Defendants intended to cause injury to Plaintiff Abdulrahman, a public and vocal dissident of Defendant KSA's authoritarian regime.

194.    As a direct and proximate result of Defendants' racketeering activities and in violation of 18 U.S.C. § 1962(c), Plaintiffs Areej and Abdulrahman have been severely harmed. Defendants' activities have directly and proximately caused severe financial and professional harms.

195.    Plaintiffs Areej and Abdulrahman are entitled to damages, costs, and fees as allowed by law.

## **THIRD CAUSE OF ACTION**

(Alien Tort Statute, 28 U.S.C. § 1350)

***Plaintiff Abdulrahman Against Defendants Twitter, Abouammo, and Alzabarah***

196.    Plaintiff Abdulrahman repeats and realleges the allegations in paragraphs 1-195 as if fully set forth herein.

197.    Defendants Twitter, Abouammo, and Alzabarah engaged in a joint criminal enterprise with, conspired with, or aided and abetted Defendant KSA by supplying Defendant KSA with technological support and access to confidential Twitter user data and transmitting confidential user data to Defendant KSA.  This unlawful conduct led to the torture Plaintiff Abdulrahman endured.

198.    Defendants Twitter's, Abouammo's, and Alzabarah's conduct—transmitting, and being complicit in transmitting, confidential Twitter account data of certain individuals, including Plaintiff Abdulrahman, to Defendant KSA—enabled Defendant KSA to identify, track, target, and torture those individuals.

199.    Defendant KSA tortured Plaintiff Abdulrahman with electric shocks, flogged and hung him from his feet, suspended him in contorted positions, deprived him of sleep, threatened to behead him, insulted him, and kept him in solitary confinement for years.

200.    The torture of Plaintiff Abdulrahman constitutes a "tort . . . committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that it violated customary international law prohibiting torture as reflected, expressed, defined, and codified in customary international law, multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

201.    As a result of being tortured in violation of the law of nations, Plaintiff Abdulrahman has suffered severe physical and mental pain, suffering, and anguish.

202.    As a result of being tortured in violation of the law of nations, Plaintiff Abdulrahman is entitled to damages in an amount to be determined at trial.

203.    Defendants Twitter, Abouammo, and Alzabarah's acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

204.    Additionally, Plaintiff Abdulrahman is entitled to a declaratory judgment stating that Defendants have violated the law of nations.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Abdulrahman and Areej pray that the Court enter judgment and relief as follows:

A.    Appointing Plaintiff Areej as Next Friend of Plaintiff Abdulrahman pursuant to Federal Rule of Civil Procedure 17(c)(2);

B.      Awarding Plaintiffs Abdulrahman and Areej a money judgment for damages, in an amount to be determined at trial;

C.      Awarding Plaintiff Abdulrahman punitive and exemplary damages;

D.      Awarding Plaintiff Abdulrahman declaratory relief that Defendants have violated his rights;

E.      Awarding Plaintiffs Abdulrahman and Areej prejudgment interest;

F.      Awarding Plaintiffs Abdulrahman and Areej reasonable attorney's fees and costs incurred in connection with this action; and

G.      Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

1.      Plaintiffs Abdulrahman and Areej demand trial by jury of all claims triable to a jury in this action.

Dated: August 30, 2023, in San Francisco, California

WALDEN MACHT & HARAN LLP

By: *Jim Walden*

    Jim Walden
    Avni P. Patel
    Deanna Paul
    Peter A. Devlin
    Catherine Weiss
    250 Vesey Street, 27th Floor
    New York, NY 10281
    (212) 335-2030

VAN DER HOUT LLP

By: *Marc Van Der Hout*

    Marc Van Der Hout
    Johnny Sinodis
    360 Post Street, Suite 800
    San Francisco, CA 94108

    (415) 981-3000

THE FREEDOM INITIATIVE

    Andrea J. Prasow
    1101 New York Avenue, NW
    Suite 1000
    Washington, DC 20005
    (917) 842-5109

    *Attorneys for Plaintiffs*