1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

AREEJ AL-SADHAN, et al.,

8

Plaintiffs,

9

v.

10

TWITTER INC., et al.,

11

Defendants.

Case No.  23-cv-02369-EMC

**MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED COMPLAINT**

Docket No. 45

## I.      <u>INTRODUCTION</u>

Plaintiff Abdulrahman Al-Sadhan resided and studied in the U.S. for several years.  He operated an anonymous X Corporation ("X") account which was critical of the Kingdom of Saudi Arabia ("KSA").  Mr. Al-Sadhan was kidnapped, tortured, and imprisoned in Saudi Arabia by the KSA government and its agents.  Plaintiffs allege that, though Mr. Al-Sadhan operated an anonymous X account, the KSA was able to locate him because X conspired with KSA informants to transmit confidential user information to the KSA for the purpose of their silencing political dissidents in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) and the Alien Tort Statute (ATS).  Mr. Al-Sadhan's sister is Plaintiff Areej Al-Sadhan.  After Mr. Al-Sadhan was kidnapped and tortured, Ms. Al-Sadhan began speaking out publicly, decrying the KSA and its activities.  She was subsequently stalked and harassed.  The suit is brought against X and the KSA.[1]  X has brought a motion to dismiss, alleging that Plaintiffs lack standing to bring their claim, that their First Amended Complaint (FAC) fails to state a plausible claim under RICO and the ATS, and that Plaintiff's claim is time-barred by RICO's four-year statute of limitations.

---

[1] The KSA have not responded to this suit.

United States District Court
Northern District of California

The Court hereby **GRANTs** X's motion to dismiss because the RICO statute of limitations has lapsed; and because Plaintiffs fail to state a plausible claim for relief under the ATS.

## II.    BACKGROUND

A.    X-Saudi Relationship Development

In the early 2010s, the Arab Spring roiled the Arab world, unseating brutal dictators. FAC, ¶ 31. The revolt was made possible, in part, by X enabling public but pseudonymous speech, via anonymous X accounts. *Id.* ¶ 32. After the Arab Spring, the KSA doubled down on its strategy to silence domestic and international dissidents. *Id.* ¶ 34.

In 2011, Saudi Prince Alwaleed Bin Talal's private investment firm, Kingdom Holding Company (KHC), invested $300,000,000 in X. FAC, ¶ 14. As of October 28, 2022, the KHC owned approximately 35 million shares of X, which is valued at $1,089,000,000. *Id.* It is the second largest shareholder of X second to Elon Musk. *Id.* X has more than 10 million users in Saudi Arabia, making Saudi Arabia its most important market in the Middle East. *Id.* Plaintiffs allege that X was on notice of the KSA's concerns about Saudi dissenters on X as early as January 2013. FAC, ¶¶ 45, 79. The KSA allegedly knew that X was struggling to make a profit, and the KSA offered a sizeable equity investment while threatening to block access to X within its borders. *Id.* ¶ 36. The FAC alleges that, in return for the equity investment, X "allowed or deliberately turned a blind eye to Defendant KSA accessing information through back channels." *Id.* ¶ 37.

In 2013, the KSA and X began negotiating another equity stake. FAC, ¶ 51. On November 4, 2013, X hired Mr. Abouammo, one of the two X employees who sent confidential user data to the KSA. Mr. Abouammo was provided direct access to confidential user data as part of his job. *Id.* ¶ 53. Plaintiffs allege that X hired Mr. Abouammo "having assented to or deliberately ignored infiltration by members of the Saudi Criminal Enterprise." *Id.*

Plaintiffs allege that "[Mr.] Abouammo needed to find a way to introduce executives from [X] to meet [Mr.] Al-Asaker, his main point of contact in the criminal scheme." FAC, ¶ 54. Mr. Abouammo arranged a meeting ("purportedly at the request of a representative of a U.S.-Saudi Arabian trade organization in Washington, D.C.") to tour X's headquarters with a delegation of

United States District Court
Northern District of California

1    "entrepreneurs" from Saudi Arabia.  *Id.*  Plaintiffs allege that, at that meeting, Mr. Al-Asaker

2    discussed the goals of the Saudi Criminal Enterprise with Defendant X's representatives.  *Id.*

3          On or around November 15, 2014, Mr. Almutairi, a member of the Saudi Criminal

4    Enterprise, and Mr. Abouammo had a meeting, discussing directions for obtaining confidential

5    user data from X.  FAC, ¶¶ 19, 56.  On or around December 1, 2014, Mr. Almutairi emailed Mr.

6    Abouammo's X email stating "I'm quite confident that by both of us cooperating and working

7    together, we'll achieve the goals of X in the region." *Id.* ¶ 57.  After a December 5, 2014,

8    meeting, Mr. Abouammo began sending confidential data from X to KSA officials.  *Id.*  Mr.

9    Abouammo sent Mr. Al-Qahtani (a member of the Saudi Criminal Enterprise who helped to

10    coordinate the transmission of X users' data) a message on X stating, "proactively and reactively

11    we will delete evil, my brother." *Id.* ¶¶ 16, 59.

12          Mr. Abouammo resigned from his position in May 2015, but he continued to contact X to

13    field requests, including for confidential information on users by request from Mr. Al-Asaker.

14    FAC, ¶ 61.  On one occasion, Mr. Abouammo contacted X support and indicated that his request

15    was on behalf of his old "partners in the Saudi Government" and in multiple instances he said his

16    requests would be used by "the King's team." *Id.*  In July 2015, Mr. Al-Asaker sent Mr.

17    Abouammo a direct message on X with a photograph of a wire transfer for $100,000.  *Id.*

18          To continue the conspiracy, in or around February 2015, Mr. Abouammo introduced Mr.

19    Almutairi to Mr. Alzabarah, who had been working at X since August 2013.  FAC, ¶ 42.  In Mr.

20    Alzabarah's role, he was provided direct access to X users' confidential information.  *Id.* ¶ 63.

21    Mr. Al-Asaker arranged that Mr. Alzabarah and Almutairi meet on or about May 14, 2015.  *Id.* ¶

22    64.  Mr. Alzabarah then began transmitting confidential X user data.  *Id.* ¶ 66.  Mr. Alzabarah also

23    allegedly ensured that the KSA's Emergency Disclosure Requests (EDRs) were usually and

24    rapidly approved.  *Id.* ¶ 37.  EDRs allows "law enforcement to obtain documentation with account

25    information when there is an exigent emergency that involves a risk of death or serious physical

26    injury to a person." *Id.* ¶ 35.

27          During the summer of 2015, according to Plaintiffs, Mr. Alzabarah requested permission

28    from X to take personal leave and travel to Saudi Arabia, which X approved.  FAC, ¶ 69.

1    Plaintiffs allege that X took no action to disable or restrict Mr. Alzabarah's access to confidential

2    user data while in Saudi Arabia "knowing or being deliberately ignorant to the fact that Defendant

3    Alzabarah would continue his malign activities from Saudi Arabia." *Id.*

4        Between Mr. Abouammo and Alzabarah, they accessed more than 6,000 users' profiles

5    and transmitted personal identifying information 30,892 times.  FAC, ¶ 183.  Among the accounts,

6    the conspirators identified Mr. Al-Sadhan's X handle, @sama7ti, and provided the KSA Mr. Al-

7    Sadhan's personal identifying information.  *Id.* ¶ 73.

8        In 2014 and 2015, X allegedly was aware that the Saudi Criminal Enterprise routinely used

9    X to identify and target political dissidents.  FAC, ¶ 80.  For example, on May 21, 2015, an X user

10   ("User 1") posted on X about the Saudi royal family.  *Id.* ¶ 89.  Mr. Al-Asaker posted on X that

11   User 1's post was false.  *Id.*  That same day, Mr. Alzabarah accessed User 1's confidential

12   information including their second X account, and he conveyed the information to Mr. Almutairi.

13   *Id.*  On or about September 28, 2015, X received a complaint from User 1 stating that their

14   accounts had been compromised.  *Id.* ¶ 90.  "[X] took no action.  Clearly, this was not new

15   information to [X], which already knew of or was deliberately ignorant of [Mr.] Alzabarah's

16   malign activities."  *Id.*

17       Between July and December 2015, X complied with 85% of Defendant KSA's requests for

18   information, including EDR requests.  FAC, ¶ 92.  This was not only higher than before the

19   conspiracy began but also higher than X's rate for granting similar requests made by most other

20   countries, including Canada, the United Kingdom, Australia, and Spain.  *Id.*  On October 7, 2015,

21   the KSA increased its equity stake in X, to over 5%, which was double its prior stake.  *Id.* at ¶ 99.

22   Plaintiffs allege that X "needed" that money at the time and that the "KSA *bought* [X's]

23   participation in the goals of the Enterprise."  *Id.*

24       On November 5, 2015, X promoted Mr. Alzabarah to its "technical team."  FAC, ¶ 82.

25   Mr. Alzabarah sent a note to Mr. Al-Asaker conveying his "unimaginable happiness" for the

26   promotion.  *Id.*  Plaintiffs allege that the note implied "that [Mr.] Al-Asaker had either arranged

27   [the promotion] or been influential in it."  *Id.*

28       On or about November 29, 2015, the Federal Bureau of Investigation (FBI) confronted X

United States District Court
Northern District of California

4

about the "Saudi espionage problem" on its platform allegedly conveying that someone inside X was conveying confidential personal data on Saudi dissidents to the KSA.  FAC, ¶ 83.  X "played dumb, disclaiming knowledge of who within the company could be at fault."  *Id*.  However, within 48 hours of the FBI contact, X reported that it had "discovered" the individuals responsible for the unauthorized access: Mr. Abouammo and Alzabarah.  *Id*. ¶ 84.  Subsequently, X placed Mr. Alzabarah on leave and confiscated his laptop.  *Id*.  However, X allowed Mr. Alzabarah to keep his X cellphone "the very cellphone he had used, and continued to use, for malign activities."  *Id*.  Plaintiffs allege that X was only able to act so "swiftly because it either already knew about or was deliberately ignorant to [Mr.] Abouammo's and Alzabarah's unlawful activities."  *Id*. ¶ 85.  Mr. Alzabarah immediately fled to Saudi Arabia.  *Id*. ¶ 86.

On December 11, 2015, Defendant X emailed a small group of accounts notifying them:

> … [W]e are alerting you that your [X] account is one of a small group of accounts that may have been targeted by state-sponsored actors.  We believe that these actors (possibly associated with a government) may have been trying to obtain information such as email addresses, IP addresses, and/or phone numbers.
>
> At this time, we have no evidence they obtained your account information, but we're actively investigating this matter.  We wish we had more we could share, but we don't have any additional information we can provide at this time.
> …

Docket No. 29, Ex. 1, 1-2.  Mr. Al-Sadhan claims he did not receive or see the notification.  FAC, ¶ 95.  The notification did not mention the KSA.  *Id*. ¶ 96.

Six months later, in June 2016, X's then-CEO Jack Dorsey had a meeting with non-party MBS and discussed how the two could cooperate to "train and qualify Saudi cadres."  FAC, ¶ 98.  Later, the Justice Department charged Mr. Abouammo, Alzabarah, and Almutairi with spying on X users on behalf of the Saudi government.  *Id*. ¶ 102.

B.    Plaintiff Abdulrahman Al-Sadhan

Mr. Al-Sadhan is a noncitizen who lived in the U.S. for approximately six years while he held lawful nonimmigrant status.  FAC, ¶ 12.  He was a humanitarian aid worker and citizen of Saudi Arabia.  *Id*.  While in the U.S., he created an anonymous X account named @sama7ti.  *Id*. ¶

United States District Court
Northern District of California

104. His account built a substantial following and often tweeted about the Saudi royal family, including political cartoons and commentary featuring non-party MBS, issues of gas prices and taxes, and other topical stories and critiques. *Id.* ¶ 105. He kept his account anonymous to avoid reprisal from the KSA. *Id.* ¶ 104. Mr. Al-Sadhan returned to Saudi Arabia in late 2014. *Id.* ¶ 107. His long-term goal was to return to the U.S. after gaining work experience abroad, with the intention of attending a U.S.-based business school and pursuing post-graduate employment thereafter. *Id.*

In 2015, X/the X employees leaked Mr. Al-Sadhan's confidential identity, and the Saudi Criminal Enterprise learned that he was behind the @sama7ti account. FAC, ¶ 108. The Saudi Criminal Enterprise began continuously surveilling Mr. Al-Sadhan. *Id.* ¶ 109. Defendant KSA routinely surveils its targets, sometimes for several years, so they can gather information about the political dissidents and the people they communicate with. *Id.*

On March 12, 2018, Mr. Al-Sadhan was kidnapped from his office at the Red Crescent Society. FAC, ¶ 110. Mr. Al-Sadhan's coworker at the Red Crescent Society told Mr. Al-Sadhan's family that he was taken by Defendant KSA's secret police, the State Security Presidency. *Id.* Mr. Al-Sadhan had been taken to an unknown location, was not shown an arrest warrant, and his family did not know where he was. *Id.*

Ms. Al-Sadhan, with her family, contacted the secret police, but the police denied holding Mr. Al-Sadhan or knowing where he was. FAC, ¶ 114. After a month, a government clerk responded to a request from a member of the Al-Sadhan family—Mr. Al-Sadhan was in the "system," the clerk said, and under investigation. *Id.* ¶ 115. The clerk would not provide information about where he was held. *Id.* The clerk said they could request a phone call or visit, but that a visit would not be permitted, and, even if it were, it could be "after years, not months." *Id.*

Ms. Al-Sadhan eventually learned that Defendant KSA's secret police broke Mr. Al-Sadhan's hand and smashed his fingers, taunting him that "this is the hand you write and tweet with." FAC, ¶ 118. The secret police also tortured Mr. Al-Sadhan with electric shocks, flogged and hung him from his feet, suspended him in contorted positions, deprived him of sleep,

6

1    threatened to behead him, insulted him, and kept him in solitary confinement for years.  *Id.*

2    C.    Plaintiff Areej Al-Sadhan

3          Ms. Areej Al-Sadhan is Mr. Al-Sadhan's sister.  She is a U.S. citizen and, since her

4    brother's disappearance, has become a human rights activist campaigning against the KSA's

5    oppression.  FAC, ¶ 13.  Her objective is to rescue her brother from unlawful detention and torture

6    in Saudi Arabia.  *Id.*  After Mr. Al-Sadhan was kidnapped, Ms. Al-Sadhan filed a complaint with

7    the United Nations, shared details of her concerns with many organizations, tweeted online, and

8    petitioned the U.S. Department of State and her local and county and state representatives.  *Id.* ¶

9    144.  Ms. Al-Sadhan received an influx of online threats, frightening messages, and a phone call

10   from Defendants John Doe 1-9, saying Defendant KSA killed her brother and warning her that her

11   and her family would meet the same fate.  *Id.* ¶ 145.

12          In May 2019, Ms. Al-Sadhan visited Oslo, Norway to attend the Oslo Freedom Forum

13   hosted by the Human Rights Foundation, where an agent of the Saudi Criminal Enterprise,

14   Defendant John Doe 10, threatened her.  FAC, ¶ 146.  At 5:00 a.m. on May 29, 2019, Ms. Al-

15   Sadhan was walking to the train station in Oslo.  *Id.*  The streets were empty, except for a man,

16   Defendant John Doe 10, in a suit walking parallel to her on the other side of the street keeping the

17   exact same pace as her stride.  *Id.*  Defendant John Doe 10 was speaking into a headset and staring

18   pointedly at her as she walked.  *Id.*  She turned into the first building with security inside because

19   she was fearful that Defendant John Doe 10 was an agent of the Saudi Criminal Enterprise tasked

20   with following her.  *Id.*  The moment she did, her fears were confirmed—Defendant John Doe 10

21   yelled at her in Arabic with a Saudi accent, "Where are you going?!"  *Id.*  Ms. Al-Sadhan was

22   rattled by being stalked but decided her only option was to be louder in protest.  *Id.* ¶ 147.  Ms. Al-

23   Sadhan began consistently tweeting about her brother on her X account.  *Id.* ¶ 147.  The account

24   has since been a dedicated tool for her advocacy.  *Id.*[2]

25   D.    Mr. Al-Sadhan's Sham Trial

26          Three years after Mr. Al-Sadhan was first detained, he was put through a sham trial and

27

28   _____
     [2] The FAC alleges another incident in which Ms. Al-Sadhan was followed, stalked, and harassed.  FAC, ¶¶ 166-67.

was convicted and sentenced to 20 years in prison followed by a 20-year travel ban.  FAC, ¶ 155.

On March 3, 2021, the Saudi Criminal Enterprise reportedly presented the case in secret before the

Specialized Criminal Court for a first hearing.  *Id*. ¶ 156.  At the second hearing, Mr. Al-Sadhan's

counsel noticed that he had trouble walking and focusing, his toenails were missing, his hand was

mutilated, and his body showed other signs of torture.  *Id*. ¶ 159.  Mr. Al-Sadhan was forced to

sign confessions and evidentiary documents blindfolded.  *Id*. ¶ 160.  He had been threatened not to

speak of the torture inflicted upon him in court or he would endure more.  *Id.*  Mr. Al-Sadhan's

legal representative was forced to remove details about torture from Mr. Al-Sadhan's defense

filings in court.  *Id.*  The public prosecutor presented as evidence 200 printed tweets from Plaintiff

Abdulrahman's account @Sama7ti.  *Id*. ¶ 161.  He was charged with "storing and sending what

would prejudice public order and religious values which is declared criminal and punishable under

paragraph 1 or article 6 of Anti-Cyber Crime Law issued by Royal Decree no. 17/M dated

08/03/1428 H through publishing tweets on his [X] accounts."  *Id*. ¶ 162.  On April 5, 2021, Mr.

Al-Sadhan was sentenced to 20 years in prison followed by a 20-year travel ban.  *Id*. ¶ 163.  His

family has had no contact with him since he was sentenced.  *Id*. ¶ 164.  Because Mr. Al-Sadhan's

family is unable to contact him, he is unable to assist counsel in the preparation of this case.  *Id*. ¶

12.

E.      Harm to Plaintiffs' Business Opportunities

        Mr. Al-Sadhan planned to further his education and develop business opportunities in the

U.S., but the kidnapping, 20-year imprisonment, and subsequent 20-year travel ban has halted his

ability to do so.  FAC, ¶¶ 169, 171.  Even if he was physically able to return to work after the 20-

year imprisonment, his conviction would impose restrictions on employment opportunities and

have immigration consequences for work visas.  *Id*. ¶ 155.

        Ms. Al-Sadhan has taken time away from her employment to advocate for her and her

family's safety, her brother's release, and to take care of her health.  FAC, ¶ 172.  Since

approximately 2019, Ms. Al-Sadhan has devoted much of her focus and energy toward traveling

to speak out against human rights abuses by the Saudi Criminal Enterprise.  *Id*. ¶ 174.  The time

that she has spent advocating for her brother is time that she would have otherwise spent

United States District Court
Northern District of California

furthering her career and pursuing employment and educational opportunities; Ms. Al-Sadhan had planned to pursue higher education before her brother's kidnapping, however, she no longer has the time or capacity to do so.  *Id.*

For example, in or around September 2019 through December 2019, Ms. Al-Sadhan took a three-month leave to care for her health and safety and to advocate for her brother.  FAC, ¶ 174. While she was on leave, Ms. Al-Sadhan's colleagues replaced her on teams and projects.  *Id.*  She could not complete projects that ultimately contributed to her peers—who replaced Ms. Al-Sadhan on those initiatives—being promoted within the company over her.  *Id.*  This has been a recurring experience.  In or around late 2019, Ms. Al-Sadhan took sick days and time off to care for her health and to gain strength to advocate against the Saudi Criminal Enterprise and for her brother's release after receiving a message about his torture.  *Id.*  Because of the time she has taken away from opportunities to develop her skills and take leads on new initiatives, Ms. Al-Sadhan has missed opportunities for promotions, networking, and bonuses.  *Id.* ¶ 175.

The Saudi Criminal Enterprise's actions have impacted Ms. Al-Sadhan's ability to work in other ways as well.  FAC, ¶ 176.  For example, the incessant and gruesome messages that Ms. Al-Sadhan received from Mr. Al-Qahtani's "digital army" have dissuaded her from leaving her house and going to work.  *Id.*  In one instance, after Ms. Al-Sadhan received a message that her brother had been killed, she was so devastated and fearful for her own safety if she left her house that she had to request time off from work.  *Id.*

F.    Plaintiffs' Causes of Actions

Plaintiffs allege that X, the KSA, and KSA informants violated RICO and the ATS. Plaintiffs allege that the racketeering acts involve the Saudi Criminal Enterprise's efforts to engage in transnational repression and have continued from 2015 through the present.  FAC, ¶ 179.  Each access of confidential user information occurred close in time to the prior access, and each constitutes a separate racketeering act in violation of 18 U.S.C. §§ 1028(a)(7), 1029(a)(7). *Id.* at ¶ 75.  Each effort to access confidential X user data and unlawfully transmitted it to the KSA to identify and target the KSA's political dissidents and critics constituted an act of racketeering. *Id.*  Members of the Saudi Criminal Enterprise then used X data to conspire to threaten, arrest,

United States District Court
Northern District of California

1  kidnap, torture, and kill other exposed X users.  *Id.*  Further, Plaintiff alleges that X engaged in a

2  joint criminal enterprise with, conspired with, or aided and abetted the KSA by supplying the KSA

3  with technological support and access to X user's confidential X user data, enabling the KSA to

4  kidnap and torture Mr. Al-Sadhan, which constituted a tort under the ATS.  FAC, ¶ 196-204.

### III.    LEGAL STANDARD

6       Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

7  statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

8  complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R.

9  Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's

10  decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550

11  U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must ... suggest that the claim

12  has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir.

13  2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the

14  pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire &*

15  *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint ... may not

16  simply recite the elements of a cause of action [and] must contain sufficient allegations of

17  underlying facts to give fair notice and to enable the opposing party to defend itself effectively."

18  *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d

19  990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual

20  content that allows the court to draw the reasonable inference that the Defendant is liable for the

21  misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

22  'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

23  unlawfully."  *Id.*  (quoting *Twombly*, 550 U.S. at 556).[3]

---

[3] With regard to the allegations that involve fraud, those allegations must be pled with "particularity," per Fed. R. Civ. P. 9(b), "set[ing] forth what is false or misleading about a statement, and why it is false."  *Brown v. China Integrated Energy, Inc.*, 2012 WL 1129909 *3 (C.D. Cal 2012).  "The circumstances constituting the alleged fraud must be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong."  *Vess v. Ciba–Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).

United States District Court
Northern District of California

## IV.     DISCUSSION

A.     Article III Standing

The "irreducible constitutional minimum" of standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These three elements are referred to as, respectively, injury in fact, causation, and redressability. *See Planned Parenthood of Greater Was. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020). For causation, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883-889 (1990)) (other citations omitted). Plaintiffs need not demonstrate that defendants' actions are the "proximate cause" of plaintiffs' injuries. *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011).

"To survive a motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Id*. (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). "A causation chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'" *Id*. (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002).). Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury, and there's no requirement that the defendant's conduct comprise the last link in the chain. *Mendia v. Garcia*, 768 F.3d 1009, 1012–13 (9th Cir. 2014) (quoting *Bennett v. Spear,* 520 U.S. 154, 168–69 (1997)). However, "where a chain of causation 'involves numerous third parties' whose 'independent decisions' collectively have a 'significant effect' on plaintiffs' injuries, the Supreme Court and [the Ninth Circuit] have found the causal chain too weak to support standing at the pleading stage." *Maya*, 658 F.3d at 1070 (citing *Allen,* 468 U.S. at 759.). "The plaintiff, as the party invoking federal jurisdiction,

11

1    bears the burden of establishing these elements[.]" *Spokeo*, 578 U.S. at 338 (quoting *Warth v.*

2    *Seldin*, 422 U.S. 490, 518 (1975)).

3         X relies heavily on *Abdulaziz v. [X], Inc.*, a case heard before the Honorable Magistrate

4    Judge Beeler several years ago.  In *Abdulaziz*, Plaintiff Omar Abdulaziz was a political dissident

5    who moved to Canada in 2009 and criticized the KSA on X and other social-media platforms.

6    2020 WL 6947929 *1 (N.D. Cal 2020), No. 21-16195 (9th Cir. argued Dec. 4, 2023).  The KSA

7    harassed him, he was granted political asylum in Canada in 2014, he increased his criticism of the

8    KSA, and the KSA continued harassing him.  *Id.*  Mr. Abdulaziz sued X, and X filed a motion to

9    dismiss, which was granted because Mr. Abdulaziz lacked Article III standing.  *Id.* at *6.  The

10   complaint did not explain how Mr. Abdulaziz's compromised X data caused his harm given that

11   "he … suffered persecution before the compromise of his [X] data."  *Id.*

12        1.    Mr. Al-Sadhan's Standing

13        With regard to Mr. Al-Sadhan, there is a traceable causal link between his injuries and X's

14   alleged actions.  Mr. Al-Sadhan had an anonymous X account where he tweeted political

15   commentary about the Saudi royal family.  FAC, ¶¶ 104, 105.  The KSA did not know who he

16   was.  *Id.* ¶ 105.  According to the complaint, X knew or deliberately ignored that their employees,

17   Mr. Abouammo and Alzabarah, were transmitting confidential X user data to the KSA.  *Id.* ¶¶ 53,

18   63.  Among the accounts, the conspirators identified Mr. Al-Sadhan's X handle, @sama7ti, and

19   provided the KSA Mr. Al-Sadhan's personal identifying information.  *Id.* ¶ 73.

20        On March 12, 2018, Mr. Al-Sadhan was kidnapped by the KSA's secret police and was

21   brutally tortured.  FAC, ¶¶ 110, 118.  On March 3, 2021, the Saudi Criminal Enterprise presented

22   his case in a sham trial wherein the prosecutor presented as evidence 200 printed tweets from Mr.

23   Al-Sadhan's account @Sama7ti—the same anonymous account for which X disclosed Mr. Al-

24   Sadhan's confidential data.  *Id.* ¶¶ 156, 161.  He was charged with "storing and sending what

25   would prejudice public order and religious values which is declared criminal and punishable under

26   paragraph 1 or article 6 of Anti-Cyber Crime Law issued by Royal Decree no. 17/M dated

27   08/03/1428 H through publishing tweets on his X accounts."  *Id.* ¶ 162.  On April 5, 2021, Mr. Al-

28   Sadhan was sentenced to 20 years in prison followed by a 20-year travel ban.  *Id.* ¶ 163.

United States District Court
Northern District of California

1  Mr. Al-Sadhan has standing because X's alleged actions in permitting Mr. Abouammo and

2  Alzabarah to identify Mr. Al-Sadhan to the KSA was a but-for cause for Mr. Al-Sadhan's

3  kidnapping, torture, and imprisonment.[4]  Before Mr. Al-Sadhan's personal identifying information

4  was disclosed to the KSA, his identity was anonymous and the KSA did not know who he was.

5  Unlike in *Abdulaziz*, where Mr. Abdulaziz was a known political dissident before his X

6  information was leaked, here, Mr. Al-Sadhan was anonymous before his X information was

7  leaked.  *Abdulaziz*, 2020 WL 6947929 *1 (N.D. Cal 2020).  The "line of causation between

8  defendants' action," sending Mr. Al-Sadhan's identifying information to the KSA, and "the

9  alleged harm," convicting Mr. Al-Sadhan for the tweets that he published, is not "attenuated," or

10  "hypothetical."  *Maya*, 658 F.3d at 1070 (quoting *Allen*, 468 U.S. at 757.).[5]

11      2.   Ms. Al-Sadhan's Standing

12  Ms. Al-Sadhan does not have standing because her causal chain is attenuated.  As

13  previously discussed, "plaintiffs must establish a 'line of causation' between defendants' action

14  and their alleged harm that is more than 'attenuated.'"  *Maya*, 658 F.3d at 1070 (quoting *Allen v.

15  Wright*, 468 U.S. 737, 757 (1984)).  Although "a causation chain does not fail simply because it

16  has several 'links,' provided those links are 'not hypothetical or tenuous' and remain

17  'plausib[le],'" *id*. (*quoting Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)),

18  "[w]here a chain of causation 'involves numerous third parties' whose 'independent decisions'

19  collectively have a 'significant effect' on plaintiffs' injuries, the Supreme Court and [the Ninth

20  Circuit] have found the causal chain too weak to support standing at the pleading stage."  *Maya*,

21  658 F.3d at 1070 (citing *Allen,* 468 U.S. at 759.).

---

[4] Article III standing does not require "but-for causation," only a "causal relationship."  *Khodara Environmental, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004).
[5] X argues that Mr. Al-Sadhan's injuries lack temporal proximity.  Mot. 6.  However, "standing depends on the probability of harm, not its temporal proximity."  *Orangeburg, South Carolina v. Federal Energy Regulatory Commission*, 862 F.3d 1071 1078 (D.C. Cir. 2017) (quoting *520 Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006)).  Even if temporal proximity were an issue, the KSA received Mr. Al-Sadhan's information sometime in 2014-2015, and they kidnapped him in 2018.  FAC, ¶¶ 57, 83.  The FAC specifically alleges that the KSA routinely surveils its targets sometimes for several years.  *Id*. ¶ 109.  It is plausible that the KSA surveilled Mr. Al-Sadhan for several years before taking action.  Further, the fact that the Saudi government referenced his tweets at his trial suggests a connection notwithstanding the time lag.  *See City of Los Angeles v. Wells Fargo & Co.*, 22 F.Supp.3d 1047, 1053 (C.D. Cal. 2014); *Enslin v. The Coca-Cola Co.*, 136 F.Supp.3d 654, 666 (E.D. Penn. 2015).

1    Here, Ms. Al-Sadhan states that the KSA's actions in kidnapping and torturing her brother

2    caused her to advocate on her brother's behalf, miss work, suffer from emotional distress, and

3    become the target of the KSA's harassment.  However, Ms. Al-Sadhan's "independent decisions,"

4    undertaken on her own volition, effected her injuries and broke the chain of causation.  X and the

5    KSA's alleged conspiracy did not force her to engage in public advocacy, she chose to do so.  Ms.

6    Al-Sadhan has failed to establish a "line of causation" that is more than "attenuated" between the

7    Defendant's conduct and her injuries.  *Maya*, 658 F.3d at 1070.  Notably, injury caused by her

8    reaction to her brother's disappearance is akin to that of a bystander whose ability to recover is

9    severely circumscribed under common law.[6]

10   B.    RICO Standing

11   For RICO standing, the Ninth Circuit applies a three-factor remoteness test, including

12   "whether there are more direct victims of the alleged wrongful conduct who can be counted on to

13   vindicate the law as private attorneys general."  *Oregon Laborers-Employers Health & Welfare*

14   *Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999).  Here, Mr. Al-Sadhan's

15   injuries are direct, but Ms. Al-Sadhan's injuries are not.  Her injuries are derivative of Mr. Al-

16   Sadhan's injuries for which he has legal recourse.  She thus has no standing under RICO.

17   C.    ATS Claim

18   In Plaintiff's Third Cause of Action, he alleges that X engaged in a joint criminal

19   enterprise with, conspired with, or aided and abetted the KSA by supplying the KSA with

20   technological support and access to X user's confidential X user data enabling the KSA to kidnap

21   and torture Mr. Al-Sadhan, constituting a tort under the ATS.  FAC, ¶ 196-204.  The Ninth Circuit

22   has stated that aiding and abetting liability is cognizable under the ATS.  *Doe I v. Cisco Sys.*, 73

23   F.4th 700, 717 (9th Cir. 2023).

24   "The standard for accomplice liability is determined by customary international law."

---

[6] Compare with tort liability, wherein a plaintiff may recover for negligent infliction of emotion distress on the basis that they witnessed another person being injured; the plaintiff must have been within the "zone of danger" of the accident, which involves being present and seeing "actual physical injuries to the plaintiff" or "witness[ing] harm to a close family member, or both."  *Stacy v. Rederiet Otto Danielsen, A.S.*, 609 F.3d 1033, 1043 & n.3 (9th Cir. 2010) (citing *Consolidated Rail Corp. v. Gotshall*, 512 U.S. 532, 547-48 & n.9 (1994)).

United States District Court
Northern District of California

*Cisco Sys.*, 73 F.4th at 724 (*See Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254 268-69 (2d Cir. 2007); *See also Sosa v. Alvarez-Machain*, 542 U.S. 692, n.20 (2004)).  The "*actus reus* of aiding and abetting liability requires assistance of the principal with substantial effect on an international law violation."  *Cisco Sys.*, 73 F.4th at 724.  "A defendant's assistance in locating or identifying victims, through technology or otherwise, can have a substantial effect on the commission of international law violations."  *Id.* at 726-27.  In one case, a Nuremberg tribunal found Waldemar Klingelhoefer guilty as a principal and accessory to the German military killing thousands of people because he "locat[ed], evaluat[ed] and turn[ed] over lists of Community party functionaries to the executive of his organization" making him an accessory to the "killing of the individuals whose identity he revealed."  *Id.* at 727.  Similarly, the Rwanda Tribunal Appeals Chamber held that a military chaplain in the Rwandan army fulfilled the *actus reus* of aiding and abetting killings when he "on at least four occasions … was present … and identified Tutsi refugees to soldiers … who subsequently removed and then killed them."  *Id.*

Here, Plaintiffs state: "the FAC alleges that [X] assisted KSA by giving KSA the data and means to identify [Mr. Al-Sadhan]; without that, KSA never would have been able to identify him and disappear him."  Opp'n 23.  But as described in greater detail below, this allegation is not plausibly pled because, as alleged, there is no realistic basis for finding X engaged in a conspiracy with the KSA and knowingly turned over Mr. Al-Sadhan's information to the KSA.

Further, Plaintiffs fail to plausibly allege that X acted with the requisite *mens rea* to conspire or to aid and abet the KSA's actions.  The *mens rea* for aiding and abetting liability is satisfied when:

> [A] defendant acts with knowledge that the defendant's actions will assist in the commission of a crime or with awareness of a "substantial likelihood that [the defendant's] acts would assist the commission of a crime."  "It is not necessary that the aider or abettor know the precise crime that was intended and was in fact committed—if [the accused] is aware that one of a number of crimes will probably be committed, and one of those crimes is committed …"

*Cisco Sys.*, 73 F.4th at 734.  In *Cisco Sys.*, Cisco had the requisite *mens rea* to assist a Chinese terrorist enterprise as the Chinese authorities communicated to them that they wanted to use the

technology to "eliminate Falun Gong adherents" and Cisco's internal reports reflected the goal to crackdown on Falun Gong adherents.  *Id.*  Conversely, in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, plaintiffs' complaint failed to allege a violation of the ATS after a defendant company agreed to explore for oil in Sudan, allegedly understanding that the Sudan government would clear the land and local population in response.  582 F.3d 244, 261 (2d Cir. 2009).  Though the company financed the infrastructure of the oil exploration in Sudan, "obviously there are benign and constructive purposes for these projects, and (more to the point) there is no evidence that any of this was done for an improper purpose."  *Id.* at 262.[7]

Here, *mens rea* presumes a conspiracy between X and the KSA.  But the incidents alleged in the FAC do not provide a plausible inference that X engaged in a conspiracy with the KSA. These events are discussed below.

1.     KSA Investing in X

The FAC alleges that, when the KSA knew that X was struggling to make a profit, it offered X a sizeable equity investment while threatening to block access to X within its borders. FAC, ¶ 36.  In 2011, Saudi Prince Alwaleed Bin Talal's private investment firm, Kingdom Holding Company (KHC), invested $300,000,000 in X.  *Id.* at ¶ 14.  In 2013, X had its initial public offering (IPO), and its stock became public.[8]  On October 7, 2015, the KSA increased its equity stake in X, to over 5%, which was double its prior stake.  *Id.* at ¶ 99.  As of October 28, 2022, the KHC owned approximately 35 million shares of X, which is valued at $1,089,000,000. *Id.*  The FAC alleges that, in return for the equity investment, X "allowed or deliberately turned a blind eye to [] KSA accessing information through back channels."  *Id.* at ¶ 37.

A complaint "must contain something more … than … a statement of facts that merely

---

[7] *See also Aziz v. Alcolac*, wherein the only reference to the company's intentional conduct was an allegation that it placed a substance that can be used to create mustard gas "into the stream of international commerce."  658 F.3d 388, 401 (4th Cir. 2011).  The substance was used to manufacture chemical weapons to be used against the Kurdish population in northern Iraq, but there was no specific indication that the company sought that outcome, so the company was not liable under the ATS.  *Id.*

[8] The Court has "a discretionary authority to" "take judicial notice on its own."  Fed. R. Civ. P. 201(c)(1) Advisory Committee Notes, 1972 Proposed Rules.  The Court takes judicial notice of X's IPO date—November 7, 2013.  *See* Eric Wallerstein, *From IPO to Elon Musk Buyout: The Timeline of a Twitter Shareholder*, WALL STREET JOURNAL (Oct. 28, 2022, 5:06 PM), https://www.wsj.com/livecoverage/stock-market-news-today-10-28-2022/card/from-ipo-to-musk-buyout-the-timeline-of-a-twitter-shareholder-lchBDEjrKhIQHHefW40e.

United States District Court
Northern District of California

creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 556 (citations omitted).  Here, the KSA's initial investments in X, in 2011, occurred when X was privately held, so the investments could have gone directly to X's revenue.  However, these investments occurred *long before* Mr. Abouammo and Alzabarah began accessing confidential X data from 2014-15.  FAC, ¶¶ 57, 83.  It is not plausible that the KSA would have paid X long before the conspiracy commenced.  This allegation contrasts with the traditional kind of quid-pro-quo as when after Mr. Abouammo started sending confidential user information to the KSA, and Mr. Al-Asaker sent Mr. Abouammo a wire transfer for $100,000.  *Id*. ¶ 61.

With regard to the KSA's X investments that occurred between 2011 and 2022 (the FAC only alleges when one subsequent investment was made—on October 7, 2015), X went public in 2013, so the KSA's investments would not have gone to X after 2013.  Instead, the KSA's payment would have gone to the shareholders whose stock the KSA bought.  X did not benefit financially from this purchase of publicly traded stock in the marketplace.  Thus, there was no quid-pro-quo.

    2.    Meeting with the Delegation of Entrepreneurs from Saudi Arabia

The complaint alleges that Mr. Abouammo arranged a meeting ("purportedly at the request of a representative of a U.S.-Saudi Arabian trade organization in Washington, D.C."), to arrange a tour of X's headquarter with a delegation of "entrepreneurs" from Saudi Arabia.  FAC, ¶ 54.  Mr. Al-Asaker and other employees of the Saudi royal family joined the delegation.  *Id*.  Plaintiffs allege that at that meeting, Mr. Al-Asaker discussed the goals of the Saudi Criminal Enterprise with X's representatives.  *Id*.  However, other than this conclusory allegation, there is no specific allegation supporting this presumption.  Rather, the complaint merely alleges that Mr. Al-Asaker and X representatives attended the same delegation.  That Mr. Al-Asaker and X discussed the goals of the Saudi Criminal Enterprise is purely "speculative," which is insufficient under *Twombly*, 550 U.S. at 555.

    3.    Emails in the X Server and Direct Messages on the X Platform

Plaintiffs allege that X would have had knowledge of Mr. Alzabarah and Abouammo's infiltration efforts based on emails that were sent to these individual's work email or were sent via

United States District Court
Northern District of California

direct messaging on X.  FAC, ¶ 57 ("[Mr.] Almutairi emailed [Mr.] Abouammo—using [Mr.] Abouammo's [X] account email—stating: 'I'm quite confident that by both of us cooperating and working together, we'll achieve the goals of [X] in the region.'"); *Id.* ¶ 59 ("[Mr.] Abouammo sent [Mr.] Al-Qahtani a message on [X] proclaiming, 'proactively and reactively we will delete evil, my brother[.]'"); *Id.* ¶ 61 ("[Mr.] Al-Asaker sent [Mr.] Abouammo a direct message—again, *using [X's] platform*—with a photograph of a wire transfer for $100,000.")  However, it is not alleged why X would have knowledge of these communications.  There is no plausible allegation that X monitors its employees' emails or direct messages.  Any assertion that management at X saw these emails and understood them to be part of a KSA conspiracy is speculative.

### 4.  Mr. Alzabarah's Personal Leave in Saudi Arabia

The FAC alleges:

> [X] permitted [Mr.] Alzabarah to continue his malign activities even when he was physically present in Saudi Arabia.  During the summer of 2015 (July 13 to August 11), [Mr.] Alzabarah requested permission from [X] to take personal leave and travel to Saudi Arabia.  [X] agreed.  Knowing or being deliberately ignorant to the fact that [Mr.] Alzabarah would continue his malign activities from Saudi Arabia, [X] furthered its contribution to the Saudi Criminal Enterprise's goals and took no action to disable or restrict his access to sensitive and confidential user data.

FAC, ¶ 69.  A mere visit to Saudi Arabia proves nothing, and nothing suggests that X knew that such a visit was in furtherance of a conspiracy.

### 5.  EDRs

The FAC alleges that between July and December 2015, X complied with 85% of KSA's requests for information, including Emergency Disclosure Requests (EDRs) which allow "law enforcement to obtain documentation with account information when there is an exigent emergency that involves a risk of death or serious physical injury to a person."  FAC, ¶¶ 92, 35.  This 85% rate was allegedly higher than before the conspiracy began and higher than X's rate for granting similar requests made by other countries, including Canada, the United Kingdom, Australia, and Spain.  *Id.*  The FAC alleges that Saudi Arabia's requests were approved quicker than countries in North America, Europe, and Australia, but there is no indication of how Saudi

United States District Court
Northern District of California

Arabia's requests were approved in comparison to other Middle Eastern countries, especially in the context of the Arab Spring.

The FAC provides one specific example of the KSA using the EDR process:

> On May 29, 2015, two [X] users tweeted about KSA, which [Mr.] Alzabarah found objectionable. Over the course of approximately three hours, [Mr.] Al-Asaker and Alzabarah exchanged three phone calls and [Mr.] Alzabarah accessed user data for the two [X] users. KSA submitted EDRs to [X] for the same two accounts, which [X] immediately approved.

FAC, ¶ 92. Here, it is not alleged whether these two X users accounts were confidential and whether any confidential information was provided to the KSA. Nor is there any allegation that any grant of these EDRs were out of the ordinary practice and policy of X. The content of the X users' tweets is not specified, so it is unclear whether it was reasonable for X to classify these tweets as emergencies. Aside from these two X users, the FAC alleges that, to target anonymous dissidents, the KSA initially sought user information through X's EDR process, FAC, ¶ 35, but there is no allegation that confidential information of dissidents was in fact provided to the KSA through this process. For plaintiffs' claims to go forward, there needs to be stronger allegations about (1) the relationship between the EDRs and the KSA's obtaining confidential information on dissidents and (2) that the grant of these EDRs were inconsistent with X's general policy and practice in order to draw an inference that X was conspiring with the KSA to uncover dissidents.

### 6. Mr. Alzabarah's Promotion

The FAC alleges that, on November 5, 2015, X promoted Mr. Alzabarah to its "technical team" and that Mr. Alzabarah sent a note to Mr. Al-Asaker conveying his "unimaginable happiness" for the promotion. FAC, ¶ 82. Plaintiffs allege in a conclusory manner that the note implied "that [Mr.] Al-Asaker had either arranged [the promotion] or been influential in it." *Id*. But on its face, it does not, and the proposed inference is a stretch. There is no allegation of a relationship between Mr. Al-Asaker's actions and Mr. Alzabarah's obtaining a promotion. It is speculative whether the promotion was based on anything other than merit. Further, there is no allegation that, as a result of the promotion, Mr. Alzabarah gained new access or clearance to X's systems. For the promotion to be relevant, it would need to be tied to Mr. Alzabarah's enhanced

19

access to the company and to X's knowledge of Mr. Alzabarah's nefarious activities.

       7.    <u>The FBI Bust</u>

The FAC alleges that on or about November 29, 2015, the FBI confronted X about the "Saudi espionage problem" on its platform allegedly conveying that someone inside X was conveying confidential personal data on Saudi dissidents to the KSA.  FAC, ¶ 83.  X "played dumb, disclaiming knowledge of who within the company could be at fault."  *Id.*  However, within 48 hours of the FBI contact, X reported that it had "discovered" the individuals responsible for the unauthorized access: Mr. Abouammo and Alzabarah.  *Id.* ¶ 84.  Subsequently, X placed Mr. Alzabarah on leave and confiscated his laptop.  *Id.* ¶ 84.  However, X allowed Mr. Alzabarah to keep his cellphone he used for X business "the very cellphone he had used, and continued to use, for malign activities."  *Id.*  Plaintiffs allege that X was only able to act so "swiftly because it either already knew about or was deliberately ignorant to [Mr.] Abouammo's and Alzabarah's unlawful activities."  *Id.* ¶ 85.  Mr. Alzabarah immediately fled to Saudi Arabia.  *Id.* ¶ 86.

This account does not indicate that it is plausible that X already knew of the conspiracy.  It is unclear what the FBI told X, so judging X's reaction to the news is speculative.  There is no indication that X delayed in talking to the FBI or failed to comply with the FBI investigation in any way.  Instead, X confiscated Mr. Alzabarah's laptop, risking allowing the authorities to search the laptop and obtain any evidence contained therein.  If X was engaged in the conspiracy, it is more likely that X would have allowed Mr. Alzabarah to take the laptop and make it unavailable to investigators, since the laptop likely would have evidence implicating X's involvement in the conspiracy.  Although the complaint alleges that X allowed Mr. Alzabarah to keep his phone, Plaintiffs fail to allege that the phone contained confidential X information.  In short, if X was hiding its participation in a conspiracy with the KSA, it would have done things differently.  It would have delayed talking to the FBI, tipped off Mr. Alzabarah before reporting him to the FBI, and/or refrained from taking his laptop.  It did none of these things.

Finally, the fact that X identified Mr. Alzabarah within 48-hours' notice from the FBI is not probative; a 48-hour time span is not a suspicious amount of time to find an internal informant absent any information about what tools were available to X in order to ferret out the wrongdoing

and identify the wrongdoers.  Nothing demonstrates that 48-hours was extraordinarily quick in ascertaining the identification of the culprits.

        8.      <u>X Providing Notice to Hacked Accounts</u>

      On December 11, 2015, after the FBI informed X about the "Saudi espionage problem," X emailed a small group of accounts advising them their accounts had been hacked and notifying them:

> … [W]e are alerting you that your [X] account is one of a small group of accounts that may have been targeted by state-sponsored actors.  We believe that these actors (possibly associated with a government) may have been trying to obtain information such as email addresses, IP addresses, and/or phone numbers.
>
> At this time, we have no evidence they obtained your account information, but we're actively investigating this matter.  We wish we had more we could share, but we don't have any additional information we can provide at this time.
> …

Docket No. 29, Ex. 1, 1-2.  Mr. Al-Sadhan claims he did not receive or see the notification.  FAC, ¶ 95.  The notification did not mention the KSA.  *Id*. ¶ 96.  Plaintiff alleges:

> The Alleged Notification did not inform its recipients that their accounts had been hacked by agents of [] KSA or that their personal information had been sent to [] KSA.  In fact, the Alleged Notification did not even mention [] KSA, as [X] was fully in league with the Saudi Criminal Enterprise's goals and did not want to expose it.
>
> The Alleged Notification lacked crucial information despite the fact that, at the time, [X] knew of [Mr.] Abouammo's and Alzabarah's malign activities.

*Id*. ¶ 96.  Even if the notice was less than fulsome, it does not logically support the existence of a conspiracy with the KSA.  By then, X knew that the FBI was aware of the nature of the infiltration.  The notice to users, complete or not, served no function in hiding the alleged conspiracy.

        9.      <u>Former-CEO Jack Dorsey Meeting with MBS</u>

      Six months after the FBI bust, in June 2016, X's then-CEO Jack Dorsey had a meeting with non-party MBS and allegedly discussed how the two could cooperate to "train and qualify

1   Saudi cadres." FAC, ¶ 98.  Plaintiffs allege "this meeting and statement indicate a clear

2   conspiratorial allegiance between [X] and [] KSA."  *Id.* ¶ 102.

3         If X and the KSA were conspiring together, they would not have had a meeting that was

4   photographed and posted online six months after the FBI found that there was a Saudi espionage

5   problem at X.[9]  Instead, X would be trying to distance itself from Saudi officials as much as

6   possible.  At the motion to dismiss hearing, plaintiffs stated that these pictures were posted

7   without Jack Dorsey's consent, but that is not alleged in the complaint.  Even if it were alleged in

8   the complaint, Mr. Al-Asaker would not have brazenly posted about the meeting on X if there was

9   a secret conspiracy afoot.

10        The statement noted from the meeting, that the two would cooperate to "train and qualify

11  Saudi cadres," FAC, ¶ 98, has many plausible inferences.  There is nothing obviously sinister

12  about the communication.  Cadre may be used to describe "a small group of trained people who

13  form the basic unit of a . . . business organization," *Cadre*, CAMBRIDGE DICTIONARY,

14  www.dictionary.cambridge.org (last visited Jan. 28, 2024), such as a cadre of engineers.

15        10.   Mr. Abouammo's Trial

16        The Court takes judicial notice of the trial transcript from Mr. Abouammo's trial.  Trial

17  Transcript, *United States v. Abouammo*, 2022 WL 17584238 (N.D. Cal. 2022), 19-cr-00621-EMC.

18  X's involvement was never implicated in Mr. Abouammo's trial.  If X had been a co-conspirator,

19  it seems likely that this fact would have been surfaced or at least suggested at the trial.  It was not.

20        In sum, it is not plausibly alleged that X engaged in the conspiracy with the KSA.[10]

21

22  [9] "[D]etermining whether a complaint states a plausible claim is context specific, requiring the reviewing court to
    draw on its experience and common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009).

23  [10] Because plaintiffs fail to allege that X acted with the requisite *mens rea* to conspire or to aid or abet, they have also
    failed to allege that X engaged in a conspiracy to perpetuate torture under the ATS.  *Cisco Sys.*, 73 F.4th at 734 ("The

24  knowledge *mens rea* standard is satisfied when a defendant acts with knowledge that the defendant's actions will
    assist in the commission of a crime or with awareness of a 'substantial likelihood that [the defendant's] acts would

25  assist the commission of a crime.'").  Additionally, X argued in its motion to dismiss that conspiracy to perpetuate
    torture is not cognizable under the ATS.  However, that is incorrect as the Ninth Circuit has specifically held that the
    ATS applies when a United States company aids and abets a foreign national "for international human rights

26  violations including torture …" *Cisco Sys.*, 73 F.4th at 715.  X also alleges that the FAC improperly applies the ATS
    extraterritorially.  *Cisco Sys.*, 73 F. 4th at 736 (citing *Nestle II*, 141 S. Ct. at 1936 (majority op.) (quoting *RJR*

27  *Nabisco*, 579 U.S. at 337)) ("The ATS does not apply extraterritorially … plaintiffs … must establish that 'the
    conduct relevant to the statute's focus occurred in the United States.'").  Here, the alleged conspiracy to transmit user

28  data to a foreign actor occurred in the United States, so the ATS is applicable to the alleged conspiracy to transmit
    user data to the KSA.

D.      RICO Statute of Limitations

Mr. Al-Sadhan's first and second causes of action allege RICO claims specifying violations of 18 U.S.C. §§ 1962(c) and (d), which each arise under 18 USC § 1964(c).  The statute of limitations for a civil RICO claim is four years.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  Here, the initial complaint was filed on May 16, 2023.  Docket No. 1.  If the claim accrued four years before the filing, it is barred by the limitations period.

"[T]he civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action."  *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996).).  The Supreme Court has stated:

> [I]n applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.  In the circumstance of medical malpractice, where the cry for a discovery rule is loudest, we have been emphatic that the justification for a discovery rule does not extend beyond the injury:
>
> "We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment.  That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.  The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury.  He is no longer at the mercy of the latter.  There are others who can tell him if he has been wronged, and he need only ask."  *United States v. Kubrick,* 444 U.S. 111, 122 (1979).
>
> A person suffering from inadequate treatment is thus responsible for determining within the limitations period then running whether the inadequacy was malpractice.
> …
> And it is true as well that a pattern of predicate acts may well be complex, concealed, or fraudulent.  But identifying professional negligence may also be a matter of real complexity, and its discovery is not required before the statute starts running.  *Kubrick, supra,* at 122, 124.  Although we said that the potential malpractice plaintiff "need only ask" if he has been wronged by a doctor, considerable enquiry and investigation may be necessary before he can make a responsible judgment about the actionability of the unsuccessful treatment he received.  The fact, then, that a

1

considerable effort may be required before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable does not place him in a significantly different position from the malpractice victim.  A RICO plaintiff's ability to investigate the cause of his injuries is no more impaired by his ignorance of the underlying RICO pattern than a malpractice plaintiff is thwarted by ignorance of the details of treatment decisions or of prevailing standards of medical practice.

2

3

4

…

5

Whatever disputes may arise about pinpointing the moment a plaintiff should have discovered an injury to himself would be dwarfed by the controversy inherent in divining when a plaintiff should have discovered a racketeering pattern that might well be complex, concealed or fraudulent, and involve harm to parties wholly unrelated to an injured plaintiff.

6

7

8   *Rotella v. Wood*, 528 U.S. 549, 555-57 (2000).  The Ninth Circuit has echoed this, stating that the

9   plaintiff "need not discover the injury is part of a 'pattern of racketeering' for the period to begin

10   to run."  *Grimmett*, 75 F.3d at 510 (quoting *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th

11   Cir. 1992)).  This is because "RICO focuses on the predicate acts[,]" not on the RICO violation.

12   *Id.* at 511.

13       "Generally, a cause of action accrues, and the statute begins to run when a defendant

14   commits an act that injures a plaintiff's business."  *Rotella*, 528 at 554 (citing *Zenith Radio Corp.*

15   *v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971)).  The injury is that which flows from the

16   violation of section 1962.  *Diaz v. Gates*, 420 F.3d 897, 901 (9th Cir. 2005) (quoting 18 U.S.C.

17   § 1964(c)) ("The only requirement for RICO standing is that one be a 'person injured in his

18   business or property by reason of a violation of section 1962.'").  "If the defendant engages in a

19   pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering

20   activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)."

21   *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985), *abrogated on other grounds*.  There is

22   no requirement that "the business or property interest have been the 'direct target' of the predicate

23   act."  *Diaz*, 420 F.3d at 901 (citations omitted).

24       A civil RICO injury "requires proof of concrete financial loss, and not mere 'injury to a

25   valuable intangible property interest.'"  *In re Chrysler-Dodge-Jeep*, 295 F. Supp. 3d at 961

26   (quoting *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992)).  In *Diaz*, an en

27   banc panel held that "false imprisonment that caused the victim to lose employment and

28   employment opportunities is an injury to 'business or property' within the meaning of RICO."

24

420 F.3d at 898.  Where there is an injury to "business or property" under RICO, it is not relevant whether the plaintiff "lost actual employment" or "that he was rendered unable to pursue gainful employment."  *Id*. at 900.

Plaintiffs allege that Mr. Al-Sadhan's RICO injury commenced on April 5, 2021, when he was sentenced to 20 years' imprisonment followed by a 20-year travel ban.  FAC, ¶ 171.  Plaintiffs state "it was on that date that [Mr. Al-Sadhan] discovered his injury: that he would be unable to pursue business opportunities in the United States or obtain post-graduate employment in the United States for nearly the rest of his lifetime."  *Id*.  However, the onset of the injury, not discovery of other elements of a RICO claim, starts the clock.  *Rotella*, 528 U.S. at 555–57.

Here, both of Plaintiff's RICO causes of action include as a predicate act the conspiracy to kidnap and torture Mr. Al-Sadhan.  FAC, ¶¶ 183(c), 190(c).  On March 12, 2018, Mr. Al-Sadhan was kidnapped from his office at the Red Crescent Society on March 12, 2018, and was subsequently imprisoned and tortured.  FAC, ¶ 110.  After a month, a government clerk responded to a request from a member of Mr. Al-Sadhan's family who was asking for information on Mr. Al-Sadhan's whereabouts.  *Id*. ¶ 115.  The clerk said that "he was in the system," that nobody could communicate with him, and that they could request a phone call or a visit, but a visit would not be permitted, and even if it were, it could be "after years, not months."  *Id*.

Mr. Al-Sadhan's injury began when he was kidnapped and detained for a significant period by the KSA, not when he learned of his sentence after trial.  *Diaz* makes clear that "false imprisonment that caused the victim to lose employment and employment opportunities is an injury to 'business or property' within the meaning of RICO."  420 F.3d at 898.  An injury under RICO occurs whenever one is injured by a predicate act.  *Diaz*, 420 F.3d at 901 (quoting 18 U.S.C. § 1964(c)) ("The only requirement for RICO standing is that one be a 'person injured in his business or property by reason of a violation of section 1962.'").  Contrary to Plaintiffs' assertion, there is no requirement that the full extent of Plaintiff's injury needs to be established and cognizable for the statute of limitations to run.  *Grimmett*, 75 F.3d at 510-11 (Plaintiff "need not discovery the injury is part of a 'pattern of racketeering' for the period to begin to run" because "RICO focuses on the predicate acts.").  Here, Mr. Al-Sadhan's RICO injury first occurred when

he was kidnapped because that is the first injury to his business or property that occurred by virtue of Defendant's alleged predicate act—conspiracy to kidnap and torture Mr. Al-Sadhan and the resulting deprivation of his ability to continue to work.  Therefore, the statute of limitations began when Mr. Al-Sadhan was kidnapped on March 12, 2018 (or at most shortly thereafter when it became evident that he would not be immediately released from detention), so Plaintiff's RICO claims are barred by the statute of limitations.

## V.    CONCLUSION

In sum, Mr. Al-Sadhan has standing for the claims discussed herein, but Ms. Al-Sadhan does not and thus her claim is **DISMISSED**.  Mr. Al-Sadhan's ATS claim is **DISMISSED**, because he fails to state a plausible claim for relief.  The RICO claim is **DISMISSED**, because it is barred by the statute of limitations.  Therefore, X's motion to dismiss the FAC is **GRANTED**.

**IT IS SO ORDERED**.

Dated: February 9, 2024

_____
EDWARD M. CHEN
United States District Judge